**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| STEEL DYNAMICS, INC. AND | ) |
| SSAB ENTERPRISES LLC, | ) |
| | ) |
| *Plaintiff-Intervenors*, | ) |
| | ) |
| v. | ) Court No.  21-00528 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) |
| | ) |
| BLUESCOPE STEEL LTD., AND | ) |
| BLUESCOPE STEEL AMERICAS INC., | ) |
| | ) |
| *Defendant-Intervenors*. | ) |

## ORDER

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record filed by

United States Steel Corporation ("U. S. Steel"), Plaintiff in this action, and Plaintiff-Intervenors,

SSAB Enterprises LLC and Steel Dynamics, Inc. (collectively, "Plaintiffs"), and all other papers

and proceedings herein, it is hereby

**Ordered**, that Plaintiffs' motion is GRANTED; and it is further

**Ordered**, that the U.S. Department of Commerce's *Final Results* of the third

administrative review of the antidumping duty order applicable to certain hot-rolled steel flat

products from Australia, 86 Fed. Reg. 47,054 (Dep't of Commerce Aug. 23, 2021), are not in

accordance with law and not supported by substantial evidence; and it is further

**Ordered**, that this action is remanded to Commerce for the agency to reconsider, in accordance with this Court's opinion.

**So Ordered**.

Dated: _____          _____
          New York, New York                                         Richard K. Eaton, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| STEEL DYNAMICS, INC. AND | ) |
| SSAB ENTERPRISES LLC, | ) |
| | ) |
| *Plaintiff-Intervenors*, | ) |
| | ) |
| v. | )     Court No.  21-00528 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) |
| | ) |
| BLUESCOPE STEEL LTD., AND | ) |
| BLUESCOPE STEEL AMERICAS INC., | ) |
| | ) |
| *Defendant-Intervenors*. | ) |
| | ) |

**<u>PLAINTIFF'S AND PLAINTIFF-INTERVENORS' MOTION FOR</u>**
**<u>JUDGEMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

United States Steel Corporation ("U. S. Steel"), Plaintiff in this action, and Plaintiff-Intervenors,

SSAB Enterprises LLC and Steel Dynamics, Inc. (collectively, "Plaintiffs") respectfully move

for judgment on the agency record with respect to the *Final Results* of the third administrative

review of the antidumping duty order on *Certain Hot-Rolled Steel Flat Products from Australia*.

The *Final Results* were published in the *Federal Register* on August 23, 2021.  *Certain Hot-*
*Rolled Steel Flat Products from Australia: Final Results of Antidumping Duty Administrative*
*Review and Final Rescission of Review, in Part; 2018-2019*, 86 Fed. Reg. 47,054 (Dep't of

Commerce Aug. 23, 2021).

Plaintiffs respectfully move, for the reasons explained in the brief accompanying this motion, that this Court find that the U.S. Department of Commerce's ("Commerce") *Final Results* are not in accordance with law nor supported by substantial evidence.  Plaintiffs further move that the Court remand these results to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

/s/ Roger B. Schagrin                                   /s/ Sarah E. Shulman

Roger B. Schagrin                                       Thomas M. Beline
Jeffrey D. Gerrish                                      Yohai Baisburd
Kelsey M. Rule                                          Sarah E. Shulman

SCHAGRIN ASSOCIATES                                     CASSIDY LEVY KENT (USA) LLP
900 Seventh Street, N.W.                                900 19th Street, N.W.
Suite 500                                               Suite 400
Washington, DC 20001                                    Washington, D.C. 20006
(202) 223-1700                                           (202) 567-2300

*Counsel to Steel Dynamics, Inc. and*                   *Counsel to United States Steel Corporation*
*SSAB Enterprises LLC*

Date:   March 1, 2022

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, )<br><br>*Plaintiff,* )<br><br>SSAB ENTERPRISES LLC, AND )<br>STEEL DYNAMICS, INC., )<br><br>*Plaintiff-Intervenors,* )<br><br>v. )<br><br>UNITED STATES, )<br><br>*Defendant,* )<br><br>BLUESCOPE STEEL LTD., AND )<br>BLUESCOPE STEEL AMERICAS INC., )<br><br>*Defendant-Intervenors.* )<br> ) | Court. No. 21-00528<br><br>**PUBLIC VERSION**<br>Business Proprietary Information<br>Removed from Brackets on Pages<br>ii, 5-8, 24-28, 34-37. |

**MEMORANDUM OF POINTS OF LAW AND FACT IN SUPPORT OF THE**
**RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**
**FILED BY PLAINTIFF AND PLAINTIFF-INTERVENORS**

Roger B. Schagrin
Jeffrey D. Gerrish
Kelsey M. Rule

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc. and*
*SSAB Enterprises LLC*

Thomas M. Beline
Yohai Baisburd
Sarah E. Shulman

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
 (202) 567-2300

*Counsel to United States Steel Corporation*

Date:   March 1, 2022

PUBLIC VERSION

## Table of Contents

**Page**

I.   Statement Pursuant to Rule 56.2 ................................................................................. 2

    A.   Administrative Determination Under Review .................................................... 2

    B.   Issues Presented for Review ............................................................................... 3

        1.   Reimbursement of Duties:  Issue of Law and Issue of Fact ........................ 3

        2.   Commerce's Margin Calculation Is Flawed:  Issue of Law and Issue of Fact ............................................................................................................... 3

II.   Statement of the Facts .................................................................................................. 4

    A.   Factual Record Pertinent to BlueScope's Reimbursement of Duties ............... 4

    B.   Factual Record Pertinent to BlueScope's Further Manufacturing Activities ... 9

III.   Summary of the Argument ........................................................................................... 9

    A.   Commerce's Failure to Counteract Reimbursement Is Contrary to Law and Unsupported by Substantial Evidence ............................................................. 10

    B.   Commerce's Dumping Calculation Is Erroneous Because U.S. Price Includes Profit Attributable to Processing Activities and Not the Subject Merchandise ............ 11

IV.   Argument .................................................................................................................... 12

    A.   Standard of Review ......................................................................................... 12

    B.   Commerce Acted Contrary to Law by Declining to Find Reimbursement and Otherwise Failed to Support its Conclusion with Substantial Evidence ........ 14

        1.   Commerce's Regulations Require it to Address Reimbursement and Commerce is Bound by its Express Intent at the Time of the Regulation's Promulgation to Counteract Indirect Reimbursement ........................ 14

            i.   Commerce must interpret its regulation consistent with its express intent at promulgation despite subsequent amendments ................................. 15

            ii.   Commerce has consistently interpreted its regulation to adjust for indirect reimbursement ...................................................................... 16

            iii.   Commerce did not provide a reasonable basis to depart from its established regulatory interpretation in this case and thus its

determination could not overcome any amount of deference.............................. 18

iv. Reimbursement will not be addressed in any other part of Commerce's
    margin calculation ................................................................................... 20

2. Commerce's Evidentiary Findings Lack Merit and Support; There Is
   No Path of Reasonable Discernibility...................................................................... 22

   i. BSA's payment of duties in the form of cash deposits is irrelevant.................... 23

   ii. Commerce's margin calculation does not use a transfer price ........................... 23

   iii. BlueScope did not follow its pricing mechanism and did not properly
        account for duties................................................................................... 24

        a) BlueScope's pricing mechanism sets the steel price based on two
           [        ] indices and [                                    ]................ 24

        b) Customs procedures account for duty-inclusive prices by allowing the
           U.S. importer to remove the duty embedded in the price as a non-
           dutiable charge on the entry summary thereby avoiding paying a duty
           on a duty................................................................................... 25

        c) Under Commerce's rationale, the higher the dumping duties, the less
           BSA pays for the actual steel in contravention of the supply agreement ....... 26

        d) The economic impact of the antidumping duties was shifted from the
           importer to BlueScope's Australian Producer, which is reimbursement........ 28

C. In Declining to Apportion Profit to Further Manufacturing Commerce Acted
   Inconsistent with the Intent of the Antidumping Statute and its Established
   Practice Resulting in Distortions in the Margin Calculation.......................................... 28

   1. Commerce Failed to Follow the Law and Apportion Profit to the
      Subject Merchandise on One Hand and Further Manufacturing
      Activities on the Other .................................................................................. 29

      i. For over 20 years Commerce has been directed to avoid commingling
         profit attributable to further manufacturing activities with profit
         attributable to the subject merchandise.................................................. 29

      ii. Commerce's explanations in the Final Results cannot overcome the
          SAA's requirements................................................................................... 32

          a) CEP profit accounts for total actual profit for all sales in both the home
             and U.S. market; it does not ensure the appropriate amount of further
             manufacturing profit is deducted from CEP .................................... 33

PUBLIC VERSION

b)  Further manufacturing profit is an expense attributable exclusively to
            activity in the U.S. market ............................................................. 35

    2.  Commerce Erroneously Included Profit Attributable to Non-Subject
        Merchandise in the U.S. Price for Subject Merchandise ........................................ 37

V.  Conclusion ................................................................................................. 38

PUBLIC VERSION

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1401a(b)(3)(B) .................................................................................25

19 U.S.C. § 1516a(b)(l)(B)(i) .............................................................................12

19 U.S.C. § 1677a ..........................................................................................15, 20

19 U.S.C. § 1677a(b) ...........................................................................................29

19 U.S.C. § 1677a(d) .....................................................................................11, 30

19 U.S.C. § 1677a(d)(2) .......................................................................................30

19 U.S.C. § 1677a(d)(3) ................................................................................ *passim*

19 U.S.C. § 1677a(f) .....................................................................................11, 33

19 U.S.C. § 3511 ..................................................................................................32

19 U.S.C. § 3512(d) .............................................................................................31

Regulations

19 C.F.R. § 351.401(a) .........................................................................................29

19 C.F.R. § 351.402(a) .........................................................................................22

19 C.F.R. § 351.402(f) .................................................................................. *passim*

Court Decisions

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) ..............................................28

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ...................................................... 37-38

*Apex Exps. v. United States*, 777 F.3d 1373 (Fed. Cir. 2015) .....................................................21

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................ 12-13, 15

*Bonney Forge Corp. v. United States*, Ct. No. 20-3837, Slip Op. 22-8 (Ct. Int'l
Trade 2022) .......................................................................................................37

*Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410 (1945) .........................................................12

*Br. Steel PLC v. United States*, 127 F.3d 1471 (Fed. Cir. 1997) .................................................18

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011)................................................................13

*Chevron, USA., Inc. v. Natural Res. Def Council, Inc.*, 467 U.S. 837 (1984) ..............................12

*Christopher v. SmithKline Beecham*, 567 U.S. 142 (2012) ...........................................................13

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ......................................................................13

*Gardebring v. Jenkins*, 485 U.S. 415 (1988) .........................................................................13, 15

*Gose v. United States Postal Serv*., 451 F.3d 831 (Fed. Cir. 2006)..............................................15

*Glycine & More, Inc. v. United States*, 107 F. Supp. 3d 1356 (Ct. Int'l Trade
2015) ................................................................................................................................. 15-16, 32

*Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331 (Ct. Int'l
Trade 2018)....................................................................................................................................22

*Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001)...........................................31

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins.
Co.*, 463 U.S. 29 (1983) ....................................................................................................13, 19, 22

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)....................................28

*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371 (Fed. Cir.
2007) ..............................................................................................................................................13

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)..........................................13

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) .....................................18-19, 22

*Ranchers-Cattlemen Action Legal Foundation v. United States*, 74 F. Supp. 2d
1353 (Ct. Int'l Trade 1999)............................................................................................................19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............................................12

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ...................................18

*Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261 (Ct.
Int'l Trade 2006) ................................................................................................................ 10, 18-19

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994).......................................................13, 15

*Torrington Co. v. United States*, 881 F. Supp. 622 (Ct. Int'l Trade 1995) ........................ 10, 19-20

PUBLIC VERSION

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ......................................................12

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951). ...........................................13

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) ...........................................................................................................................22

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ...........................................................................................................................28

Administrative Determinations

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 54,043 (Oct. 17, 1997) ............................................... 16-17

*Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews*, 71 Fed. Reg. 40,064 (July 14, 2006) ......................................................29

*Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping Duty Administrative Review and Final Rescission of Review, in Part; 2018-2019*, 86 Fed. Reg. 47,054 (Aug. 23, 2021) ..................................... *passim*

*Circular Welded Non-Alloy Steel Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 33,041 (June 17, 1998) ...................................................................................21

*CTVs from Korea; Final Results of Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 4,408 (Feb. 6, 1996) ...............................................21

*Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea; Final Results of Antidumping Duty Administrative Review*, 61 Fed. Reg. 20,216 (May 6, 1996) ........................................................31

*Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea; Preliminary Results of Antidumping Duty Administrative Review*, 60 Fed. Reg. 47,149 (Sept. 11, 1995) ....................................... 31-32

*Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 70 Fed. Reg. 38,873 (July 6, 2005) ..................................................................17

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 3,014 (Jan. 17, 2020) ...................................................................4

*Notice of Final Determination of Sales at Less Than Fair Value: Bottle-Grade Polyethylene Terephthalate (PET) Resin from Indonesia*, 70 Fed. Reg. 13,456 (March 21, 2005) ................................................................ 20-21

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rod from Spain*, 63 Fed. Reg. 40,391 (July 29, 1998) ................................................................................................................22

*Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 50,166 (Aug. 13, 2004) .........................................................................33

*Porcelain-on-Steel Cookware from Mexico: Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 30,068 (May 10, 2000) ................................................................................................................17

Other Administrative Materials

*Antidumping Duties,* 45 Fed. Reg. 8,182 (Feb. 6, 1980) ............................................15

Headquarters Ruling Letter (HQ) H301048, "Request for Internal Advice Regarding Deductions from Entered Value of Softwood Lumber; Countervailing Duties; Anti-Dumping Duties," dated May 26, 2021 ...........................................6, 25

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ......................................... *passim*

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| SSAB ENTERPRISES LLC, AND | ) |
| STEEL DYNAMICS, INC., | ) |
| | ) |
| *Plaintiff-Intervenors,* | ) |
| | ) Court. No. 21-00528 |
| v. | ) |
| | ) **PUBLIC VERSION** |
| UNITED STATES, | ) Business Proprietary Information |
| | ) Removed from Brackets on Pages |
| *Defendant,* | ) ii, 5-8, 24-28, 34-37. |
| | ) |
| BLUESCOPE STEEL LTD., AND | ) |
| BLUESCOPE STEEL AMERICAS INC., | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

## MEMORANDUM OF POINTS OF LAW AND FACT IN SUPPORT OF THE RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD FILED BY PLAINTIFF AND PLAINTIFF-INTERVENORS

U.S. law requires the U.S. Department of Commerce ("Commerce") to prohibit a foreign producer from reimbursing its related importer for antidumping duties owed on the importation of merchandise subject to an antidumping duty order.  Commerce confirmed its continued practice of adjusting for reimbursement when an exporter lowers the price invoiced to the importer by antidumping duties.  And Commerce found the record establishes that BlueScope lowered the price invoiced to the importer by antidumping duties.  Plaintiff, United States Steel Corporation ("U. S. Steel") and Plaintiff-Intervenors, SSAB Enterprises LLC and Steel Dynamics, Inc. (collectively, "Plaintiffs") contend that Commerce unlawfully ignored its regulations, agency interpretation of those regulations, and record evidence when it failed to find

reimbursement provided by BlueScope Steel Ltd., BlueScope Steel Americas, Inc., and Steelscape LLC (collectively, "BlueScope").

U.S. law requires Commerce to adjust the constructed export price ("CEP") by an amount for further manufacturing profit.  The amount for further manufacturing profit should be calculated by apportioning profit to the activities that occurred in the United States after import, as distinct from the profit attributable to the subject merchandise.  Commerce did neither. Plaintiffs contend that by both failing to calculate a further manufacturing profit amount apportioned to the value added in the United States after import and reducing CEP by that amount, Commerce calculated a dumping margin based on an inflated U.S. price inconsistent with the dumping statute.

Plaintiffs respectfully submit this memorandum of points of law and fact in support of the motion for judgment on the agency record filed by Plaintiffs pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("CIT").  As Commerce's *Final Results* are not in accordance with law and unsupported by substantial evidence, Plaintiffs request that this Court remand this matter to Commerce for Commerce to adjust the dumping calculation by (1) applying its reimbursement regulation consistent with its established practice, and (2) making a further manufacturing adjustment consistent with 19 U.S.C. § 1677a(d)(3), calculating further manufacturing profit by apportioning BlueScope's profit between the value added in the United States and subject merchandise.

# I.    STATEMENT PURSUANT TO RULE 56.2

## A.  Administrative Determination Under Review

U. S. Steel, SSAB Enterprises LLC, and Steel Dynamics, Inc. are domestic producers of hot-rolled steel ("HRS") and have brought this action to challenge the final results of

Commerce's third administrative review of the antidumping duty ("AD") order on HRS from Australia.  *See Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping Duty Administrative Review and Final Rescission of Review, in Part; 2018-2019*, 86 Fed. Reg. 47,054 (Dep't of Commerce Aug. 23, 2021) ("*Final Results*") (P.R. 124) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 116).[1]

### B. Issues Presented for Review

#### 1. Reimbursement of Duties:  Issue of Law and Issue of Fact

<u>Issue of Law:</u>  BlueScope lowered the invoice price to its importer for the antidumping duties paid upon importation.  Commerce's rules, guidance provided at promulgation, and consistent practice prohibit a foreign producer from reimbursing a U.S. importer for antidumping cash deposits in this manner.  Commerce did not account for BlueScope's reimbursement, reasoning that it is addressed elsewhere in the margin calculation.   When Commerce's margin calculation ignores transfer prices and Commerce failed to counteract BlueScope's reimbursement scheme, did Commerce act contrary to law?

<u>Issue of Fact:</u>  Record evidence demonstrates that BlueScope lowered its invoice price to its importer for an amount corresponding to antidumping duties.  Commerce has defined reimbursement as, among other things, the lowering of an invoice price when linked to antidumping duties.  When Commerce concluded that BlueScope did not reimburse its importer for antidumping duties, was that conclusion supported by substantial evidence?

#### 2. Commerce's Margin Calculation Is Flawed:  Issue of Law and Issue of Fact

<u>Issue of Law:</u>  The antidumping statute requires Commerce to adjust the starting price (the price charged to the first unrelated party) by specific amounts.  One such amount reduces the U.S. price by the further manufacturing expenses incurred after importation.  To avoid calculating a U.S. price with profit attributable to further manufacturing activities, the statute and Commerce practice apportion the profit or loss to subject merchandise separate from the non-subject value added in the United States.    Insofar as Commerce failed to calculate and apportion further manufacturing profit and remove the profit exclusively attributable to further manufacturing activities, did Commerce act in accordance with law?

<u>Issue of Fact:</u>  Commerce must reduce the starting price by an amount for further manufacturing profit.   A profit amount attributable to company-wide further

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

PUBLIC VERSION

manufacturing activities is also included in Commerce's constructed export profit calculation.  By not making a further manufacturing adjustment, instead relying exclusively on its calculation of constructed export profit, did Commerce support with substantial evidence its decision to include profit associated with further manufacturing activities in the net U.S. price used in the dumping calculation?

## II.   STATEMENT OF THE FACTS

On January 17, 2020, following separate requests from domestic interested parties and BlueScope, Commerce initiated the third administrative review of the AD order on HRS from Australia.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 3,014 (Dep't of Commerce Jan. 17, 2020) (P.R. 24-25).  On March 3, 2020, BlueScope filed its response to Commerce's initial Section A questionnaire on behalf of "BlueScope Steel Ltd., its wholly-owned U.S. importer BlueScope Steel Americas LLC, and its U.S. affiliate Steelscape LLC."  "BlueScope Steel's Section A Questionnaire Response," dated March 3, 2020 ("*BlueScope's Sec. A*") (P.R. 33, C.R. 3).

### A.  Factual Record Pertinent to BlueScope's Reimbursement of Duties

BlueScope identified a single channel of distribution in the United States.  *Id*. at 16. BlueScope's sales in the United States involve three related parties:

(1) **Australian Producer**:  BlueScope Steel (AIS) Pty Ltd ("AIS") is BlueScope's wholly owned Australian HRS producer.  *See id*. at 8, 12.  AIS manufactured and exported all the HRS BlueScope imported into the United States during the POR.  *Id*. at 2, 16.

(2) **U.S. Importer**:  BlueScope Steel Americas LLC ("BSA") is BlueScope's wholly owned trading company that served as importer of record for all the HRS BlueScope imported into the United States during the POR.  *Id*. at 2, 7, 16.

(3) **U.S. Further Processor**:  Steelscape LLC ("Steelscape") is a BlueScope affiliate that purchased the subject merchandise and further processed it into non-subject coated steel ("CORE") during the POR.  *Id*. at 2, 7, 8, 16.

"BlueScope sold all of its hot-rolled steel to the United States from AIS through its related-party sales entity, BSA.  BSA sold all of that steel to Steelscape in back-to-back transactions."  *Id*. at

4

16.

Included with its Section A response, BlueScope submitted sales trace documentation for a sample U.S. sale.  Steelscape submitted purchase order number [               ] to BSA for HRS.  *See BlueScope's Sec. A* at Exhibit A-8 (P.R. 34, C.R. 4).  [

                        ].  *Id*.  As BlueScope later clarified, ASP is not a legal or functioning entity but rather a segment designation for five Australian steel entities — including AIS.  "BlueScope Steel's Response to Section A of the Department's Second Supplemental Questionnaire," dated Dec. 17, 2020 at 5 ("*BlueScope's Second Supp. A*") (P.R. 73, C.R. 159).  [

                                              ].  *See BlueScope's Sec. A* at Exhibit A-2 (P.R. 34, C.R. 4).

Source: *BlueScope's Sec. A* at Exhibit A-8 (P.R. 34, C.R. 4).

BSA in turn submitted purchase order number [         ] to AIS.  *See BlueScope's Sec. A* at

Exhibit A-8 (P.R. 34, C.R. 4).  Upon receipt of the HRS order, AIS issued BSA commercial

invoice [         ].  *Id.*  Invoice [            ] prices HRS at $[            ].



Source:  *BlueScope's Sec. A* at Exhibit A-8 (P.R. 34, C.R. 4).

BlueScope declared [                    ] on its entry summary and identified

[

        ].  *Id.*  [

           ].[2]

---

[2] Customs procedures provides for importers to declare antidumping duties as non-dutiable charges on the entry summary when they are included in the invoice price of the merchandise. *See* Headquarters Ruling Letter (HQ) H301048, "Request for Internal Advice Regarding Deductions from Entered Value of Softwood Lumber; Countervailing Duties; Anti-Dumping Duties," dated May 26, 2021 ("With regard to . . . whether ADD/CVD are allowed to be deducted from the invoice value at the time of entry, the answer is yes, if they are part of the invoice amount and they are separately identified.").  Customs has directly spoken to the proper protocol for merchandise priced on a duty-inclusive basis — *i.e.*, "the importer of record is still

**PUBLIC VERSION**



Source: *BlueScope's Sec. A* at Exhibit A-8 (P.R. 34, C.R. 4).

This sale, along with all of BlueScope's U.S. sales under review, were governed by a supply agreement between AIS, BSA, and Steelscape. *Id*. at 20. BlueScope provided a copy of the supply agreement in its first supplemental Section A questionnaire response. "BlueScope Steel's Response to the Department's Supplemental Section A Questionnaire," dated July 10, 2020 at Exhibit SA-5 ("*BlueScope's Supp. A*") (P.R. 59-60, C.R. 146 & 152). Under the supply agreement, "{p}rices are set according to a formula [

].". *BlueScope's Sec. A* at 20 (P.R. 33, C.R. 3); *BlueScope's Supp. A* at Exhibit SA-5 (P.R. 60, C.R. 152). The supply agreement dictates that all sales of HRS will be [                                   ]. *BlueScope's Supp. A* at Exhibit SA-5 (P.R. 60, C.R. 152). As BlueScope confirmed, "the price of the merchandise is a [                    ]

---

required to . . . identify the non-dutiable charges within the invoice price, including duties in the case of a DDP transaction." *Id*.

amount." *BlueScope's Second Supp. A* at 2 (P.R. 73, C.R. 159).  The terms of the pricing

formula under the supply agreement were in effect during the POR.  *BlueScope's Supp. A* at 5

(P.R. 59, C.R. 146).

 To demonstrate how it calculated the invoice price, BlueScope submitted a transfer price

worksheet "detail{ing} the application of the transfer price formula" to the HRS included in

invoice [   ].  *BlueScope's Supp. A* at 5, Exhibit SA-6 (P.R. 59-60, C.R. 146 & 152).

BlueScope applied the transfer price formula to reach the [  ] price of $[  ], from

which it deducted $[  ] for "Estimated Duty" to reach the per MT invoice price of

$[  ].



Source:  BlueScope's Supp. A at Exhibit SA-6 (P.R. 60, C.R. 152).

BlueScope later clarified that the transfer price worksheet was meant to [   

 ], the reference to [   ] was a typographical error.  *BlueScope's Second Supp. A* at

2 (P.R. 73, C.R. 159).

PUBLIC VERSION

**B.  Factual Record Pertinent to BlueScope's Further Manufacturing Activities**

BlueScope reported that all of its "sales of hot-rolled coils during the POR were sold to its affiliate Steelscape to be further processed into coated steel for sale to Steelscape's customers."  *BlueScope's Sec. A* at 39 (P.R. 33, C.R. 3).  In its April 6, 2020 Section E questionnaire response, BlueScope failed to allocate profit between imported subject hot-rolled steel and additional materials associated with Steelscape's further manufacturing in the United States.  *See* "BlueScope Steel Ltd.'s Response to Section E of the Department's Antidumping Questionnaire," (April 6, 2020) ("*BlueScope's Sec. E*") (P.R. 50-51, C.R. 127-128).  This is evident from the fields in BlueScope's Section E database:  PRODQTY, RAWMAT, FURMAT, FURLAB, FORFOH, FURCOM, FURGNA, FURINT, TOTFMG, TOTFURGNA, TOTFURINT, TOTCOST.  *Id.* at Exhibit E-1.  BlueScope did not include a field for allocated further manufacturing profit.

*             *             *

Petitioners fully briefed the need for Commerce to make adjustments for reimbursement and further manufacturing profit.  *See* "Petitioners' Case Brief," dated March 25, 2021 ("*Petitioners' Case Br.*") (P.R. 105, C.R. 263).  Commerce rejected Petitioners' arguments in summary fashion — its conclusions detailed in the argument section below.  IDM at 7-12 (P.R. 116).  Without adjusting for the foreign producer's reimbursement of antidumping duties or for further manufacturing costs attributable to non-subject merchandise, Commerce calculated an antidumping duty rate of 9.94 percent.  *See Final Results*, 86 Fed. Reg. at 47,054.  This appeal commenced.

**III.    SUMMARY OF THE ARGUMENT**

The Court should remand Commerce's *Final Results* because they are not in accordance

PUBLIC VERSION

with law and otherwise not supported by substantial evidence.

### A. Commerce's Failure to Counteract Reimbursement is Contrary to Law and Unsupported by Substantial Evidence

Commerce's interpretation and application of its reimbursement regulation are not entitled to deference. Rather than recognize the intent expressed at promulgation or its long-standing interpretation of its reimbursement regulation, Commerce simply observed that its regulation "provides no explicit direction with respect to potential indirect reimbursement between affiliated parties." At promulgation, Commerce made its intent known: it will reduce U.S. price by any antidumping duties the "manufacturer, producer, seller, or exporter" reimbursed to the importer "either directly or indirectly." Despite subsequent amendments to the regulation, Commerce has never indicated an intent to change the intended purpose of the law. Since promulgation, Commerce has upheld its intent to correct for all reimbursement — including indirect reimbursement of the type evidenced by the record — through decades of practice. Indeed, in its *Final Results* Commerce confirmed that it considers an exporter lowering the amount invoiced to its importer for antidumping duties to be an example of reimbursement. The cases cited in the *Final Results* do not negate a finding of reimbursement on this record because (1) the link required by *Torrington* to evidence reimbursement in a lowered transfer price is evidenced on the record, and (2) the controlling precedent matches the factual record, consistent with *Shandong*. Further, Commerce mistakenly believed that a reimbursement adjustment was unnecessary as the lowered invoice price would be accounted for in its dumping calculation. However, because the transfer price is disregarded under Commerce's CEP calculation, lowering the invoice price for antidumping duties can only be addressed through a reimbursement adjustment.

Commerce's evidentiary findings lack merit and do not support Commerce's conclusion

that BlueScope was not reimbursing its importer for antidumping duties.  *First*, Commerce's
"crucial" finding that the importer paid cash deposits upon entry is an irrelevant red herring.
Cash deposits are always paid upon entry — regardless of reimbursement.  *Second*, Commerce's
finding that its dumping calculation will address the lowered transfer value is incorrect unless it
makes a reimbursement adjustment.  *Third*, Commerce's finding that BlueScope deducted an
amount for antidumping duties from the transfer price evidences reimbursement.  Rather than
adhere to Customs procedure that allows for the deduction of antidumping duties included in the
invoice price to reach the entered value, BlueScope did not invoice its importer the full price of
the HRS.  By lowering the price of the HRS for antidumping duties, BlueScope ensured the
burden of the antidumping duty was carried by the Australian producer instead of the importer.

### B.  Commerce's Dumping Calculation Is Erroneous Because U.S. Price Includes Profit Attributable to Processing Activities and Not the Subject Merchandise

Dumping margins are calculated exclusively on sales of subject merchandise.  When the
first sale to an unaffiliated party is of a further manufactured product, Commerce must make
certain deductions under 19 U.S.C. § 1677a(d) to back out expenses associated with economic
activity occurring in the United States.  One such adjustment is for the value added in the United
States by further manufacturing.  Not only must Commerce make an adjustment for further
manufacturing profit, it must ensure that it removes all profit that is attributable to the value
added in the United States only — as opposed to the profit reported on the sale of the
downstream merchandise (*i.e.*, CORE), which will necessarily include a profit element
attributable to the subject merchandise as well as the non-subject value added in the United
States.  Commerce is also directed to calculate a CEP profit amount — or the total actual profit
for all sales in both the home and U.S. markets.  *See* 19 U.S.C. § 1677a(f).  Commerce erred as a
matter of law by conflating its CEP profit calculation with its distinct statutory directive to adjust

PUBLIC VERSION

for further manufacturing profit.

Commerce in its *Final Results* declined to calculate an apportioned further manufacturing profit amount and adjust the U.S. starting price instead explaining that it followed its CEP profit calculation.  Insofar as Commerce's reasoning was entirely focused on its CEP profit calculation rather than Plaintiffs' argument concerning the appropriate calculation of further manufacturing expenses, Commerce did not meaningfully address the arguments of the parties, rendering its decision unsupported by substantial evidence.

## IV.   ARGUMENT

### A.  Standard of Review

The Court will hold Commerce's determinations unlawful in an AD proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(l)(B)(i).  Commerce acts contrary to law where, as here, it unreasonably declines to apply its regulations in a manner consistent with the interpretation established at the time of promulgation.  *See United States v. Mead Corp.*, 533 U.S. 218, 226-28 (2001).  An agency enjoys express deference to fill gaps left in the statute by regulation.  *See id*. at 227 (citing *Chevron, USA., Inc. v. Natural Res. Def Council, Inc*., 467 U.S. 837, 843-44 (1984)).  A reviewing Court will generally view an agency's interpretation of its own regulation as controlling unless plainly erroneous or inconsistent with the regulation.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989), in turn quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *Mead*, 533 U.S. at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances").  An agency's interpretation will not be considered controlling when "there is reason to suspect that the agency's interpretation 'does not reflect the

agency's fair and considered judgment on the matter in question.'"  *Christopher v. SmithKline Beecham*, 567 U.S. 142, 143-44 (2012) (quoting *Auer*, 519 U.S. at 462 and citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011)).  "This might occur when the agency's interpretation conflicts with a prior interpretation. . . ." *Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).  Similarly, an agency's interpretation of its regulations is not in accordance with law when it conflicts with the intent the agency expressed at the time of promulgation.  *Thomas Jefferson Univ.*, 512 U.S. at 512 ("{W}e must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'") (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Importantly, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable.  *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).  In examining an agency's decision to depart from its established practice, a reviewing Court examines whether the agency provided a reasoned basis for doing so.  "When an agency decides to change course…it must adequately explain the reason for a reversal of policy."  *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis") (internal quotation and citation omitted).

PUBLIC VERSION

**B.   Commerce Acted Contrary to Law by Declining to Find Reimbursement and Otherwise Failed to Support its Conclusion with Substantial Evidence**

Commerce stated:  a "parent . . . lower{ing} the amount invoiced to the importer . . . for antidumping duties to be assessed" is "an example of what {Commerce} considers to be reimbursement."  IDM at 8 (P.R. 116).  Commerce found:  "AIS lowered its transfer price to BSA by the amount of estimated antidumping duties."  *Id*. at 9; *id*. at 8 ("AIS's pricing methodology, in which AIS calculates BSA's transfer price by, among other things, deducting an amount for estimated antidumping duties from the price."); *id*. at 9 ("AIS calculates BSA's transfer price by, among other things, deducting an amount for estimated antidumping duties from the price.").  But Commerce concluded that "AIS did not reimburse BSA for AD deposits during the POR" and declined to apply its reimbursement regulation to adjust its margin calculation.  *Id*. at 10.  Where Commerce essentially concluded that 1 + 1 = 0, Commerce failed to act in accordance with law and its conclusion cannot be supported with substantial evidence.

**1.   Commerce's Regulations Require it to Address Reimbursement and Commerce is Bound by its Express Intent at the Time of the Regulation's Promulgation to Counteract Indirect Reimbursement**

Commerce declined to apply its regulation here by claiming it possesses discretion in the regulation's application.  Specifically, Commerce reasoned:  "the plain language of Commerce's regulation is ambiguous with respect to direct or indirect reimbursement between exporter/producer and U.S. importer, and provides no explicit direction with respect to potential indirect reimbursement between affiliated parties."  IDM at 9 (P.R. 116).  Although the regulation may be ambiguous concerning what constitutes reimbursement, Commerce's express intent at promulgation and consistent practice bind Commerce as to its application in this case.  Moreover, Commerce has not provided a reasonable explanation as to why it departed from its consistent interpretation of its regulation.

PUBLIC VERSION

i.   *Commerce must interpret its regulation consistent with its express intent at promulgation despite subsequent amendments*

Courts will defer to an agency's interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation.  *See e.g., Auer*, 519 U.S. at 461.  "Conversely, an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is 'entitled to considerably less deference.'"  *Gose v. United States Postal Serv.*, 451 F.3d 831, 837 (Fed. Cir. 2006) (emphasis in original) (citing *Thomas Jefferson Univ.*, 512 U.S. at 515).  "Just as an agency's inconsistent interpretation of its regulation detracts from the deference we owe to that interpretation, so does evidence that the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation."  *Id*. at 838 (citing *Gardebring*, 485 U.S. at 430).

Commerce's interpretation of its regulations is informed by "indications of the Secretary's intent at the time of the regulation's promulgation."  *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Gardebring*, 485 U.S. at 430).  In its inaugural rulemaking, Commerce utilized its authority under 19 U.S.C. § 1677a to establish a deduction from U.S. price of any antidumping duties the "manufacturer, producer, seller, or exporter" reimbursed to the importer "**either directly or indirectly**."  *Antidumping Duties*, 45 Fed. Reg. 8,182, 8,206 (Feb. 6, 1980) ("*Original Rules*") (emphasis supplied).  Clearly Commerce expressed its intent to address indirect reimbursement at the time of promulgation.

In *Glycine & More*, the court found that while the plain language of Commerce's regulation afforded discretion, Commerce's interpretation of its regulation could not "be reconciled with the purpose for which the regulation was promulgated, and indeed defeats that purpose for which the regulation was promulgated" and was thus not in accordance with law.

PUBLIC VERSION

*Glycine & More, Inc. v. United States*, 107 F. Supp. 3d 1356, 1367 (Ct. Int'l Trade 2015).

Without a clear indication that amendments to the provision were meant to change the intended

purpose of the provision, the court reasoned that Commerce must apply its regulation "consistent

with the purpose of the regulation, as stated by Commerce upon promulgation." *Id*. at 1367,

1370. *Glycine & More* is not controlling precedent, but it does inform the Court's disposition of

the issue here.

In its IDM, Commerce concedes that no subsequent rulemaking establishes an intent to

change the purpose of the reimbursement regulation as originally promulgated. IDM at 8

("Commerce's *Preamble* additionally does not address whether or not Commerce's regulation

applies to indirect reimbursement.") (P.R. 116). As such, Commerce should have interpreted its

regulation consistent with the originally-stated purpose of the regulation. *See Glycine & More*,

107 F. Supp. 3d at 1367 (Commerce "gave no indication in the 1997 promulgation that the

intended purpose of the provision, as Commerce had explained it at the time of the 1989

promulgation, had changed."). Commerce's refusal to apply its reimbursement regulation in the

manner intended at the time of promulgation is not entitled to deference.

    ii.   *Commerce has consistently interpreted its regulation to adjust for indirect reimbursement*

Commerce has consistently interpreted its reimbursement regulation consistent with its

intent at promulgation. Shortly after recodifying its reimbursement regulation under 19 C.F.R. §

351.402(f), Commerce explained that "the reimbursement regulation is applicable in related-

party situations" if "the parent has reimbursed (*e.g.*, the exporter directly paid the duties for the

importer or **the exporter lowered the amount invoiced to the importer**) its subsidiary for

antidumping duties to be assessed." *Antifriction Bearings (Other Than Tapered Roller Bearings)
and Parts Thereof from France, Germany, Italy, Japan, Romania, Singapore, Sweden and the*

*United Kingdom; Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg.

54,043 (Oct. 17, 1997) ("*AFBs*"), IDM at Section 13, Comment 1 (emphasis supplied).

Commerce reinforced the continued applicability of its prior interpretation in its *Final Results*,

explicitly confirming that an "exporter lower{ing} the amount invoiced to the importer . . . for

antidumping duties to be assessed" is an "**an example of what it considers to be**

**reimbursement**."  IDM at 8 (emphasis supplied) (P.R. 116).

Beyond the specific example of indirect reimbursement provided in *AFBs*, Commerce

continued to indicate its intent to adjust its margin calculation for reimbursement, either direct or

indirect, after amending the language of its reimbursement regulation.  In *Porcelain-on-Steel*

*Cookware from Mexico*, Commerce announced that "the language of the certification

requirement does not exclude indirect reimbursements of the importer by the exporter or

producer."  *Porcelain-on-Steel Cookware from Mexico: Final Results of Antidumping Duty*

*Administrative Review*, 65 Fed. Reg. 30,068 (May 10, 2000), IDM at Comment 1.  In *Honey*

*from the People's Republic of China*, Commerce continued to allude to its intent to apply the

reimbursement regulation to indirect reimbursement as described in *AFBs*.  There Commerce

recognized the calculation of a transfer price net of dumping duties as "troubling."  *Honey from*

*the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping*

*Duty Administrative Review*, 70 Fed. Reg. 38,873 (July 6, 2005), IDM at Comment 10.

Commerce ultimately eliminated the risk of reimbursement by "revising its cash deposit

collection methodologies to avoid an artificial lowering of the transfer prices."  *Id*.

In the IDM, Commerce reiterated its unchanged regulatory interpretation that an exporter

lowering the amount invoiced to the importer for antidumping duties is an "example of what it

considers to be reimbursement."  Yet, Commerce did not apply the regulation to BlueScope

when BlueScope "lowered {the} transfer price from AIS to BSA by the amount of dumping

duties." IDM at 9 (P.R. 116). Given that Commerce's interpretation of its reimbursement

regulation as applied in the underlying review conflicts with its long-standing prior

interpretation, the Court should reverse.

>    iii.   *Commerce did not provide a reasonable basis to depart from its established*
>           *regulatory interpretation in this case and thus its determination could not overcome*
>           *any amount of deference*

Once Commerce has adopted a policy or practice, it "is obliged to follow it until

Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB*

*Sing. Ltd v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) (citing *Br. Steel PLC v. United*

*States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997)); *Save Domestic Oil, Inc. v. United States*, 357 F.3d

1278, 1283-84 (Fed. Cir. 2004) ("{I}f Commerce has a routine practice for addressing like

situations, it must either apply that practice or provide a reasonable explanation as to why it

departs therefrom."). To be sure, this is not a case in which Commerce disclaims that it has a

practice. Indeed, Commerce confirmed that it still considers its prior practice as constituting an

example of reimbursement to be adjusted for under 19 C.F.R. § 351.402(f). *See* IDM at 8 (P.R.

116). Rather than applying its routine practice to the like facts of the underlying review,

Commerce cited two factually distinct cases to support its decision. Neither provide a reasoned

explanation to not apply the regulation.

Commerce cites this court's opinion in *Shandong Huarong Mach. Co. v. United States*

for the proposition that "two prior determinations are not enough to constitute an agency practice

that is binding on Commerce." IDM at 8 n.43 (citing *Shandong Huarong Mach. Co. v. United*

*States*, 435 F. Supp. 2d 1261, 1282 n.23 (Ct. Int'l Trade 2006)) (P.R. 116). *Shandong Huarong*

did not invalidate the regulation and therefore does not compel an alternate interpretation of

PUBLIC VERSION

Commerce's reimbursement regulation.

Plaintiffs do not dispute the court's reasoning in *Shandong Huarong*.  *Shandong Huarong Mach. Co.*, 435 F. Supp. 2d at 1293 n.23 (citing *Ranchers-Cattlemen Action Legal Foundation v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999) ("An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.")).  Unlike in *Shandong Huarong*, Commerce's *Final Results* fail to identify any case in which it has rejected its intent to adjust for indirect reimbursement when the record shows an exporter has lowered the amount invoiced its importer for antidumping duties.  Indeed, Commerce definitively confirmed that it continues to consider an exporter lowering the amount invoiced to its importer for antidumping duties "to be reimbursement."  IDM at 8 (P.R. 116).  That BlueScope "lowered {the} transfer price from AIS to BSA by the amount of dumping duties" is not in dispute.  *Id*. at 9; *see also id*. at 8.

Commerce need not express its intent a certain number of times to create a routine practice.  Nor should the absence of numerous cases describing its practice be conflated with a reversal of practice.  Commerce's practice will be controlling to like situations unless and until it articulates an express reversal of interpretation.  *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis") (internal quotation and citation omitted); *NMB Sing. Ltd*, 557 F.3d at 1328 ("Although many of the cases Timken cites do not address the issue clearly, those that do indicate that Timken is correct").

Commerce also relies heavily on *Torrington v. U.S.*  IDM at 8-9 (citing *Torrington Co. v. United States*, 881 F. Supp. 622, 632 (Ct. Int'l Trade 1995) ("This finding is consistent with

PUBLIC VERSION

Commerce's past practice, upheld by *Torrington*.") (P.R. 116). *Torrington* does not compel an

alternate interpretation of Commerce's reimbursement regulation. Without acknowledging the

context of *Torrington*, Commerce simply cited the court's holding that "'{e}vidence of below-

cost transfer pricing between related parties is not **in itself** evidence of reimbursement of

antidumping duties.'" *Id*. at 8 (emphasis supplied)). Plaintiffs' allegations have nothing to do

with below-cost sales and therefore *Torrington* is irrelevant.

To the extent *Torrington* can even be construed as relevant, Commerce overlooked a

critical component of the court's holding — that because of Plaintiff's "failure to produce any

evidence showing **a link**" between the transfer price and antidumping duties "Commerce

properly decided not to make a deduction to USP for antidumping duty reimbursement."

*Torrington*, 881 F. Supp at 632 (emphasis supplied). *Torrington* requires a link and therefore

supports Plaintiffs' substantial evidence argument below that there is a link between the lowered

invoice price and antidumping duties. IDM at 8 ("AIS calculate{d} BSA's transfer price by,

among other things, deducting an amount for estimated antidumping duties.") (emphasis

supplied) (P.R. 116).

iv.   *Reimbursement will not be addressed in any other part of Commerce's margin calculation*

Commerce mistakenly suggested that the "lowered transfer price from AIS to BSA by the

amount of dumping duties offers no relief to BSA, because the lowered transfer price will be

reflected in AIS' dumping margin." IDM at 9 (P.R. 116). This is false. By statute, Commerce

disregards the transfer price in its dumping calculation.

In a CEP transaction, the statute specifies the price that Commerce shall use U.S. sales

made to an unaffiliated purchaser. 19 U.S.C. § 1677a; *Notice of Final Determination of Sales at

Less Than Fair Value: Bottle-Grade Polyethylene Terephthalate (PET) Resin from Indonesia*, 70

Fed. Reg. 13,456 (March 21, 2005), IDM at Comment 2.  To calculate a CEP price that

corresponds "as closely as possible" to an "export price between non-affiliated exporters and

importers" Commerce will "reduc{e} the price of the first sale to an unaffiliated customer in the

United States by {an} amount {for} expenses (and profit) associated with economic activities

occurring in the United States."  Uruguay Round Agreements Act, Statement of Administrative

Action, H.R. Rep. No. 103-316, vol. 1, at 823 (1994), reprinted in 1994 U.S.C.C.A.N. 4040,

4165 ("SAA").  A transfer price that has been lowered to reimburse the importer will not be

accounted for in Commerce's CEP calculation unless "{i}n calculating the export price (or the

constructed export price) {Commerce} deduct{s} the amount of any antidumping duty . . .

reimbursed to the importer."  19 C.F.R § 351.402(f).  Nothing else accounts for reimbursement,

nor could it.  The reimbursement adjustment is made as an added disincentive — distinct from

duty absorption — to discourage exporters from reimbursing antidumping duties.  *Apex Exps. v.*

*United States*, 777 F.3d 1373, 1381 (Fed. Cir. 2015).

Reimbursement undermines the remedial effect of the law by shifting the impact of the

duty to the foreign manufacturer as opposed to the importer regardless of whether the U.S. sale

was CEP.  *See CTVs from Korea; Final Results of Antidumping Duty Administrative Reviews*, 61

Fed. Reg. 4,408, 4,410-11 (Feb. 6, 1996).  Accordingly, Commerce will adjust CEP sales for

reimbursement where an exporter has lowered the invoice price to the importer for antidumping

duties.  *See* IDM at 8 (P.R. 116); *AFBs*, IDM at Section 13, Comment 1; *Circular Welded Non-*

*Alloy Steel Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative*

*Review*, 63 Fed. Reg. 33,041, 33,043 (June 17, 1998) ("the Department has, nevertheless, applied

the reimbursement provision in cases with CEP sales").

Without incurring the expense of the antidumping duties, in addition to the price of the

PUBLIC VERSION

subject merchandise as intended by the law, the U.S. importer has profited by the amount of the reimbursement.  As such, Commerce will adjust CEP for reimbursement.  19 C.F.R. § 351.402(f); 19 C.F.R. § 351.402(a) ("This regulation clarifies how the Secretary will make certain of the adjustments to the starting price in the United States that are required by section 772 of the Act."); *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rod from Spain*, 63 Fed. Reg. 40,391 (July 29, 1998), IDM at Comment 1 ("Acerinox, U.S.A. incurred selling expenses that are deducted from CEP under section 772(d) of the Act, and Roldan reimbursed Acerinox, U.S.A. for these expenses through the commission.  Therefore, in accordance with section 351.402(e) of the Department's regulations, for the final determination we adjusted Roldan's CEP sales by Acerinox, U.S.A.'s actual selling expenses, revised based on {reimbursement} findings.").  Commerce is wrong that it would use a transfer price and as such, it has no lawful basis to decline to remedy reimbursement.

## 2.  Commerce's Evidentiary Findings Lack Merit and Support; There Is No Path of Reasonable Discernibility

For Commerce's decision to be supported by substantial evidence the path to its decision must be reasonably discernable.  *NMB Sing. Ltd*, 557 F.3d at 1319 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) ("The path of Commerce's decision must be reasonably discernable to a reviewing court")); *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1367-1368 (Fed. Cir. 2019); *Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331, 1349 (Ct. Int'l Trade 2018).  Commerce did not provide a path of any discernibility.

Commerce reasoned as follows:

(1) "Commerce found in part that BSA was not reimbursed for any payment of duties based on BlueScope's pricing methodology in which AIS calculates BSA's transfer price by, among other things, deducting an amount for estimated antidumping duties." IDM at 9 (P.R. 116).

(2) Commerce reasoned that BlueScope lowering the price invoiced to its importer by antidumping duties was of no consequence because the lowered transfer price will be "accurately reflected in AIS' dumping margin." *Id.*

(3) "Commerce additionally found that BSA paid cash deposits for antidumping duties upon entry." *Id.*

Taking these in reverse order, Plaintiffs will demonstrate how none of the above support

Commerce's decision that BlueScope did not reimburse its importer for antidumping duties.

     i.    *BSA's payment of duties in the form of cash deposits is irrelevant*

Commerce considered the fact that BlueScope's importer paid cash deposits for

antidumping duties upon entry to be "crucial to Commerce's determination."  IDM at 9.

Commerce is mistaken.  The fact that BSA paid cash deposits upon entry is an irrelevant red

herring.  No party alleged that BSA did not pay duties on its import of subject merchandise, but

rather that the price BSA paid for the HRS was lowered for antidumping duties as a passthrough

— meaning the cash deposits did not effectively increase the expense to the importer — from

BlueScope to reimburse it for the duties it pays upon entry.  Payment of antidumping duties is

merely a prerequisite for subject merchandise to enter the United States, regardless of

reimbursement.  Had the importer not paid the antidumping duties due upon entry, the

merchandise would not have entered the United States, and there would have been no entries for

Commerce to review.

     ii.    *Commerce's margin calculation does not use a transfer price*

As discussed in the previous section, Commerce misunderstands its dumping calculation.

Commerce does not use the transfer price in its dumping calculation.  The lowered transfer price

will not be reflected in BlueScope's margin without a reimbursement adjustment.  As the SAA

elaborated, "the transfer price between exporters or producers and the affiliated importer is irrelevant in determining the amount of profit to be deducted from constructed export price." SAA at 825.

iii. *BlueScope did not follow its pricing mechanism and did not properly account for duties*

Commerce mistakenly characterized BlueScope's pricing methodology as calculating a "transfer price by, among other things, deducting an amount for estimated antidumping duties." IDM at 9 (P.R. 116). This is incorrect as a matter of fact and Customs law. Moreover, following Commerce's rationale creates absurd results. As such, Commerce's *Final Results* cannot be resuscitated through a path of reasonable discernibility.

a) BlueScope's pricing mechanism sets the steel price based on two [        ] indices and [                                    ]

BlueScope's pricing methodology does not calculate the price of HRS by deducting an amount for estimated antidumping duties. Rather, the supply agreement requires that all HRS sold by BlueScope to BSA during the period of review was to be priced based on averaging two [     ] indices and [                                    ]. *BlueScope's Supp. A* at Exhibit SA-5 (P.R. 60, C.R. 152); *BlueScope's Second Supp. A* at 2. The terms of the supply agreement further stipulate that all sales of subject merchandise during the period of review between AIS, BSA, and Steelscape were subject to [                 ]. *Id*. All HRS supplied pursuant to the supply agreement is sold on a duty-inclusive basis. *BlueScope's Second Supp. A* at 2 (P.R. 73, C.R. 159).

BlueScope acted outside the parameters of its supply agreement by lowering the price of HRS by estimated duties. BlueScope should have invoiced its importer the full price of the HRS — a duty inclusive price as calculated under the supply agreement using the two [     ] indices

[                                                                                    ].

      b)  Customs procedures account for duty-inclusive prices by allowing the U.S. importer to remove the duty embedded in the price as a non-dutiable charge on the entry summary thereby avoiding paying a duty on a duty

[

              ] BlueScope unlawfully lowered the price of the HRS by antidumping duties to reimburse its importer for the duties paid upon entry.

U.S. Customs and Border Protection ("Customs") routinely processes entries priced on a duty-inclusive basis.  Customs does not assess duties on the full invoice price.  19 U.S.C. § 1401a(b)(3)(B) ("The transaction value of imported merchandise does not include any of the following, if identified separately from the price actually paid or payable . . . The customs duties and other Federal taxes currently payable on the imported merchandise by reason of its importation.").  Customs has interpreted the statute to allow for antidumping and countervailing duties — if appropriately identified — to "be deducted from the transaction value of the merchandise, that is, the invoiced amount paid by the buyer."  Headquarters Ruling Letter (HQ) H301048, "Request for Internal Advice Regarding Deductions from Entered Value of Softwood Lumber; Countervailing Duties; Anti-Dumping Duties," dated May 26, 2021 ("HQ H301048").  This avoids a double duty.  *See id*. ("the importer of record is still required to . . . identify the non-dutiable charges within the invoice price, including duties in the case of a DDP transaction").  Declaring the amount of duties included in the price on the entry summary, rather than invoicing a lowered price, allows Customs to accurately calculate and collect duties on the subject merchandise.  *Id*. ("…if the estimated duties included in the invoice price in a DDP transaction are less than the actual duties assessed, the importer may only deduct the amount of duties included in the invoice price paid by the buyer.").

**PUBLIC VERSION**

Under Customs' procedures, therefore, [

].

    c)  Under Commerce's rationale, the higher the dumping duties, the less BSA pays for the actual steel in contravention of the supply agreement

The price of hot-rolled steel BlueScope sold to BSA under its supply agreement was structured as a [    ], duty-inclusive price. As established, Customs requires the importer to be invoiced the duty-inclusive price and declare the antidumping duty on the entry summary as a non-dutiable charge. *See* H301048 ("the importer of record is still required to follow the cited regulations and identify the non-dutiable charges within the invoice price, including duties in the case of a DDP transaction").

[



]. *See BlueScope's Sec. A* at Exhibit A-8 (P.R. 34, C.R. 4).

[    ], BlueScope's transfer pricing worksheet (reproduced *supra* **Section II-A** ) confirms that BlueScope indirectly reimbursed its importer by lowering the HRS price by an amount for antidumping duties. BlueScope established the [    ]) using the pricing formula with [    ].

*BlueScope's Supp. A* at Exhibit SA-5 (P.R. 60, C.R. 152). BlueScope did not include [

    ] on the invoice, but rather made additional adjustments for commissions ( [    ]), ocean freight ([    ]), and antidumping duties ( [    ]).[3] The resulting price for the steel is [    ] to which BlueScope adds back in the ocean freight for an invoice price of [    ].

---

[3] BlueScope calculated an estimated duty amount of [    ] by applying the cash deposit rate in effect on the date of sale, ([    ]), to the FOB price of the steel [    ].

But the resulting price is not tethered to the pricing formula.  *BlueScope's Second Supp. A* at 2 ("the pricing formula used to determine the price from BSL (AIS) to BSA uses percentages from two indices, both of which are landed, duty paid prices.  Therefore, this formula derives a duty-paid price.") (P P.R. 73, C.R. 159).

Ironically, under Commerce's analysis of the supply agreement — [

] *BlueScope's Supp. A* at 5 (P.R. 59, C.R. 146) — the higher BlueScope's dumping, the lower the price BSA must pay to BlueScope for the steel.  This cannot be permissible.

Just as no deduction for antidumping duties from the HRS [     ] price would be warranted if no antidumping duty order was in place, so too the importer should be invoiced the full HRS [     ] price despite the antidumping duty order.  To reach a different conclusion and alter the price for antidumping duties creates absurd results.  For example, imagine if the cash deposits were 100 percent, *ad valorem*.  Following BlueScope's approach narrated above, BlueScope would reduce [          ] (the price established using the pricing formula), by commissions ( [     ]) and ocean freight ([      ]) to achieve an FOB price of [      ].  Application of the 100 percent cash deposit rate would reduce the invoice price by [      ]).  This would result in a BlueScope invoice price of [      ] to BSA, which accounts only for ocean freight, meaning that BSA is not paying anything for the steel.  Commerce's logic is therefore untenable and cannot form the basis of reasoned decision-making.  In contrast, if the 100 percent cash deposit rate were properly treated as a non-dutiable charge, the invoice price would be [          ], the declared customs value would be [      ].[4]  As a result BSA

---

[4] Calculation as follows:  Step 1: [                    ]: Step 2: [
                  ]: Step 3: [
      ].  Note, the freight and commission amounts were kept constant.

would be paying BlueScope [                    ] for that same steel and posting cash deposits of

[        ].

       d) The economic impact of the antidumping duties was shifted from the importer
          to BlueScope's Australian Producer, which is reimbursement

By lowering the price of the HRS an amount for antidumping duties, BlueScope shifted

the economic impact of the duty away from the importer, BSA. As explained above, the

Australian producer was not compensated for the full price of the hot-rolled steel pursuant to the

pricing mechanism. This moved the economic impact of the antidumping duty offshore to

Australia. BlueScope confirmed [

                ]. *BlueScope's Sec. A* at Exhibit A-8 (P.R. 34, C.R. 4); "BlueScope's

Rebuttal of Pre-Preliminary Comments of US Steel Corporation," dated Feb. 1, 2021 at 5

("antidumping duties are for the responsibility of ASP, not the responsibility of Steelscape")

(P.R. 87, C.R. 243). *See also BlueScope's Sec. A* at Exhibit A-2 (P.R. 34, C.R. 4). BlueScope

intentionally relieved its importer of the burden of the antidumping duty through indirect

reimbursement.

**C. In Declining to Apportion Profit to Further Manufacturing Commerce Acted
Inconsistent with the Intent of the Antidumping Statute and its Established Practice
Resulting in Distortions in the Margin Calculation**

Accuracy in calculating dumping margins must be Commerce's primary objective. *See*

*Albemarle Corp. v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016). As the Federal Circuit

has recognized, "an overriding purpose of Commerce's administration of antidumping laws is to

calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts & Crafts Co. v.*

*United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013); *Nan Ya Plastics Corp. v. United States*, 810

F.3d 1333, 1344-45 (Fed. Cir. 2016) (accuracy represents a "reliable guidepost{} for

Commerce's determinations."). Reducing U.S. price by an amount for further manufacturing

PUBLIC VERSION

expenses and calculating those expenses such that U.S. price is only reduced an amount of profit

attributable to the value added in the United States, as distinct from the subject merchandise, will

result in a more accurate dumping margin calculation.  *See Ball Bearings and Parts Thereof from*

*France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty*

*Administrative Reviews*, 71 Fed. Reg. 40,064 (July 14, 2006), IDM at Comment 15 ("The use of

freight information applicable to subject merchandise only, in place of using freight information

applicable to all products, results in a more accurate calculation of freight expenses as they relate

to subject merchandise.  A more accurate calculation of freight expenses, in turn, enhances the

accuracy of the dumping-margin calculation for NTN.  As such, for the final results of this

review, we have relied on the freight information applicable to shipments of the subject

merchandise only to re-calculate a U.S. dollars-per-kilogram factor we used in the calculation of

international and U.S. inland freight expenses from the port of entry to NTN's affiliate's

warehouse.").  Commerce did not follow these maxims and the resulting dumping margin

contains elements of profit for further manufacturing activities incurred in the United States

rather than a pure steel price.

1.  **Commerce Failed to Follow the Law and Apportion Profit to the Subject Merchandise on One Hand and Further Manufacturing Activities on the Other**

    *i.  For over 20 years Commerce has been directed to avoid commingling profit attributable to further manufacturing activities with profit attributable to the subject merchandise*

In general terms, "an antidumping analysis involves a comparison of export price or

constructed export price in the United States with normal value in the foreign market."  19

C.F.R. § 351.401(a).  Constructed export price ("CEP") is the price of the subject merchandise to

the first unaffiliated customer when the subject merchandise is sold through a related party.  19

U.S.C. § 1677a(b).  To reach a CEP price that is equivalent to an export price, deductions to CEP

associated with expenses occurred for economic activity in the United States are prescribed under 19 U.S.C. § 1677a(d).  Further manufacturing expenses are one type of expenses that the statute requires Commerce to deduct from the starting price.  19 U.S.C. § 1677a(d)(2)-(3).  However, further manufacturing expenses reported based on the sale of the downstream merchandise will necessarily include a proportion of profit attributable to the subject merchandise as distinct from the value added in the United States by further manufacturing.  Therefore, to adjust CEP by an amount specific to further manufacturing profit, Commerce must apportion the reported profit as between the subject merchandise and the value added in the United States.

Congress elaborated upon the statutory provision for a CEP adjustment for further manufacturing profit at promulgation in the SAA accompanying the Uruguay Round Agreements Act.  Confirming its intent for Commerce to apportion the further manufacturing profit between subject merchandise and the value added in the United States (non-subject merchandise) so as to allow for the 19 U.S.C. § 1677a(d)(3) deduction from starting price to reflect only the value added in the United States, Congress directed Commerce:

> in determining the constructed export price, to identify and deduct from the starting price in the U.S. market an amount for profit allocable to selling, distribution and further manufacturing activities in the United States.  **The profit to be deducted from the starting price in the U.S. market is that proportion of the total profit equal to the proportion which the U.S. manufacturing and selling expenses constitute of the total manufacturing and selling expenses.**  Thus, the profit to be deducted from the starting price in the U.S. market will be calculated by multiplying the total profit by the percentage obtained by dividing total U.S. expenses by total expenses.  The total U.S. expenses are all of the expenses deducted under Section 772(d)(l) and (2) in determining the constructed export price.

PUBLIC VERSION

SAA at 825–26 (1994) (emphasis supplied); IDM at 11 (P.R. 116).[5]  Thus, the SAA directs

Commerce to calculate further manufacturing profit as a ratio of total U.S. expenses (excluding

the subject merchandise) by total expenses (including the subject merchandise).  *Petitioners'*

*Case Br.* at 17 (P.R. 105, C.R. 263).  Thereby isolating the amount of profit attributable to the

post-import, U.S. processing.

Commerce has applied the statute consistent with the SAA's direction in *DRAMs from*

*Korea*.  Commerce's approach in *DRAMs from Korea* was to isolate the value added by the

further manufacturing process:

> For DRAMs that were further manufactured into memory modules
> after importation, we deducted all value added in the United
> States…The value added consists of the costs of the materials,
> fabrication, and general expenses associated with the portion of the
> merchandise further manufactured in the United States, as well **as a**
> **proportional amount of profit or loss attributable to the value**
> **added**.

*Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic*

*of Korea; Preliminary Results of Antidumping Duty Administrative Review*, 60 Fed. Reg. 47,149,

47,150 (Sept. 11, 1995) ("*DRAMs from Korea*") (emphasis supplied) unchanged in *Dynamic*

*Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea;*

*Final Results of Antidumping Duty Administrative Review*, 61 Fed. Reg. 20,216, 20,216 (May 6,

1996) (adopting the same calculation method).

In calculating the value added in the United States, Commerce included additional

materials associated with further manufacturing in the United States, such as a circuit board, but

excluded all imported subject materials, such as the DRAMs affixed to those circuit boards.

---

[5] The SAA is an "authoritative expression by the United States concerning the interpretation and
application of the Uruguay Round Agreements and this Act."  19 U.S.C. § 3512(d); *Micron
Tech., Inc. v. United States*, 243 F.3d 1301, 1309 (Fed. Cir. 2001).

Commerce thereafter apportioned profit to the raw material (subject merchandise) and value added in the United States (non-subject merchandise). Commerce's *DRAMs from Korea* precedent — issued on the heels of the URAA amendments, 19 U.S.C. § 3511, notes ("Executive Documents set out below, provide generally for the implementation of the trade agreements resulting from the Uruguay Round of multilateral trade negotiations, effective Jan. 1, 1995.") — is a meaningful signal of its intent to interpret the dumping statute as requiring further manufacturing profit to be apportioned to the non-subject merchandise — as directed at promulgation. *See Glycine & More, Inc.*, 107 F. Supp. 3d at 1367. Therefore, consistent with its established practice and intent expressed at promulgation, Commerce must determine a share between "value added" and the value of the subject merchandise to attribute profit.

ii. *Commerce's explanations in the Final Results cannot overcome the SAA's requirements*

In the *Final Results*, Commerce offered two reasons for why it declined to apportion further manufacturing profit consistent with the SAA's requirements but neither provides a lawful basis to act contrary to the SAA.

*First*, Commerce attempted to discount its *DRAMs from Korea* precedent by claiming it was outdated. IDM at 11 ("Section 772(e)(3) of the Act as cited in that decision, which includes all citations to the statute and regulations as they existed on December 31, 1994 before the implementation of the URAA") (P.R. 116). However, the relevant *DRAMs* precedent was preliminarily issued in 1995 and left unchanged by Commerce's final results in 1996, following the URAA's entry into force. *See* 19 U.S.C. § 3511, notes. Insofar as Commerce mistakenly cited section 772(e)(3) in *DRAMs from Korea* as opposed to the then-controlling section 772(d)(3), Commerce was in error. Commerce's typographical error does not invalidate its decision in *DRAMs from Korea*.

PUBLIC VERSION

*Second*, Commerce conflates further manufacturing profit with its separate deduction for CEP profit.  Further manufacturing profit is a standalone calculation.  Under the statute, further manufacturing profit will be deducted from the starting price to reach a CEP price equivalent to an export price from the subject country.  19 U.S.C. § 1677a(d)(3).  As such, how Commerce calculates further manufacturing profit will have a meaningful impact on its margin calculation.  Rather than address its further manufacturing calculation, Commerce deemed it unnecessary because the "calculation and deduction of CEP profit from U.S. net price follows the current statute."  IDM at 11 (P.R. 116).  Commerce fails to understand the distinction between the further manufacturing profit adjustment under 19 U.S.C. § 1677a(d)(3) and its CEP profit calculation under 19 U.S.C. § 1677a(f) — of which, further manufacturing expenses are a component.  CEP profit is the "**total** profit" "determined based on a broader product line than the subject merchandise."  *Id*. at 12.  Whereas further manufacturing profit is an expense exclusive to activities in the United States.

> a)  CEP profit accounts for total actual profit for all sales in both the home and U.S. market; it does not ensure the appropriate amount of further manufacturing profit is deducted from CEP

CEP profit accounts for total actual profit for all sales in both the home and U.S. markets.  *See* 19 U.S.C. § 1677a(f); *Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 50,166 (Aug. 13, 2004), IDM at Comment 5 ("CEP profit is determined by calculating the 'total actual profit' for all sales of the subject merchandise and the foreign like product.  We then allocate the 'total actual profit' to individual CEP sales based on the 'applicable percentage,' which is computed as the ratio of total U.S. expenses to total expenses.").  Under Commerce's CEP profit calculation, it will calculate the total actual profit for sales of the subject merchandise and the foreign like product by

PUBLIC VERSION

combining the respondent's total revenue (TOTREV), total cost of goods sold (TOTCOGS), total

selling expenses (TOTSELL), and total movement expenses (TOTMOVE) for the home and U.S.

markets.  *See* Policy Bulletin 97.1, "Calculation of Profit for Constructed Export Price

Transactions," dated Sept. 4, 1997 ("Policy Bulletin 97.1").  Further manufacturing profit is a

component of the respondent's total cost of goods sold.  *See id*.; IDM at 11 (P.R. 116).  While

further manufacturing is a component of CEP profit, Commerce's CEP profit calculation is silent

as to the appropriate calculation of further manufacturing.  Policy Bulletin 97.1.

As applied to the underlying review, Commerce's CEP profit calculation yielded a profit

rate of [        ] percent.  Before reaching the CEP profit rate, Commerce calculated BlueScope's

U.S. cost of goods sold as [            ] through applying the following formula:  [

].  The variable

CEPOTHER, used in the COGSU calculation, is the sum of expenses BlueScope incurred in the

U.S. market, including further manufacturing.  IDM at 11 (P.R. 116).  The amount for further

manufacturing profit Commerce included in CEPOTHER was $[        ] — the total realized on

the sale of the downstream merchandise in the United States.  Had Commerce calculated an

apportioned further manufacturing profit amount as advocated by Plaintiffs, it would have

included a further manufacturing profit amount of $[        ] in its calculation.  **Table 2**.

**Table 1** below reproduces Commerce's CEP profit calculation from the underlying

review under the column "Total" with market specific information detailed in the columns to the

right:

| | | | Total | US Market | Home Market | HM % of Total | |
|---|---|---|---|---|---|---|---|
| A | TOTREV | [ | | | | | ] |
| | | | | | | | |
| B | TOTCOGS | [ | | | | | ] |
| C | TOTSELL | [ | | | | | ] |
| D | TOTMOVE | [ | | | | | ] |
| | | | | | | | |
| E | TOTEXP (B+C+D) | [ | | | | | ] |
| | | | | | | | |
| F | TOTPROFT (A-E) | [ | | | | | ] |
| | | | | | | | |
| | CEPRATIO (F/E) | [ | | | | | ] |

**Table 1:  CEP Profit by Market and Demonstration that [        ] CEP Profit**
(Commerce Memorandum, "Final Results Analysis Memorandum for BlueScope Steel (AIS) Pty Ltd, BlueScope Steel Limited, and BlueScope Steel Distribution" (Aug. 17, 2021) at Attachment V (P.R. 117 & 119, C.R. 266 & 270))

Commerce's CEP profit adjustment cannot replace Commerce's further manufacturing adjustment.  The statute's further manufacturing profit adjustment is meant to account for value added in the United States by further manufacturing activities whereas, as shown in **Table 1** above, Commerce's CEP profit calculation [

].

Insofar as further manufacturing expenses are included in Commerce's CEP profit calculation, apportioning further manufacturing profit will impact CEP profit but CEP profit is not a further manufacturing adjustment.  As such, Commerce erred as a matter of law by concluding that "the appropriate amount of profit attributable to further manufacturing activities has already been deducted from CEP {by CEP profit}" thus declining to reduce the U.S. starting price by an apportioned further manufacturing profit amount.  IDM at 12 (P.R. 116).

    b)  Further manufacturing profit is an expense attributable exclusively to activity in the U.S. market

By contrast, further manufacturing expenses are incurred entirely in the U.S. market.

Consistent with the purpose of the CEP price calculation — to reach a price equivalent to an export price from the subject country — any profit attributable to the further manufacturing process must be accounted for and removed from the CEP starting price.  That said, a proportion of the profit reported on the sale of the downstream further manufactured merchandise will necessarily be attributable to the subject merchandise, as opposed to the value added in the United States by further manufacturing activities.  To isolate the further manufacturing profit attributable to the value added in the United States, Commerce must allocate the further manufacturing profit between subject and non-subject merchandise (*i.e.*, the value added in the United States).  19 U.S.C. § 1677a(d)(3); SAA at 825–26.

Insofar as BlueScope did not report its further manufacturing profit on an allocated basis, Commerce should have calculated an apportioned further manufacturing profit amount.  For example, based on SEQU [     ], Commerce used a further manufacturing profit amount of $[          ], based on BlueScope's reported US Further Cost of Manufacture, US Furman G&A, and US Furman Intex.  As demonstrated in **Table 2** below, had Commerce apportioned BlueScope's further manufacturing profit as described in Petitioners' Case Brief, it would have calculated a further manufacturing profit of $[        ], specific to non-subject merchandise, excluding the $[        ] of profit attributable to subject merchandise.  *See Petitioners' Case Br.* at 20 (P.R. 105, C.R. 263).

**Table 2:  Calculation and Allocation of Furman Profit Based on SEQU [      ] Data**
("BlueScope Steel's Response to Section E of the Department's Supplementary Questionnaire"
(Jan. 19, 2021) at Exhibit SE1-12 (P.R. 85, C.R. 224 & 226))

Rather than calculate a further manufacturing profit specific to the value added in the United States and extract that amount from the starting U.S. price, Commerce included the inflated further manufacturing profit amount as reported based on its sale of CORE in its CEP profit calculation and left an amount of profit attributable to non-subject merchandise in the U.S. price for subject merchandise.

### 2.  Commerce Erroneously Included Profit Attributable to Non-Subject Merchandise in the U.S. Price for Subject Merchandise

"A decision by Commerce cannot be supported by substantial evidence if there is no indication that Commerce considered essential arguments or evidence in making its final determination."  *Bonney Forge Corp. v. United States*, Ct. No. 20-3837, Slip Op. 22-8 at 13 (Ct. Int'l Trade 2022).  The Federal Circuit has concurred with this court in finding it was reasonably "troubled by the failure to consider all relevant argument."  *Altx, Inc. v. United States*, 370 F.3d

PUBLIC VERSION

1108, 1119-20 (Fed. Cir. 2004).

Commerce supported its decision by reasoning that its "calculation and deduction of CEP profit from U.S. net price follows the current statute." IDM at 11 (P.R. 116). This does not address the further manufacturing deduction. Commerce was statutorily obligated to adjust U.S. price an amount for further manufacturing profit. 19 U.S.C. § 1677a(d)(3). Because BlueScope reported its further manufacturing expenses based on the sale of the downstream merchandise (*i.e.*, CORE) Commerce needed to first apportion its reported profit as between non-subject further manufacturing activities and the subject merchandise to then reduce CEP by the profit allocated to further manufacturing as mandated by 19 U.S.C. § 1677a(d)(3); *Petitioners' Case Br.* at 19 (P.R. 105, C.R. 263). Instead, Commerce overlooked the further manufacturing profit adjustment entirely, only including a further manufacturing profit amount calculated using BlueScope's downstream product reporting in its CEP profit calculation. IDM at 11-12 (P.R. 116). Commerce thus calculated a constructed export price that is highly influenced by the "net profit" for its sales of further manufactured hot-rolled steel sold as CORE. Rather than meaningfully address Plaintiffs' argument, Commerce simply replied, "we disagree." *Id*. at 12. Under the statute and case law Commerce was obligated to do more to support its finding with substantial evidence.

## V.   CONCLUSION

Commerce erred by not adjusting its dumping calculation for reimbursement and further manufacturing profit. By declining to apply its reimbursement regulation consistent with the intent expressed at promulgation and established interpretation to the facts of this case evidencing BlueScope unlawfully lowering the invoice price to its importer for antidumping duties, Commerce failed to act in accordance with law nor did Commerce support its conclusion

PUBLIC VERSION

with substantial evidence.  Further, Commerce's decision not to account for further

manufacturing profit in the U.S. starting price did not comport with its statutory obligation nor

was it supported by substantial evidence.  The Court should remand Commerce's findings with

respect to BlueScope's reimbursement of its importer by lowering the HRS invoice price by the

antidumping duty and its adjustment to the CEP price by an amount for further manufacturing

profit apportioned to the value added in the United States.


Respectfully submitted,


/s/ Roger B. Schagrin                              /s/ Sarah E. Shulman

Roger B. Schagrin                                  Thomas M. Beline
Jeffrey D. Gerrish                                 Yohai Baisburd
Kelsey M. Rule                                     Sarah E. Shulman

SCHAGRIN ASSOCIATES                                CASSIDY LEVY KENT (USA) LLP
900 Seventh Street, N.W.                            900 19th Street, N.W.
Suite 500                                          Suite 400
Washington, DC 20001                               Washington, D.C. 20006
(202) 223-1700                                      (202) 567-2300

*Counsel to Steel Dynamics, Inc. and*              *Counsel to United States Steel Corporation*
*SSAB Enterprises LLC*

Date:   March 1, 2022

Court No. 21-00528

## <u>Certificate of Compliance</u>

The undersigned hereby certifies that the forgoing submission of "Memorandum Of Points of Law and Fact in Support of the Rule 56.2 Motion for Judgement on the Agency Record Filed by Plaintiff, United States Steel Corporation and Plaintiff-Intervenors, SSAB Enterprises LLC and Steel Dynamics, Inc.," filed on March 1, 2022, contains 10,927 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 14,000 word limitation set forth in the Standard Chambers Procedures.

BY: /s/ Sarah E. Shulman

Sarah E. Shulman