## UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Richard K. Eaton, Senior Judge

_____

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| STEEL DYNAMICS, INC. AND ) | |
| SSAB ENTERPRISES LLC, ) | |
| ) | |
| *Plaintiff-Intervenors*, ) | |
| ) | |
| V. ) | **Court No. 21-00528** |
| ) | |
| UNITED STATES, ) | *Non-Confidential Version* |
| ) | |
| *Defendant*, ) | |
| ) | |
| BLUESCOPE STEEL LTD., AND ) | |
| BLUESCOPE STEEL AMERICAS INC., ) | |
| ) | |
| *Defendant-Intervenors*. ) | |

_____

## RESPONSE BRIEF OF DEFENDANT-INTERVENORS BLUESCOPE STEEL LTD. AND BLUESCOPE STEEL AMERICAS INC.

Daniel L. Porter
Christopher Dunn
James Beaty

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel to BlueScope Steel Ltd., and BlueScope Steel Americas Inc.*

June 7, 2022

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

STATEMENT OF FACTS ................................................................... 4

ARGUMENT ............................................................................... 8

I.    COMMERCE'S FINGDING THAT BLUESCOPE DID NOT
      REIMBURSE ITS IMPORTER, DIRECTLY OR INDIRECTLY FOR
      ANTIDUMPING DUTY DEPOSITS IS IN ACCORDANCE WITH THE
      LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE .............................. 8

      A.    Commerce Acted In Accordance With The Law, Its Own
            Regulations, And Precedent When Declining To Find
            Reimbursement ............................................................ 8

      B.    Plaintiffs' Claim That "Reimbursement Will Not Be Addressed In
            Any Other Part Of Commerce's Margin Calculation" Is Wrong ............... 10

      C.    Commerce's Evidentiary Findings That BlueScope Did Not
            Reimburse Its Importer For AD Duties Are Reasonably Discernable
            And Supported By Substantial Evidence .................................... 12

II.   GIVEN THAT COMMERCE FOLLOWED ITS DECADES-LONG
      PRACTICE IN CALCULATING THE CEP PROFIT DEDUCTION,
      PLAINTIFFS' ARGUMENT HAS NO MERIT ..................................... 15

      A.    Commerce's Calculation of the CEP Profit Deduction In The
            Underlying AD Review Determination Was The Same Approach
            That Commerce Has Utilized for Decades ................................. 16

      B.    Plaintiffs' Claim That Commerce's Approach Is Contrary To Law Is
            Just Wrong ................................................................ 18

      C.    Plaintiff's Proposed Alternative Approach for Calculating CEP
            Profit Deduction Would Result in Impermissible Double Counting
            And Non-Sensical Profit Rates That Are Contrary To The Evidence ........ 22

CONCLUSION .......................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Auer v. Robbins,*
    519 U.S. 452 (1977) .......................................................................................... 8

*Consumer Prod. Div., SCM Corp. v. Silver Reed Am., Inc.,*
    763 F.2d 1033 (Fed. Cir. 1985) ........................................................................ 8

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) .......................................................................................... 8

*United States Steel Corporation v. United States,*
    No. 20-03815 (Ct. Int'l Trade May 31, 2022). ...................................... 13, 14

**Statutes**

19 U.S.C. § 1677a .......................................................................................... 3, 15

**Regulations**

19 C.F.R. § 353.55 ............................................................................................. 9

19 C.F.R. § 355.402(f) ...................................................................................... 9

19 C.F.R. §351.402(d) .................................................................................. 3, 15

**Administrative Decisions**

*Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping
    Duty Administrative Review and Final Rescission of Review in Part; 2018-2019,*
    86 Fed. Reg. 47,054 (August 23, 2021) .................................................. passim

*Dynamic Random Access Memory Semiconductors of One Megabit or Above from the
    Republic of Korea; Final Results of Antidumping Duty Administrative Review,*
    61 Fed. Reg. 20,216  (May 6, 1996) ............................................................... 22

**Other Authorities**

Import Admin., Dep't of Commerce, *Calculation of Profit for Constructed Export Price
    Transactions*, Policy Bulletin 97/1 (1997) ................................................. 4, 17

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No.
    103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.A.N. 4040 ................... 19, 20, 21

## INTRODUCTION AND SUMMARY OF ARGUMENT

In challenging Commerce's AD review determination, Plaintiffs make two primary arguments: (1) an argument concerning Plaintiffs' false allegation of reimbursement of antidumping duties; and (2) an argument concerning the calculation of the deduction for CEP profit.

### Plaintiffs' reimbursement argument

Plaintiffs' entire argument on the "reimbursement" of dumping duties is based on a false factual premise: that BlueScope ("BSL") "lowered" its invoice price to its related importer BlueScope Steel Americas LLC ("BSA") for the hot-rolled steel coils (hereafter, "HRC") it shipped to Steelscape. But Plaintiffs fail to provide any record-based reference point from which the price was lowered. They simply aver – without evidence – that the price BSL charged was lower than the price set forth in the Substrate Supply Agreement among BSL, BSA and Steelscape. In fact, the record makes clear that the Supply Agreement says absolutely nothing about the price BSL should charge BSA for the merchandise. On the contrary, the price set forth in the Agreement is the purchase order price that Steelscape agrees to pay when it purchases the HRC from BSA. The record demonstrates, and Commerce clearly found, both that BSA paid the estimated dumping duties for the imported HRC and that Steelscape's payment to BSA included the amount of estimated duties that BSA paid. This fatal flaw in Plaintiffs' argument eviscerates both its legal and its evidentiary claims on the issue.

As a matter of law, Commerce's determination that BlueScope did not reimburse its importer BSA for dumping duties is completely sound.  Commerce, the "master of the dumping law," has substantial discretion in interpreting the law and its own regulations promulgating the law.  Commerce correctly found that the regulation does not make clear whether any lowering of the invoice price to a related-party importer – even if it did exist – would necessarily constitute an indirect reimbursement of dumping duties.  Commerce noted that the related-party importer, BSA, in fact paid the dumping duties and was not reimbursed by the exporter directly or indirectly for that payment. *Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping Duty Administrative Review and Final Rescission of Review in Part; 2018-2019*, 86 Fed. Reg. 47,054 (August 23, 2021) and accompanying Final Decision Memorandum ("Final IDM") at 7-8 (P.R. 116).[1] The US customer for the product, in this case Steelscape, fully included the duties in its payment to BSA for the merchandise.  Hence both the literal language of the regulation and its purpose – the impact of dumping duties being felt in the US market – was fulfilled.

Commerce's determination is solidly grounded in substantial evidence in the record.  First, there is no evidence that the exporter, BSL, reimbursed either BSA or Steelscape for any duties paid by either party.  There was therefore no direct reimbursement of duties by the exporter, as Plaintiffs admit.

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__".

Second, Plaintiff's argument that BSL indirectly reimbursed BSA for dumping duties is entirely based on its claim that BSL "lowered" its price to BSA, which in turn stems from the false premise that this price was lower than the price set forth in the BSL-BSA-Steelscape Supply Agreement.  However, that Agreement says nothing about the invoice price between BSL and BSA; it refers only to the price Steelscape is to pay BSA. That price fully covered BSA's payment of duties, as required by the Agreement.  BSL did not "lower" the price to BSA from any price set forth in the Agreement.  Rather, it did not include estimated dumping duties in its invoice price to BSA because BSA was paying those duties.  This is not a "lowering" of the price to BSA; it is merely a recognition that the estimated dumping duties were required to be borne in the US market.  BSA in fact paid those duties.  Plaintiffs have presented no evidence that BSA was reimbursed, directly or indirectly, for the duties it paid.

**Plaintiffs' CEP profit deduction argument**

Plaintiffs' next challenge to Commerce's AD review determination concerns Commerce's calculation of the constructed export price (CEP) profit deduction from U.S. sales prices.  Commerce undertakes such CEP profit deduction pursuant to the statute (*see* 19 U.S.C. § 1677a) and Commerce's regulations (*see* 19 C.F.R. §351.402(d)).  There is no dispute that, during the underlying AD review, Commerce calculated the CEP profit deduction in the exact same manner as Commerce has done for twenty-five years. Accordingly, Plaintiffs' argument is essentially that Commerce was wrong to apply its long-standing practice to the particular AD review for BlueScope.  Plaintiffs' argument is wrong on the law and wrong on the facts.

Specifically, Commerce's calculation of the CEP profit deduction in the underlying AD review determination followed the same approach that Commerce set forth in its Policy Bulletin 97/1 dated September 4, 1997.  Import Admin., Dep't of Commerce, *Calculation of Profit for Constructed Export Price Transactions*, Policy Bulletin 97/1 (1997) ("Policy Bulletin 97/1").  Such Policy Bulletin 97/1 was Commerce's statement of how it intended to implement Commerce's own regulation, 351.402(d) – the CEP profit deduction regulation, that Commerce had just promulgated a few months earlier.  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27411 (May 19, 1997) (Final Rule).  And so, Commerce has employed the same approach for calculating the CEP profit deduction for 25 years.

Moreover, Plaintiffs' claim that Commerce's approach is contrary to law is just wrong; indeed, it is belied by the very statutory language and legislative history that Plaintiff references.  Finally, Plaintiffs' proposed alternative approach for calculating the CEP profit deduction would result in impermissible double counting and would generate non-sensical "profit" rates contrary to record evidence.

## STATEMENT OF FACTS

We respectfully submit that Plaintiffs' description of the key facts is not entirely accurate.  And so, we set forth below a clearer description of the different BlueScope entities involved in producing the subject merchandise hot-rolled steel in Australia, importing the hot-rolled steel into the United States and the further manufacturing that takes place before the hot-rolled steel is sold to unaffiliated U.S. customers.

BlueScope supplied HRC to Steelscape LLC, its half-owned subsidiary, through its wholly-owned subsidiary, BSA.  HRC is the substrate that Steelscape uses to produce coated steel, the only product that Steelscape sells: Steelscape cold-rolls, coats the coil (either producing galvanized or galvalume steel).  The process involved two back-to-back transactions, in which BSL invoiced BSA, and simultaneously BSA invoiced Steelscape for the HRC.  The pricing of the HRC was determined according to the BSL Substrate Supply Agreement involving all three companies – BSL, BSA and Steelscape. BlueScope's Supplemental Section A Response (July 10, 2020) at Exhibit SA-5 ("BSL Substrate Supply Agreement") (P.R. 59-60, C.R. 152).

The BSL Substrate Supply Agreement sets forth how the HRC that BSL sells to Steelscape is to be priced. Article 5.1 of that agreement states that "the base price per tonne of the HRC supplied under each PO will be determined by" a specific pricing formula using a combination of the US Mid-west Hot-rolled Steel Price Assessment and the East Asian Import Price Assessment.  *Id.* at 10. These reference prices are delivered, duty-paid prices, that is, they assume that the shipper pays freight, insurance, and any duties that might accrue on the importation of the steel.

It is important to understand that nothing in the Substrate Supply Agreement itself even mentions the invoice price that BSL is to charge BSA for the supply of the HRC. On the contrary, the only "POs" to which the Supply Agreement refers in the pricing clause (Article 5.1) are the purchase orders that *Steelscape submits to BSA* in ordering the steel.  That much is clear from Article 3.5 of the Supply Agreement, which states that "Steelscape will submit two POs to BSA for the total amount of HRC in the Steelscape

- 5 -

Order for each Supply Month….” *Id.* at 9.  Nothing in the Agreement refers to any PO between BSA and BSL, or any other PO.  Moreover, the only “invoice” that is mentioned in the agreement is the invoice that “BSA will provide to Steelscape” in relation to each PO.  BSL Substrate Supply Agreement at Article 6.1.  The Supply Agreement says nothing about the price that BSL is to charge BSA in the back-to-back invoice price for the merchandise.

    As part of the administrative review, BlueScope separately submitted to Commerce a worksheet to show how BSL calculated the invoice price it charged BSA for the HRC.  BlueScope Supplemental Section A Response at Exhibit SA-6, (P.R. 59-60, C.R. 152).  This worksheet shows the “base price” calculated pursuant to the Supply Agreement, less commission, less the ocean freight that BSL paid, less the estimated duty that BSA was to pay.  But this is not the same as the PO price that Steelscape owed BSA under the Supply Agreement.  That price [                                    ] is shown as the “Sales Price to customer” in the worksheet, and it is the sum of the “Mill Price to BlueScope Steel Americas” per metric ton, plus the estimated dumping duty (paid by BSA), plus a commission to BSA, plus inland and ocean freight.  *Id.*  It is the price BSA charged Steelscape.  In short, while the invoice price between BSL and BSA – which is not mentioned in the Supply Agreement – does not include the estimated duties that BSA pays and the freight that BSL pays, the PO price from Steelscape, determined according to the Supply Agreement includes the estimated duties and freight because the Supply Agreement uses duty-paid, delivered prices.

There is no dispute that BSA actually paid the estimated antidumping duties upon the entry of the HRC into the US.  And there is no dispute that Steelscape included the estimated dumping duties in its payment of the invoice from BSA.

## ARGUMENT

I.   **COMMERCE'S FINGDING THAT BLUESCOPE DID NOT REIMBURSE ITS IMPORTER, DIRECTLY OR INDIRECTLY FOR ANTIDUMPING DUTY DEPOSITS IS IN ACCORDANCE WITH THE LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE**

### A.   Commerce Acted In Accordance With The Law, Its Own Regulations, And Precedent When Declining To Find Reimbursement

As even Plaintiffs admit, Commerce has substantial discretion to interpret its own AD regulations.  Plaintiffs agree that a "reviewing court will generally view an agency's interpretation of its own regulation as controlling unless plainly erroneous or inconsistent with the regulation."  Pl. Br. 12, (*citing Auer v. Robbins*, 519 U.S. 452, 461 (1977) and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).  This "plainly erroneous" standard is particularly apt where, as here, the regulation in question concerns a subject in which the agency has particular expertise.  As courts have recognized, "Commerce is the master of the antidumping law," so its interpretation of its regulation applying that law is entitled to great deference. *Consumer Prod. Div., SCM Corp. v. Silver Reed Am., Inc.*, 763 F.2d 1033, 1039 (Fed. Cir. 1985).

This administrative review, like the preceding administrative review, concerns a series of transactions in which the exporter (BSL) did not include in its invoice price to its affiliated importer, BSA, the estimated duties that BSA was to pay upon importation. BSA in fact paid those duties, as Commerce found and Plaintiffs admit.  Moreover, BSA charged the "customer," Steelscape, an amount sufficient to cover the estimated duties that BSA paid.  Neither BSA nor Steelscape received any reimbursement from the exporter BSL for the amount of estimated duties paid.

Plaintiffs claim that when Commerce declined to apply its regulation on the reimbursement of duties to the facts of this case, it violated the express intent of the regulation "to address indirect reimbursement at the time of importation."  Pl. Br. 15. Yet that is manifestly not the regulation's express intent.  The regulation as originally published stated only that Commerce would deduct duties that are "paid by the manufacturer, producer, seller or exporter…which will be refunded to the importer by the manufacturer, producer, seller or exporter, either directly or indirectly."  19 C.F.R. § 353.55, 45 Fed. Reg. 8206 (February 6, 1980).  The preamble to that regulation, which might otherwise elucidate Commerce's intent, provides no further guidance than to say the regulation came from Customs Regulations and would be adopted as such.  In no event is there any requirement to *deduct indirect reimbursement at the time of importation*. *Id.*

In its Decision Memorandum in this case, Commerce correctly noted that the language of the current regulation, 19 C.F.R. §355.402(f), does not address the question of indirect reimbursement of dumping duties.  Final IDM at 8 (P.R. 116).  It is worth citing the relevant language of the regulation here.

> (f) Reimbursement of dumping duties -- (1) In general.  In calculating the export price (or the constructed export price" the Secretary will deduct the amount of any antidumping duty or countervailing duty which the exporter or producer:
>
> (A) Paid directly on behalf of the importer; or
>
> (b) Reimbursed to the importer

19 C.F.R. §355.402(f).

The regulation, while explicitly saying Commerce will deduct duties that the exporter paid "directly" on behalf of the importer, it does not use either the word "directly" or the word "indirectly" when it discusses reimbursement.  Hence, Commerce correctly concluded that the language of the regulation is "genuinely ambiguous" when it comes to questions of indirect reimbursement.  Commerce therefore has complete discretion to determine whether it believes that indirect reimbursement has occurred.

In this case, Commerce plainly understood that reimbursement, direct or indirect, did not occur based on the facts of record.  Commerce understood that while BSL (AIS) deducted estimated dumping duties "*from the price charged to its ultimate affiliated purchaser, Steelscape*," BSL did not deduct those amounts from the price AIS invoiced BSA.  Final IDM at 8 (P.R. 116).  BSA passed those duties on to Steelscape, and there was no reimbursement "by the exporter or producer" (BSL) to either BSA or Steelscape of those duties.  BSA paid the duties, and was never reimbursed by BSL, directly or indirectly, for what it paid.

### B.    Plaintiffs' Claim That "Reimbursement Will Not Be Addressed In Any Other Part Of Commerce's Margin Calculation" Is Wrong

Plaintiffs claim that Commerce was wrong in its statement that "the lowered price will be accurately reflected in the transfer price."  Final IDM at 9 (P.R. 116), Pls. Br. 20-21.  They base their claim on the assertion that "a transfer price that has been lowered to reimburse the importer will not accounted for in Commerce's CEP calculation unless…Commerce deducts the amount of any antidumping duty reimbursed to the importer."  Pls. Br. 21.  That's just wrong.

To begin, Commerce stated only that the lowered price will be "reflected" in the dumping margin.  Commerce is correct.  Although, as Plaintiffs point out, the calculation of the dumping margin in BlueScope's case was not based on the BSL-BSA transfer price (that price being disregarded in CEP calculations)[2], Commerce determines the margin in dollars (Potential Uncollected Dumping Duties, or PUDD), and determines that amount as a percentage of *entered value*.  Entered value, when determined on a transaction value of the merchandise, is the price of the merchandise, packed and *ready for shipment from the port of exportation*.  That is, the entered or transaction value does not include any duties paid at the time the merchandise is imported into the U.S.  Since the margin is legally determined by applying the uncollected duties as a percentage of the price net of duties, Commerce was correct when it said that the lowered price (the price net of duties) is reflected in the dumping margin.  The lower the entered value, the higher the percentage margin when PUDD are calculated as a percentage of entered value.

Plaintiffs compound the error of their claim by stating that the lowered transfer price will not be accounted for unless Commerce deducts "the amount of any dumping duty reimbursed to the importer."  Pls. Br. 21.  For the umpteenth time, *there was no reimbursement to the importer here*.  The importer, BSA, paid the duties in full and was never reimbursed by the exporter, directly or indirectly, for the estimated dumping duties it paid.  The record clearly supports Commerce's finding in this respect.  Moreover, as we

---

[2] In BlueScope's case, the constructed export price of the merchandise was determined by taking Steelscape's price for the further manufactured merchandise (coated steel) it sold, and deducting all of Steelscape's costs of manufacturing the downstream product.

have previously explained, the invoice price to BSA was never "lowered" to reflect

dumping duty deposits; rather, the invoice price did not include the duties that BSA

actually paid.  Hence, there was neither a direct nor an indirect reimbursement to BSA by

the exporter.

### C.   Commerce's Evidentiary Findings That BlueScope Did Not Reimburse Its Importer For AD Duties Are Reasonably Discernable And Supported By Substantial Evidence

Despite Plaintiffs' seemingly endless claims to the contrary, the record is quite

clear that BlueScope did not, directly or indirectly, reimburse its importer for dumping

duties.  First, the importer BSA paid the estimated dumping duties, as is amply

demonstrated in the record.  Final IDM at 7-8; *see also* Preliminary Analysis

Memorandum at 4 (C.R. 255).  Even Plaintiffs do not dispute BSA's payment of those

duties. There is simply no evidence that the exporter, BSL, reimbursed either BSA or

Steelscape for the estimated dumping duties that BSA paid.

Second, as we have already stated, Plaintiffs' claim of indirect reimbursement is

based entirely on their claim that BSL "lowered" the *price to BSA* because the invoice

price to BSA did not include dumping duties.  However, Plaintiffs' claim of a "lowered"

price derives from their peculiar reading of the terms of the BSL Substrate Supply

Agreement between BSL, **BSA and Steelscape**.  BSL Substrate Supply Agreement (P.R.

59-60, C.R. 152).   Plaintiffs claim that "the supply agreement requires that all *HRS sold*

*by BlueScope to BSA* …was to be priced based on averaging two price indices…"  Pls.

Br., 24.  Plaintiffs, unfortunately, have grossly misread the actual Supply Agreement.

The fact is the Supply Agreement says absolutely nothing about the "*HRS sold by BlueScope to BSA*" as Plaintiffs claim.  Rather, it says that "the base price per tonne of the HRC supplied *under each PO* will be determined by" a formula using duty paid prices in two markets.  BSL Substrate Supply Agreement at Article 5.1.  The words "under each PO" refer only to the purchase order *from Steelscape to BSA*, as is made clear in the definitions of the terms "First PO" and "Second PO" in the definitions of terms in the agreement.  These definitions refer to Article 3.5 of the Agreement, which makes clear that the "POs" in question refer to the purchase orders from Steelscape to BSA.  Article 3.4 of the agreement further makes clear that the POs are exclusively those between Steelscape and BSA.  There is no other kind of PO mentioned in the Supply Agreement.  Nothing in the Agreement refers to *any price* between BSL and BSA.

Plaintiffs' argument that BSL's non-inclusion of the dumping duties paid by BSA in its price to BSA was a "reduction" of the import price has already been rejected by this Court.  As the court stated:

> The record shows that the parent company BlueScope determined the price that the Exporter charged to the importer by reference to the downstream, duty-inclusive transfer price charged to the Importer's US customer Steelscape, pursuant to the terms of the Supply Agreement.

*United States Steel Corporation v. United States*, No. 20-03815 Slip op. at 13 (Ct. Int'l Trade May 31, 2022).  The Court well understood that there was no "reduction" in the price charged to Steelscape in the invoice price between BSL and BSA.  The Supply Agreement and the invoice pricing methodology are precisely the same in this appeal as

those that were before the Court in the previous case. Plaintiffs' claim, in other words, has been fully asked and answered by this Court.[3]

Since the pricing terms in the Supply Agreement refer exclusively to the price to be paid by Steelscape and not to the price paid by BSA, the invoice price of the merchandise from BSL to BSA is irrelevant to the price between BSL and BSA. That the invoice price between BSL and BSA did not include dumping duties, therefore, cannot represent a "lowering" of any established price between them, because the Supply Agreement does not establish any price between them. As the Court has stated, "all the record evidence shows is the manner in which the transfer price between the Exporter and Importer was calculated. Plaintiffs failed to establish, with any evidence, any link between that price and the alleged reimbursement of duties." *Id.* at Slip Op. 15. BSL did not include dumping duties in its invoice to BSA because BSA paid those duties. Including those duties in the invoice price to BSA would mean that BSA would be paying the duties twice, once to Customs and once to BSL. This is not required by the Supply Agreement, and would make no sense.

In short, the "pricing mechanism" set forth in the Agreement refers entirely to the duty paid price that *Steelscape* must pay to BSA when it purchases the merchandise. As the record makes clear, the price that Steelscape paid BSA included duties that BSA paid, as required by the Supply Agreement. Commerce correctly found that "BSA paid AD

---

[3] BlueScope recognizes that each case is decided on its own merits and the facts of individual cases may differ. However, in this case the parties and the relevant facts are exactly the same as those before this Court in *United States Steel*. Plaintiffs would be hard pressed to conjure any basis for distinguishing this case from the previous one.

deposits *and passed the price of those duties on to Steelscape*."   Final IDM at 9 (P.R. 116).  Hence the price that Steelscape paid to BSL was fully in accord with the Supply Agreement and Commerce correctly determined that there was no lowering of the price to Steelscape.[4]

Commerce's Final Decision Memorandum correctly understood that the Supply Agreement provided for the price to its "ultimate affiliated purchaser, Steelscape…" Final IDM at 8.  Commerce's finding that the "lowered" transfer price between BSL and BSA was not evidence of reimbursement is therefore correct, because (a) the price to Steelscape was not lower than required by the Agreement, and (b) neither BSA nor Steelscape was reimbursed by BSL for the dumping duties that BSA paid.  Commerce's findings on these points were solidly grounded in substantial evidence on the record.

## II.   GIVEN THAT COMMERCE FOLLOWED ITS DECADES-LONG PRACTICE IN CALCULATING THE CEP PROFIT DEDUCTION, PLAINTIFFS' ARGUMENT HAS NO MERIT

Plaintiffs' next challenge to Commerce's AD review determination concerns Commerce's calculation of the constructed export price (CEP) profit deduction from U.S. sales prices.  Commerce undertakes the CEP profit deduction pursuant to the statute (*see* 19 U.S.C. § 1677a) and Commerce's regulations (*see* 19 C.F.R. §351.402(d)).  There is no dispute that, during the underlying AD review, Commerce calculated the CEP profit

---

[4] Commerce did state that BlueScope "lowered" the transfer price from AIS to BSA. Final IDM at 9 (P.R. 116).  However, the transfer price between AIS and BSA has nothing to do with any requirement in the Supply Agreement.  If BSL had paid the duties to Customs, that would have been a direct payment of dumping duties in contravention of Commerce's regulation.  It did not include those duties in the price to BSA precisely because BSA was paying duties.

deduction in the exact same manner as Commerce has done for twenty-five years.

Accordingly, Plaintiffs' argument is essentially that Commerce was wrong to apply its

long-standing practice to the particular AD review for BlueScope.  As we detail below,

Plaintiff's argument is wrong on the law and wrong on the facts.

A.  **Commerce's Calculation of the CEP Profit Deduction In The Underlying AD Review Determination Was The Same Approach That Commerce Has Utilized for Decades**

Plaintiffs argue that Commerce needs to change the manner in which it calculates

CEP profit.  Plaintiffs claim that Commerce is required to calculate different CEP profit

amounts for different cost components of the CEP sales price.  Specifically, Plaintiffs

argue that Commerce must calculate **three** different CEP profit amounts:

(1)  a profit amount on the corrosion-resistant steel (CORE) that that was the further manufactured that BlueScope actually sold in the U.S. market;

(2)  a separate profit amount for the profit "associated with" the hot-rolled steel from Australia and

(3)  a third profit amount "attributable to" non-subject merchandise.

*See* Pls. Br. 33-35.  Plaintiffs' argument includes a specific methodology by which

Commerce should have calculated each of these three profits amounts.  *Id.* at 34.

It is important to note at the outset that Plaintiffs' argument directly contradicts

Commerce's long-standing practice for calculating the CEP profit deduction.  As

evidenced by Commerce's SAS computer code, Commerce has a long-standing practice

of applying a very specific methodology for calculating the CEP profit adjustment for

U.S. sales.  *See* Final Results Analysis Memorandum for BlueScope, (August 17, 2021)

(C.R. 266) at Attachment III: "Comparison Market Program Log and Output and

Attachment V: "U.S. Margin Calculation Program Log and Output.[5]  Such specific

methodology for calculating the CEP profit deduction is essentially identical to the

methodology that Commerce set forth in its Policy Bulletin 97/1, dated September 4,

1997, which was devoted to "Calculation of Profit for Constructed Export Price

Transactions."  Policy Bulletin 97/1.

      Broadly, such methodology involves five steps:

Step 1:      Using all submitted sales and cost data, calculate <u>total profit</u> for the U.S. and home market (HM) sales of subject merchandise.

Step 2:      Using all submitted sales and cost data, calculate total home market and U.S. production and selling expenses.

Step 3:      Calculate the CEP Profit ratio (percentage) by dividing result of Step 1 by the result of Step 2.

Step 4:      Apply the result of Step 3 to the sum of all U.S. CEP selling expenses (including further processing costs and imputed expenses incurred on CEP sales such as credit and inventory carrying costs).

Step 5:      Deduct the result in Step 4 from U.S. gross price

As noted above, each of the above steps can be clearly seen on Commerce's SAS

computer code utilized for Commerce's AD margin calculation for BlueScope in the

underlying AD review.  And, as evidenced by Commerce's Policy Bulletin 97/1, the

Commerce has applied the same methodology for calculating the CEP profit deduction

---

[5] Specifically, the SAS computer code for all of the CEP profit deduction methodology can be found at pages 68-69 of the Comparison Market Program log (SAS page numbers 141-142) (providing SAS code language for CEP profit deduction), page 157 of the Comparison Market Program output (SAS page number 75, chart entitled "HM Values for CEP Profit Calculations"), pages 33-35 of the U.S. Margin Calculation Program log (SAS page numbers 150-152) (providing SAS code language for CEP profit deduction), and page 130 of the U.S. Margin Calculation output (SAS page number 4, chart entitled "CEP Profit Calculations"). *Id*. (C.R. 267-271).

for 25 years.

The evidentiary record makes clear that, in addition to providing all U.S. and HM sales data, BlueScope has provided all relevant data for calculating (a) all costs incurred to produce the subject merchandise in Australia, (b) all costs for undertaking further processing in the United States and (c) all movement expenses in shipping the HRC to the United States and in delivering the further processed merchandise to the U.S. customer, including all imputed CEP expenses needed for the CEP profit calculation. *See generally*, Preliminary Results Analysis Memorandum for BlueScope (February 16, 2021) (C.R. 255); Final Results Analysis Memorandum for BlueScope (August 17, 2021) (C.R. 266). As such, BlueScope provided all the necessary data for Commerce to undertake its long-standing calculation of CEP profit.

As we detail below, Plaintiffs have not provided any legitimate justification for concluding that Commerce was wrong not to depart from its long-standing approach for calculating CEP profit.

**B.     Plaintiffs' Claim That Commerce's Approach Is Contrary To Law Is Just Wrong**

Plaintiffs' attempt to argue that Commerce's decision to follow its long-standing approach is contrary to law. Plaintiffs make two arguments. Both can be rejected. Plaintiffs' first attempt to argue that Commerce's long-standing approach is contrary to Commerce's own Statement of Administrative Action ("SAA") for the Uruguay Round Agreements Act. *See* Pls. Br. 30. At the outset we note that Plaintiffs' understanding of what the SAA represents is wrong. Plaintiffs claim that the SAA represents a

Congressional "direction" to Commerce.  See Pls. Br. 30 (in the SAA "Congress directed

Commerce . . ."). But this is just not true. In fact, the SAA constitutes Commerce's own

interpretation of the new legislation that Congress has effectively approved. *See*

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No.

103-316, vol. 1 at 825–27 (1994), reprinted in 1994 U.S.C.C.A.A.N. 4040 ("SAA")

("[T]his Statement represents <u>an authoritative expression by the Administration</u>

concerning its views regarding the interpretation and application of the Uruguay Round

agreements, both for purposes of U.S. international obligations and domestic law."). And

so, at its core, Plaintiffs' legal argument is that Commerce's long-standing

implementation (through its SAS code) of the CEP profit deduction is somehow contrary

to *Commerce's own* interpretation of the statute as reflected in the SAA.  Such argument

makes no sense.

      Moreover, Plaintiffs' argument is belied by the very words of the SAA.

Concerning the need to undertake a deduction from U.S. sales price for an amount of

CEP profit, the SAA states as follows:

> Section 772(d)(3) requires Commerce, in determining the
> constructed export price, to identify and deduct from the
> starting price in the U.S. market an amount for profit allocable
> to selling, distribution and further manufacturing activities in
> the United States.  The profit to be deducted from the starting
> price in the U.S. market is that proportion of the total profit
> equal to the proportion which the U.S. manufacturing and
> selling expenses constitute of the total manufacturing and
> selling expenses.  **Thus, the profit to be deducted from the
> starting price in the U.S. market will be calculated by
> multiplying the <u>total profit</u> by the percentage obtained by
> dividing total U.S. expenses by total expenses**. The total U.S.
> expenses are all of the expenses deducted under Section

772(d)(1) and (2) in determining the constructed export price. The total expenses are all expenses incurred by or on behalf of the foreign producer and exporter and the affiliated seller in the United States with respect to the production and sale of the first of the following alternatives which applies: (1) the subject merchandise sold in the United States and the foreign like product sold in the exporting country (if Commerce requested this information in order to determine the normal value and the constructed export price);  . .

Commerce will request the information necessary to determine total expenses under the first alternative if Commerce is conducting a cost of production investigation. . . .

This same formula applies regardless of which of the three methods is used to determine total expenses. No distortion in the profit allocable to U.S. sales is created if total profit is determined on the basis of a broader product-line than the subject merchandise, because the total expenses are also determined on the basis of the same expanded product line. Thus, the larger profit pool is multiplied by a commensurately smaller percentage.

SAA at 4164-4165.

Plaintiffs' argument interprets the above language as mandating a specific approach that is just not there.  Plaintiffs allege that "the SAA directs Commerce to calculate further manufacturing profit as a ratio of total U.S. expenses (excluding the subject merchandise) by total expenses (including the subject merchandise)…{t}hereby isolating the amount of profit attributable to the post-import, U.S. processing." Pls. Br. 31.  However, in making the assertion that Commerce must make an additional adjustment to U.S. price for "amount of profit attributable to the post-import U.S. processing" (which Plaintiff later defines as a deduction of a separate "standalone" calculation of profit on "non-subject merchandise." See Pls. Br. 37), Plaintiffs do not

quote either the SAA language itself, Commerce's regulations, or any other authority. Rather, what Plaintiffs offer for support for this novel legal conclusion is to cite to their own case brief submitted to Commerce. Essentially, Plaintiffs' support for this legal interpretation argument is their own legal argument.

And so, there is nothing in the plain language of the SAA that states a **<u>separate</u>** deduction to U.S. price can (or should) be made for any supposed profit on "non-subject merchandise." This is simply an artificial construct that has no legal basis and therefore was correctly dismissed by Commerce in its *Final Results*. *See* Final IDM at 12.

Rather, the actual language of the SAA instructs that Commerce "identify and deduct from the starting price in the U.S. market an amount for profit allocable to selling, distribution and further manufacturing activities in the United States" and that this "profit to be deducted from the starting price in the U.S. market is that proportion of the total profit equal to the proportion which the U.S. manufacturing and selling expenses constitute of the total manufacturing and selling expenses." (See SAA at 4164). This is precisely what Commerce's long-standing CEP profit calculation does and what Commerce actually did in its *Final Results*.[6]

Plaintiffs also claim that Commerce's decades-long standing approach is contrary to a <u>single</u> Commerce AD determination rendered 27 years ago. *Dynamic Random*

---

[6] We note that nowhere in the statute or the regulations do the words "further manufacturing profit adjustment" appear. And in fact, the portion of the SAA cited by Plaintiff is expressly referring to *all* constructed export price adjustments, of which further processing costs is one. *See* SAA at 4164 ("in determining the constructed export price, to identify and deduct from the starting price in the U.S. market an amount for profit allocable to selling, distribution and further manufacturing activities in the United States").

*Access Memory Semiconductors of One Megabit or Above from the Republic of Korea;*

*Final Results of Antidumping Duty Administrative Review*, 61 Fed. Reg. 20,216, 20,216

(May 6, 1996).  Plaintiffs' legal argument be easily dismissed.  First, we submit that

Commerce's statement that the referenced *DRAM* determination was not governed by the

Uruguay Round Agreements Act is correct.  Second, and much more importantly, even if

the URAA were applicable, as a matter of law a single contrary Commerce AD

determination does not, by itself, negate decades of subsequent Commerce practice.

In short, Plaintiff's claim that Commerce's calculation of the CEP profit deduction

was contrary to law has no legitimate support.

### C.     Plaintiff's Proposed Alternative Approach for Calculating CEP Profit Deduction Would Result in Impermissible Double Counting And Non-Sensical Profit Rates That Are Contrary To The Evidence

Another reason to reject Plaintiff's argument is that Plaintiffs' calculation would

result in impermissible double counting and non-sensical profit rates that are contrary to

the evidence.

We first start with impermissible <u>double-counting</u> of the profit attributable to U.S.

sales.  Such double counting occurs because Plaintiff's calculation proposal includes a

supposed "profit" on economic activities undertaken in the United States as both an

additional direct deduction on U.S. price <u>and</u> as part of the total expenses used to

calculate CEP profit that is then multiplied by those same expenses.

This can be seen very clearly in Attachment I.  **Attachment I** utilizes the very

same individual sales transaction – [                                    ] --  that Plaintiff

utilizes in Plaintiff's brief (*see* Pl. Br at 37) , but provides a more clear explanation of the

calculation being proposed.

Specifically, as noted above, Commerce's CEP profit deduction calculation is based on a ratio of total revenue to total expenses (including further processing costs). Or stated differently, Commerce's calculation takes into account the overall profitability of the respondent (BlueScope) as a whole.

However, Plaintiffs propose an additional deduction to price, which would be the total "profit" on each individual U.S. sale, that then Plaintiff also includes as part of the CEP profit calculation.  BlueScope provides at **Attachment I** a summary of Commerce's calculation, compared to Plaintiff's calculation, demonstrating that Plaintiffs' calculation both deducts its presumed "profit" from U.S. price on a line-item basis, and then includes that same "profit" amount once more in the calculation of the actual CEP profit deduction.   Such double-counting is not allowed under the law.

Finally, the evidentiary record demonstrates that 100% of BlueScope's U.S. sales of subject merchandise during the POR were made by BlueScope's affiliated subsidiary, Steelscape.  *See, generally*, BlueScope Section C Response (March 30, 2020) (C.R. 75-94).  What this means is that 100% of BlueScope's U.S. sales of subject merchandise consisted of sales of further manufactured subject merchandise by Steelscape.  *Id*.  The evidentiary record also demonstrates that, during the POR, Steelscape experienced an actual profit rate of only [            ]  *See* BlueScope Steel's Response to Section E of Department's Supplemental Questionnaire (January 19, 2021) (C.R. 223-224) at Exhibit

SE1-3, pp 4 and 6 of pdf.[7]   Yet, somehow, Plaintiff's proposed alternative CEP profit

calculation calculations show that Steelscape generated an extraordinary profit of [      ]

on its sales.  *See* Pl. Br. at  37.  Plaintiffs' proposed alternative calculation for CEP profit

is belied by the evidentiary record of Steelscape's actual profit.

Moreover, the rate that Plaintiffs calculate purportedly to represent the profit

attributable to hot rolled steel is not actually hot-rolled steel profit.  As demonstrated by

**Attachment I**, rather, Plaintiff has instead done the following:

1. Calculated a gross profit on a transaction specific basis by subtracting various
   expenses and costs from the reported gross unit price.

2. Calculated a "cost" for hot rolled on that transaction that includes only the entered
   value of the hot rolled steel and Steelscape's calculated product group weighted
   average cost of manufacturing on that same transaction (such "cost" excludes all
   relevant sales expenses, marketing, advertising, salaries and wages, employee
   benefits, depreciation, rent, commissions, and any other costs that relate to the
   ongoing operations experienced by Steelscape).

3. Calculated a "profit" rate on hot rolled that is calculated as the ratio of the entered
   value of the hot rolled steel substrate divided by the "cost" which is simply entered
   value plus further manufacturing cost.

4. This ratio is applied to the incorrectly calculated gross profit on the sale from Step
   1 and any remaining "profit" is then labeled "non-subject merchandise profit" and
   *also* deducted from the gross unit price of the sale.

See Attachment I.

As part of these tortured calculations, Plaintiff also makes the extraordinary leap

that somehow a ratio of Steelscape's <u>cost</u> of purchasing hot rolled steel (the entered value

of the hot rolled steel) to Steelscape's total cost of finished coated steel (entered value +

---

[7] The [      ] results from dividing "net income" of [                    ] (which can be seen on page 6 of
the exhibit pdf) by "total net sales" (for POR) of [                    ] (which can be seen on page 6 of
the exhibit pdf).

cost of further processing) (Pls Br. 36-37) should be used to arbitrarily divide the line-item net revenue into "hot rolled" and "non-subject merchandise" revenue.  However, in fact, there is no "non-subject merchandise" revenue here.  Unlike other cases in which there may be assemblies that can be easily segregated into subject and not subject parts, the final product sold by Steelscape is hot rolled steel that has been cold rolled and coated with zinc and other materials, making the underlying steel an integral and inseparable part of the finished product.

And so, the entire underlying factual predicate for Plaintiffs' proposed alternative CEP profit deduction calculation (distinguishing between *Steelscape's* subject and non-subject revenue) is pure fiction.

**CONCLUSION**

For all the foregoing reasons, BlueScope respectfully requests that the Court find

that Commerce's AD review determination is supported by substantial evidence is

otherwise in accordance with the law.


Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
Christopher Dunn
James C. Beaty

**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
1717 Pennsylvania Avenue, NW.
Suite 1300
Washington, DC 20006
Phone: (202) 452-7325
Fax: (202) 452-7333
Email: dporter@curtis.com

*Counsel to BlueScope Steel Ltd. and BlueScope
Steel Americas, Inc.*

Dated: June 7, 2022

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6,557 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel to BlueScope Steel Ltd. and BlueScope Steel Americas, Inc*

Dated: June 7, 2022