IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, ) <br> ) <br> *Plaintiff*, ) <br> ) <br> STEEL DYNAMICS, INC. AND ) <br> SSAB ENTERPRISES LLC, ) <br> ) <br> *Plaintiff-Intervenors*, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> *Defendant*, ) <br> ) <br> BLUESCOPE STEEL LTD., AND ) <br> BLUESCOPE STEEL AMERICAS INC., ) <br> ) <br> *Defendant-Intervenors*. ) | Court No. 21-00528 |

**ORDER**

Upon consideration of plaintiff's and plaintiff-intervenors' motions for judgment upon the agency record, responses thereto, replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's and plaintiff-intervenors' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained in its entirety.

Dated: _____, 2022        _____
      New York, New York                                                                 Judge

1

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, ) <br> ) <br> *Plaintiff*, ) <br> ) <br> STEEL DYNAMICS, INC. AND ) <br> SSAB ENTERPRISES LLC, ) <br> ) <br> *Plaintiff-Intervenors*, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> ) <br> *Defendant*, ) <br> ) <br> BLUESCOPE STEEL LTD., AND ) <br> BLUESCOPE STEEL AMERICAS INC., ) <br> ) <br> *Defendant-Intervenors*. ) | Court No. 21-00528 <br><br> PUBLIC VERSION <br> BPI REMOVED <br> FROM PAGES: 9, 17 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, United States Steel Corporation (U.S. Steel) and plaintiff-intervenors, Steel Dynamics, Inc. and SSAB Enterprises LLC (collectively, plaintiffs). ECF No. 37. Plaintiffs challenge certain aspects of the final results of the Department of Commerce's review of the antidumping duty order covering certain hot-rolled steel flat products (hot-rolled steel) from Australia. As demonstrated below, Commerce's final results are based upon substantial evidence and otherwise in accordance with law. Record evidence demonstrates that, although the respondent's

2

transfer price to its United States importer did deduct duty amounts, owed duties were ultimately paid by the United States importer and not reimbursed. Further, Commerce's calculation of constructed export price profit is in accordance with law. Accordingly, this Court should sustain Commerce's final results.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      Administrative Determination Under Review**

The administrative determination under review is *Certain Hot-Rolled Steel Flat Products From Australia*, 86 Fed. Reg. 47,054 (Dep't of Commerce Aug. 23, 2021) (final results), and accompanying Issues and Decision Memorandum (IDM). The administrative review covered one producer/exporter of subject merchandise: the collapsed entity consisting of BlueScope Steel (AIS) Pty Ltd (AIS), BlueScope Steel Limited (BSL), and BlueScope Steel Distribution (BSD) (collectively, BlueScope). IDM at 1. The period of review is October 1, 2018 to September 30, 2019.

**II.     Issues Presented For Review**

1.      Whether Commerce reasonably interpreted and applied 19 C.F.R. § 351.402(f) when it did not find a transfer price deduction between a foreign producer and its United States affiliate in the amount of estimated antidumping duties to be reimbursed, and where the United States affiliate was responsible for the payment of antidumping duties.

2.      Whether Commerce lawfully calculated constructed export price profit where 19 U.S.C. § 1677a(d) and (f) obligate Commerce to apportion constructed export price profit to further manufacturing activities.

## STATEMENT OF FACTS

On December 11, 2019, Commerce initiated its antidumping review covering certain hot-rolled steel from Australia for the period of review October 1, 2018 through September 30, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712 (Dep't of Commerce Dec. 11, 2018).

BlueScope is the parent company of BlueScope Steel (AIS) Pty Ltd. (AIS), BlueScope Steel Americas LLC (BSA), and Steelscape LLC (Steelscape). BlueScope's Section A Questionnaire Response, P.R. 33 at 2. AIS is an Australian producer/exporter of subject merchandise. *Id.* BSA is a United States importer. *Id.* Steelscape is a United States company that further processes hot-rolled steel into non-subject coated and galvanized steel; Steelscape sold no subject merchandise during the period of review, because it sells only out-of-scope further-processed merchandise. *Id.* All three companies are affiliated with BlueScope. *Id.* Every sale made by BlueScope during the period of review was exported from Australia by AIS to BSA in the United States. *Id.* BSA then resold the subject merchandise to Steelscape in a "back-to-back" transaction, at which point Steelscape would further manufacture the merchandise. *Id.*

In its questionnaire responses, BlueScope outlined its supply agreement and transfer price methodology for sales made between AIS, BSA, and Steelscape. BlueScope's Supplemental Section A Questionnaire Response, C.R. 152 at SA-5. BSA serves as the importer of record and pays antidumping duties before immediately transferring title to Steelscape. P.R. 33 at 16. BlueScope calculates the transfer price from AIS to BSA by deducting amounts for estimated antidumping duties, ocean freight, commissions, and inland freight from Steelscape's price. C.R. 152 at SA-6. Prices to Steelscape are set according to a formula employing weighted pricing

indices. *Id.* at SA-5. The supply agreement also provided that shipments of subject merchandise be made on a Delivered Duty Paid basis.[1] *Id.*

Prior to the preliminary results, U.S. Steel alleged that BlueScope reimbursed its affiliated importer, BSA, by deducting antidumping duties from its transfer price, and U.S. Steel requested that Commerce adjust BlueScope's entered value by the amount of the deduction. U.S. Steel's Pre-Prelim Comments, C.R. 242. Commerce declined to do so, finding that the record did not demonstrate a payment from BlueScope to BSA for antidumping duties, and that the pricing and sales process employed by BlueScope did not support a finding that BlueScope reimbursed its affiliate, BSA. Preliminary Analysis Memorandum, C.R. 255. Commerce also found that record evidence showed that BSA paid antidumping duties. *Id.* (citing BlueScope's Section C Questionnaire Response, C.R. 76 at Exhibit C-13).

In its administrative case brief, U.S. Steel continued to allege that BlueScope reimbursed its affiliated importer. U.S. Steel's Case Brief, C.R. 263 at 6-16. U.S. Steel also alleged that Commerce erroneously failed to apportion BlueScope's constructed export price profit "between (a) the further manufactured hot-rolled steel from Australia, and (b) all U.S. manufacturing and selling activities." *Id.* at 18.

In the final results, Commerce continued to determine that BlueScope did not reimburse its United States affiliated importer, BSA. IDM at 7. Commerce also rejected U.S. Steel's argument with respect to its calculation of constructed export price profit. Commerce found that its constructed export price profit calculation was in accordance with 19 U.S.C. § 1677a and

---

[1] This information was designated as business proprietary information in BlueScope's supplemental questionnaire response and in Commerce's calculation memorandum, but it was not designated as such in BlueScope's rebuttal brief filed with Commerce, thereby making it public. *See* C.R. 134 at 4.

explained that "the appropriate amount of profit attributable to further manufacturing activities has already been deducted from {constructed export price}," thus making any further deduction of profit allocable to further manufacturing expenses unnecessary. IDM at 11-12.

## SUMMARY OF THE ARGUMENT

Commerce's final results should be sustained. Commerce's determination that AIS, an Australian exporter, did not reimburse BSA, its affiliated United States importer, is supported by substantial record evidence showing that BSA paid antidumping duties on its imports of hot-rolled steel from Australia, and that BSA was not reimbursed for that payment or for any payment of duties.

Commerce lawfully and reasonably concluded that AIS's pricing arrangement was not evidence of reimbursement. Under its pricing methodology, AIS calculates BSA's transfer price by, among other things, deducting an amount for estimated antidumping duties from the price calculated to estimate entry value. Commerce determined that the pricing arrangement confirmed that, while anticipated duties were subtracted from the calculated AIS to BSA transfer price, BSA paid duties on the imports of subject merchandise and was not reimbursed by AIS for them.

Plaintiffs' challenge to Commerce's application of its reimbursement regulation, 19 C.F.R. § 351.402(f), is based entirely upon Commerce's long-since replaced 1980 regulations. Commerce's application of the reimbursement regulation is consistent with the plain meaning of its current regulation, promulgated in 1998. The fact that the 1980 regulation included more expansive language, language that Commerce did not include when it revised the regulation in 1998, underscores Commerce's intent not to include that language in its 1998 regulation.

Commerce's calculation of constructed export price also accords with law. Plaintiffs –

citing no legal authority – assert that Commerce failed to apportion constructed export price profit to further manufacturing activities. Plaintiffs also argue that Commerce's 1996 review of DRAMS from Korea is relevant; however, that determination applied law that is no longer in effect. *See Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea*, 60 Fed. Reg. 47,149 (Sept. 11, 1995) (final results) (*DRAMS from Korea*). Plaintiffs next claim that Commerce's calculation of constructed export price profit failed to account for "further manufacturing profit," but cannot establish any authority requiring, or even permitting, such an adjustment. Finally, plaintiffs argue that constructed export price profit fails to account for profit derived from further manufacturing activities in the United States, however this argument is contravened by the plain language of 19 U.S.C. § 1677a(d)(3).

## ARGUMENT

**I.  Standard of Review**

The Court upholds Commerce's determination if it is supported by "substantial evidence on the record" and otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted). Rather, when Congress has

entrusted an agency to administer a statute that demands inherently fact intensive inquiries, such as in this case, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

To comply with the statutory requirement that Commerce's determinations be made "in accordance with law," Commerce must "follow its established practice or explain why it is reasonable for it to deviate from its practice." *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018). Commerce's actions establish a practice "'when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to' the agency's past action." *Id.* at 1254 (quoting *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2017)).

## II. Commerce Lawfully Determined That AIS Did Not Reimburse BSA, Its United States Affiliate

Commerce will deduct from export price or constructed export price the amount of any antidumping duty that an exporter either pays directly on behalf of the importer or reimburses to the importer. 19 C.F.R. § 351.402(f)(1)(i). Commerce may presume from an importer's failure to file a certificate (as described by 19 C.F.R. § 351.402(f)(2)) that the importer was reimbursed by the exporter or producer for payment of antidumping duties. 19 C.F.R. § 351.402(f)(3). The preamble to Commerce's regulations further explains that 19 C.F.R. § 351.402 applies to "affiliated importers and requires that they certify that they have not been reimbursed by the exporter." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,355 (Dep't Commerce May 19, 1997).

8

In *Torrington*, this Court held that Commerce's reimbursement regulation does not require Commerce to investigate allegations of reimbursement absent additional evidence. *Torrington Co. v. United States*, 881 F. Supp. 622, 632 (Ct. Int'l Trade 1995), *aff'd*, 127 F.3d 1077 (Fed. Cir. 1997). In *Torrington*, the Court also upheld Commerce's finding that "{e}vidence of below-cost transfer pricing between related parties is not in itself evidence of reimbursement of antidumping duties." *Id.* at 631; *see also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 57 Fed. Reg. 28,360 at Comment 4 (Dep't of Commerce 1992) (final results) (*Antifriction Bearings 1992*).

Commerce's finding that AIS, an Australian exporter, did not reimburse BSA, a United States importer, for anticipated antidumping duties is supported by substantial evidence. IDM at 7. BSA, AIS's United States importer, provided record evidence in the form of a supply agreement showing that BSA actually paid antidumping duties. IDM at 7; *see also* C.R. 76 at Exhibit C-13. The supply agreement between BSA, the United States importer, and Steelscape, its U.S. customer, provides that [

] C.R. 152 at SA-5. The [




]
*See* Incoterms 2010, available at https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/ (last accessed 6/3/2022) (emphasis added). Therefore, record evidence shows that BSA, the importer of record, was responsible for the payment of

9

antidumping duties on its purchases of hot-rolled steel from Australia.

Plaintiffs do not contest this factual finding, but argue that AIS indirectly reimbursed its U.S. affiliate by lowering the amount of its transfer price in the amount of antidumping duties. Pl. Br. at 14. However, neither Commerce's regulations nor the *Preamble* indicate that they apply to indirect reimbursement. The regulation states only that "{Commerce} will deduct the amount of any antidumping duty … reimbursed to the importer," making no mention of the question of indirect reimbursement. 19 C.F.R. § 351.402(f)(1)(i); *see also* IDM at 8.

In support its argument that 19 C.F.R. § 351.402(f)(1)(i) is intended to address "indirect reimbursement" in the form of lowered transfer pricing, plaintiffs cite Commerce's former regulations. Pl. Br. at 15 (citing *Antidumping Duties*, 45 Fed. Reg. 8,182, 8,206 (Dep't of Commerce Feb. 6, 1980) (*1980 Regulations*)). Plaintiffs are correct that the former regulations directed Commerce to deduct from U.S. price an amount reimbursed to the importer "either directly or indirectly." *1980 Regulations*, 45 Fed. Reg. at 8,206. However, this regulation was *replaced* by 19 C.F.R. § 351.402(f)(1)(i), which no longer addresses "indirect reimbursement."

Plaintiffs offer no explanation for why Commerce should apply a regulation no longer in effect in favor of its current regulation. Indeed, contrary to plaintiffs' argument, the tools of statutory construction support a reading of the regulation as not applicable to indirect reimbursement. *See Goodman v. Shulkin,* 870 F.3d 1383, 1386 (Fed. Cir. 2017) ("{i}t is well established that "{t}he rules of statutory construction apply when interpreting an agency regulation.") (Fed. Cir. 2017) (quoting *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006)). "'{A} change in the language of a statute is generally construed to import a change in meaning.'" *Bausch & Lomb v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) (quoting Ruth F. Sturm, *Customs Laws and Administration* § 51.7 at 57 (1995)). In promulgating its

current regulations, Commerce excised reference to indirect reimbursement. To imbue this regulatory change with meaning, the current reimbursement regulation must be read as either expressly excluding or intentionally silent with respect to indirect reimbursement. Either way, the conclusion that plaintiffs seek to draw is not supported by the current version of the regulation.

In support of their argument that Commerce's former regulation should bear on interpretation of 19 C.F.R. § 351.402(f)(1)(i), plaintiffs allege that, "{w}ithout a clear indication that amendments to the provision were meant to change the intended purpose of the provision . . . Commerce must apply its regulation 'consistent with the purpose of the regulation, as stated by Commerce upon promulgation.'" Pl. Br. at 16 (citing *Glycine & More, Inc. v. United States*, 107 F. Supp. 3d 1356, 1367 (Ct. Int'l Trade 2015)). The facts of *Glycine & More* are distinguishable from the present case; primarily, the provision at issue was essentially *identical* to its predecessor. *Glycine & More,* 107 F. Supp. 3d at 1365. In contrast, when it revised its regulations in 1998, Commerce altered 19 C.F.R. § 351.402(f)(1)(i) to *exclude* reference to indirect reimbursement. Moreover, nothing in the *Preamble* addresses the issue of indirect reimbursement or links the interpretation of the present 19 C.F.R. § 351.402(f)(1)(i) to its predecessor. Therefore, Commerce's removal of the reference to indirect reimbursement demonstrates an intent that 19 C.F.R. § 351.402(f)(1)(i) not apply to indirect reimbursement. *See Bausch & Lomb*, 148 F.3d at 1367.

Plaintiffs next argue that, notwithstanding the change to Commerce's regulation, a series of administrative determinations constitutes a "practice" with respect to indirect reimbursement. Plaintiffs fail to identify a single case, much less a series of cases, that overcome Commerce's deference in interpreting its own regulations. *See United Steel & Fasteners, Inc. v. United*

*States,* 947 F.3d 794 (Fed. Cir. 2020) ("An agency's interpretation of its own ambiguous regulation is controlling unless it is 'plainly erroneous or inconsistent with the regulation.'").

First, plaintiffs assert that Commerce's 1997 review of *Antifriction Bearings* constitutes an interpretation of Commerce's intent with respect to whether lowered transfer pricing constitutes reimbursement. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 62 Fed. Reg. 54,043 at Comment 13 (Dep't Commerce Oct. 17, 1997) (final results) (*AFBs 1997*). But the language of this case does not confirm any practice of considering "indirect reimbursement." First, this determination is of limited persuasive value, because Commerce did not find reimbursement, indirect or otherwise, to have occurred in *AFBs 1997*. In fact, *AFBs 1997 supports* Commerce's determination in the present case, because Commerce found there that "the presence of below-cost transfer prices … do{es} not, in and of itself, constitute evidence that reimbursement is taking place." IDM at 8-9; *see also AFBs 1997* at Comment 13; *Torrington,* 881 F. Supp. at 632 (affirming Commerce's similar determination in *Antifriction Bearings 1992*).

Moreover, a single administrative determination published near the time of the promulgation of a regulation that does not address the issue, does not constitute a binding interpretation or established practice of that regulation. Indeed, Commerce's actions establish a practice "'when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to' the agency's past action." *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018) (quoting *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2017)); *see also Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261 n. 23 (Ct. Int'l Trade 2006) (finding that "two prior determinations are not enough to constitute an

12

agency practice that is binding on Commerce").

The remainder of the cases cited by plaintiffs likewise do not establish any Commerce practice with respect to whether lowered transfer pricing can be considered "reimbursement" pursuant to 19 C.F.R. § 351.402(f)(1)(i). Plaintiffs first cite Commerce's 2000 review of its order on porcelain-on-steel cookware from Mexico. Pl. Br. at 17 (citing *Porcelain-on-Steel Cookware from Mexico*, 65 Fed. Reg. 30,068 (Dep't of Commerce May 10, 2000) (final results) (*POS Cookware*), and accompanying Issues and Decision Memorandum at Comment 1. Although Commerce references "indirect reimbursement," it does so in the context of a different issue: whether to apply a reimbursement adjustment where a parent company reimburses an affiliated importer on the behalf of an affiliated exporter. *POS Cookware* at Comment 1. *POS Cookware* is thus distinguishable because the reimbursing entity did so through a separate transaction – not by lowering its transfer price, as AIS did here. Accordingly, this determination offers no guidance regarding Commerce's treatment of transfer pricing lowered by the amount of antidumping duties.

Plaintiffs next cite Commerce's 2005 review of its order on honey from the People's Republic of China. Pl. Br. at 17 (citing *Honey from the People's Republic of China*, 70 Fed. Reg. 38,873 (July 6, 2005) (final results), and accompanying Issues and Decision Memorandum at comment 10. While this review concerned transfer pricing lowered in the amount of antidumping duties, Commerce, despite petitioners' suggestion, did not invoke the reimbursement regulation to account for the respondent's transfer price methodology. *See Honey from China* at comment 10 (declining respondents' request to "treat the lowering of prices by {respondent} to {its United States importer} as improper reimbursement, requiring the Department to reduce the U.S. price by the amount of the offset."). Commerce addressed this concern elsewhere in its review by resorting to an alternative cash deposit methodology. *Id.* at

13

comment 7.  Plaintiffs do not argue that Commerce should revise its cash deposit methodology as it did in *Honey from China*, but that Commerce should apply its reimbursement regulation to lower BlueScope's United States price by the amount of the estimated antidumping duty deduction.  Because Commerce rejected that approach in *Honey from China*, that determination can only *support* Commerce's finding in the review in question.

Finally, Commerce recently has clarified its position with respect to 19 C.F.R. § 351.402(f)(1)(i).  In the immediately preceding review of hot-rolled steel from Australia, Commerce found, under nearly identical facts, that 19 C.F.R. § 351.402(f)(1)(i) does not apply to BlueScope's transfer price methodology, and was sustained in its review by this Court.  *HRS Australia 2020*, Issues and Decision Memorandum at 7-9; *see also United States Steel Corporation v. United States*, CIT No. 20-3815, Slip Op. 22-57.[2]  Specifically, as here, Commerce found – notwithstanding BlueScope's transfer price methodology – that no record evidence supported a finding that AIS reimbursed duties to BSA, and that BSA paid duties and passed those duties onto its United States customer.  *Id.* at 9.  To the extent that Commerce's statement in *AFBs 1997* obscured Commerce's interpretation and practice in implementation of the reimbursement regulation, *HRS Australia 2020* clearly sets forth Commerce's current practice, as sustained by this Court.

Commerce's interpretation also accords with the purpose of the provision, which is to "ensure that the antidumping duty order's incentive for importers to buy at non-dumped prices is not negated by exporters who sell at dumped prices while removing the importer's exposure to antidumping liability."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d

---

[2] Although the disposition of this order has been made public, only the confidential version of the accompanying slip opinion is currently available.  The Court ordered parties to file comments concerning bracketing for the public version by June 7, 2022.

1367, 1375-1376 (Ct. Int'l Trade 2013). Because AIS did not reimburse its United States importer in a separate transaction, it did not remove the importer's exposure to antidumping liability. *See* IDM at 9 ("As a practical matter, the fact that AIS lowered its transfer price to BSA by the amount of estimated antidumping duties offers no relief to BSA because the lowered transfer price will be accurately reflected in AIS' dumping margin.")

Plaintiffs claim that Commerce's constructed export price methodology does not account for prices lowered in the amount of antidumping duties. Pl. Br. at 20-21. As a matter of law, this cannot be correct, because the price used by Commerce as a starting point for its constructed export price calculations will necessarily incorporate any deductions in the amount of estimated antidumping duties. *See* 19 U.S.C. § 1677a(b). Applying the reimbursement regulation in such a scenario to make a further deduction would double-count the amount of antidumping duties, undermining the accuracy of Commerce's calculation. *See Ad Hoc Shrimp Trade Comm.*, 925 F. Supp. 2d at 1376 (finding non-application of the reimbursement regulation where it would "arbitrarily double-count the dumping margin"). Insofar as AIS's transfer price did not factor into Commerce's constructed export price, that is only because BSA paid the antidumping duties, and added those duties into its price for Steelscape – meaning that neither entity is insulated from the disincentivizing effect of antidumping duties.

### III. Commerce's Calculation of Constructed Export Price Profit Is In Accordance With Law

Commerce calculates constructed export price in accordance with 19 U.S.C. § 1677a(d), which requires Commerce to adjust a producer's constructed export price to account for its expenses and the profit allocated to those expenses. 19 U.S.C. § 1677a(f) governs the calculation of the profit component of constructed export price. Commerce must calculate profit, for purposes of 19 U.S.C. § 1677a(d)(3), by multiplying a respondents' total actual profit by the

15

"applicable percentage." 19 U.S.C. § 1677a(f)(1). The "applicable percentage" is calculated pursuant to 19 U.S.C. § 1677a(f)(2)(A) by dividing a respondent's "total United States expenses" by the respondent's total expenses. "{T}otal United States expenses" is defined as the total expenses described in 19 U.S.C. § 1677a(d)(1)-(2). 19 U.S.C. § 1677a(f)(2)(B). Put more simply, Commerce's constructed export price profit calculation generally has two steps: first, Commerce calculates a respondent's total actual profit, then it multiplies that profit by the ratio of United States expenses to total expenses. *See* Import Administration Policy Bulletin No. 97/1, *Calculation of Profit for Constructed Export Price Transactions* (Sept. 4, 1997).

Plaintiffs argue that Commerce's 1996 review of the antidumping order on *DRAMS from Korea* controls Commerce's application of 19 U.S.C. § 1677a(d). Pl. Br. at 30 (citing *DRAMS from Korea*). However, in *DRAMS from Korea*, Commerce applied the law that was in effect *before the promulgation* of the current statute. *See DRAMS from Korea* at 47,150 ("Unless otherwise indicated, all citations to the statute and to the Department's regulations are in reference to the provisions as they existed on December 31, 1994."). The law applied in *DRAMS from Korea* was thus replaced by the passage of the Uruguay Round Agreements Act. *See* Uruguay Round Agreements Act, Statement of Administrative Action, H. R. Rep. No. 103-316, vol. 1, at 823-824 (1994). The now-controlling statute provides that "{t}he profit to be deducted from the starting price in the U.S. market is that proportion of the total profit equal to the proportion which the U.S. manufacturing and selling expenses constitute of the total manufacturing and selling expenses." *Id.* at 824.

Plaintiffs next argue that Commerce failed to distinguish between constructed export price profit and "further manufacturing profit," asserting that 19 U.S.C. § 1677a(d)(3) provides for a "further manufacturing profit adjustment," which is distinct from the constructed export

price profit calculation under 19 U.S.C. § 1677a(f). Pl. Br. at 33. But that is simply a misreading of the statute. Section 1677a(d) is entitled "Additional adjustments to constructed export price." Included as "adjustments" under (d)(1) are certain expenses incurred in selling the subject merchandise and – under (d)(2) – the cost of certain further manufacture or assembly. 19 U.S.C. § 1677a(d)(1) and (2). 19 U.S.C. § 1677a(d)(3) includes profit allocated to such expenses described in (d)(1) and (d)(2). All are adjustments to constructed export price. Indeed, 19 U.S.C. § 1677a(f)(1) defines "profit" "for the purposes of subsection (d)(3)," which covers both (d)(1) and (d)(2). Nowhere in the statute, or in Commerce's practice, is "further manufacturing profit" distinguishable from constructed export price profit. Such an interpretation would unreasonably lead to the double counting of a profit deduction, because Commerce's practice is to deduct an amount of the respondent's total actual profit apportioned to its United States sales. *See* IDM at 12 ("As demonstrated above, the appropriate amount of profit attributable to further manufacturing activities has already been deducted from CEP. Plaintiff offers no support for its novel interpretation of the statute."). For this reason, plaintiffs are mistaken in its assertion that Commerce "overlooked the further manufacturing profit adjustment entirely." Pl. Br. at 38.

Plaintiffs suggest that Commerce's constructed export price profit calculation is somehow faulty because it is [                                    ] Even if plaintiffs offered support for why this methodology is unreasonable, their complaint is contrary to the statute, which requires Commerce to apportion a respondent's total profit to a ratio of United States expenses over total expenses. *See* 19 U.S.C. § 1677a(f).

Plaintiffs finally argue that Commerce's final results do not "meaningfully address" their argument that constructed export price profit is unduly influenced by sales of hot-rolled steel further manufactured as corrosion resistant steel. To the contrary, Commerce addressed this

concern, in its IDM, explaining that:

> The total profit in the CEP profit calculation is determined based on a broader product line than the subject merchandise insofar as Steelscape further manufactures both subject and non-subject hot rolled coil which is then sold as non-subject coated steel. With regard to the total expenses component of the CEP profit calculation, such expenses are also determined based on the same expanded product line; thus, no distortion in the profit allocable to subject merchandise is created.

IDM at 12; *see also* 19 U.S.C. § 1677a(f)(C) (permitting Commerce to define "total expenses" as "{t}he expenses incurred with respect to the narrowest category of merchandise sold … which includes the subject merchandise.")

Plaintiffs fail to offer any support for its position outside of one irrelevant administrative determination. Absent any contrary authority, there is no reason why, despite conforming to the precise demands of the statute, Commerce should stray from its established constructed export price profit methodology, particularly when the established methodology already cures the concern raised by the plaintiffs.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain the final results and deny plaintiffs' motion for judgment on the agency record.

    Respectfully Submitted,

    BRIAN M. BOYNTON
    Principal Deputy Assistant Attorney General

    PATRICIA M. MCCARTHY
    Director

    /s/ Tara K. Hogan
    TARA K. HOGAN
    Assistant Director

OF COUNSEL:    /s/ Kelly A. Krystyniak

SPENCER NEFF  
Staff Attorney  
Office of the Chief Counsel  
    For Trade Enforcement & Compliance  
U.S. Department of Commerce  

KELLY A. KRYSTYNIAK  
Trial Attorney  
Commercial Litigation Branch  
Civil Division  
U.S. Department of Justice  
P.O. Box 480  
Ben Franklin Station  
Washington, D.C. 20044  
(202) 307-0163  
Fax: (202) 514-8640  
Email: kelly.a.krystyniak@usdoj.gov  

Dated: June 7, 2022

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this motion complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 5,130 words.

s/ Kelly A. Krystyniak

June 7, 2022