IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |
|---|---|
| UNITED STATES STEEL CORPORATION, | ) |
| *Plaintiff,* | ) |
| SSAB ENTERPRISES LLC, AND<br>STEEL DYNAMICS, INC., | ) |
| *Plaintiff-Intervenors,* | ) |
| v. | ) |
| UNITED STATES, | ) |
| *Defendant,* | ) |
| BLUESCOPE STEEL LTD., AND<br>BLUESCOPE STEEL AMERICAS INC., | ) |
| *Defendant-Intervenors.* | ) |

Court. No. 21-00528

**NON-CONFIDENTIAL VERSION**
Business Proprietary Information Removed from Brackets on Pages 3 and 16-19.

**PLAINTIFF'S AND PLAINTIFF-INTERVENORS' REPLY BRIEF
IN SUPPORT OF THE RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin
Jeffrey D. Gerrish
Kelsey M. Rule

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics, Inc. and
SSAB Enterprises, LLC*

Thomas M. Beline
Yohai Baisburd
Sarah E. Shulman

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
 (202) 567-2300

*Counsel to United States Steel Corporation*

Date:   July 7, 2022

NON-CONFIDENTIAL VERSION

**Table of Contents**

Page

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.  BlueScope Reimbursed Its Affiliated Importer; *Post Hoc* Rationalizations Do Not Overcome Commerce's Failure to Remedy this Reimbursement ........................................... 3

    A.  The Government's Position that Commerce's Reimbursement Regulation Does Not Apply to Indirect Reimbursement Is a *Post Hoc* Rationalization that Is Not Entitled to Deference ................................................................ 3

    B.  Despite the Government's Attempt to Write Indirect Reimbursement Out of the Law, Reimbursement Nevertheless Occurred .............................................. 5

        1.  Regardless of whether reimbursement is labeled as "indirect," Commerce's regulation requires an adjustment when a producer reimburses its importer for antidumping duties ....................................... 5

        2.  Antidumping duties must always be paid; the anti-reimbursement regulation guards against the foreign producer paying the duties, which is exactly what occurred here.................................................. 7

    C.  Commerce's Margin Calculation Will Not Otherwise Account For The Lowering Of An Invoice Price For Antidumping Duties Without An Adjustment For Reimbursement ........................................................ 10

II.  Further Manufacturing Profit — As Distinct From Constructed Export Price Profit — Must be Accurately Calculated and Accounted For In Commerce's Constructed Export Price Calculation ......................................................... 11

    A.  The Government's Arguments Miss the Mark Because Plaintiffs Have Not Challenged the Constructed Export Price Profit Calculation........................... 12

    B.  The Government's Litigation Position Is Explicitly Contradicted By Commerce's *Final Results* ............................................................ 13

    C.  The Statute Has Long Required Commerce to Reduce Constructed Export Price by an Amount for Profit Allocable to the Further Manufacturing Expenses Incurred in the United States............................................................ 14

    D.  There Is No Double Counting ...................................................... 16

CONCLUSION .................................................................................................. 20

NON-CONFIDENTIAL VERSION

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677a ................................................................................................12

19 U.S.C. § 1677a(d) .......................................................................................12, 14

19 U.S.C. § 1677a(f) ...........................................................................................14

19 U.S.C. § 3512(d) ............................................................................................15

Regulations

19 C.F.R. § 351.402(f)(1) ...................................................................................3, 5

Court Decisions

*Abbott Labs. v. United States,* 573 F.3d 1327 (Fed. Cir. 2009) ......................................4

*Apex Exps. v. United States,* Consol. No. 11-291, Slip Op. 13-158 (Ct. Int'l Trade 2013) .................................................................................... 10, 11

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988) ...............................................4

*MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303 (Ct. Int'l Trade 2009) ....................................................................................5, 16

*Pandrol USA, LP v. Airboss Ry. Prods.*, 320 F.3d 1354 (Fed. Cir. 2003) ...............5, 16

*Torrington Co. v. United States*, 881 F. Supp. 622 (Ct. Int'l Trade 1995) .....................7

*WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067 (Fed. Cir. 2019) ....................................................................................4, 5, 16

*Wheatland Tube Co. v. United States,* 495 F.3d 1355 (Fed. Cir. 2007*)* ........................10

Administrative Determinations

*Antifriction Bearings from France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 54,043 (Oct. 17, 1997) ...................................4, 7

*CTVs from Korea; Final Results of Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 4,408 (Feb. 6, 1996) ...........................................6

*Dynamic Random Access Memory Semiconductors of One Megabit or Above
from the Republic of Korea; Preliminary Results of Antidumping Duty
Administrative Review*, 60 Fed. Reg. 47,149 (Sept. 11, 1995) ..........................................14, 15, 16

*Porcelain-on-Steel Cookware from Mexico: Final Results of
Antidumping Duty Administrative Review,* 65 Fed. Reg. 30,068
(May 10, 2000)..................................................................................................................................3, 4

Other Administrative Materials

Policy Bulletin 97.1, "Calculation of Profit for Constructed Export Price
Transactions," (Sept. 4, 1997)..................................................................................................13, 14

Other Legislative Materials

Statement of Administrative Action Accompanying the Uruguay Round
Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ............................................................. *passim*

NON-CONFIDENTIAL VERSION

**INTRODUCTION**

This reply brief is submitted by Plaintiff, United States Steel Corporation ("U. S. Steel"), and Plaintiff-Intervenors, SSAB Enterprises LLC and Steel Dynamics, Inc. (collectively, "Plaintiffs"), to respond to the briefs filed by Defendant, United States,[1] and Defendant-Intervenors, BlueScope Steel Ltd. and BlueScope Steel Americas, Inc. (collectively, "BlueScope"),[2] concerning U. S. Steel's challenges to the final results of the 2018-2019 administrative review concerning the antidumping duty order on imports of hot-rolled steel flat products from Australia. *See Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping Duty Administrative Review and Final Rescission of Review, in Part; 2018-2019*, 86 Fed. Reg. 47,054 (Dep't of Commerce Aug. 23, 2021) ("*Final Results*") (P.R. 124).[3] As discussed below, the response briefs offer *post hoc* rationalizations that are not entitled to deference for Commerce's failure to adjust for unlawful reimbursement of antidumping duties; and otherwise respond to an issue that is not on appeal for why Commerce erred in using a net U.S. price for hot-rolled steel that includes profit generated on further manufacturing activities (*i.e.*, profit generated by non-subject merchandise).

As demonstrated in our opening brief, Commerce must, by law, make an adjustment to constructed export price ("CEP") when a producer reimburses its importer for antidumping duties, regardless of whether it is "direct," "indirect," obvious, or complicated — reimbursement

---

[1] Response Brief of United States in Response to Plaintiff's Motion for Judgement Upon the Agency Record, Ct. No. 21-528, ECF No. 45-46 (citations to the brief take the form "USG Br. at __").

[2] Response Brief of BlueScope Steel Ltd. and BlueScope Steel Americas Inc., Ct. No. 21-528, ECF No. 43-44 (citations to the brief take the form "BlueScope Br. at __").

[3] The Issues and Decision Memorandum is available at P.R. 116 and cited herein as "IDM at __ (P.R. 116)." All citations to the administrative record take the form "P.R.__" or "C.R.__".

is reimbursement.[4]  The Government bases its entire response on a single legal theory, *viz.*, that Commerce's anti-reimbursement regulation *allows* producers to reimburse their importers so long as it is done *indirectly*.  The Government's position that Commerce's regulations do not apply to indirect reimbursement has never been expressed by Commerce.  As such, it is a *post hoc* rationalization that is not owed deference by the Court.  The Government's position is also internally inconsistent and undermines the spirit of the antidumping duty law and Commerce's regulations.  Moreover, the Government's reliance on the payment of antidumping duties as evidence that no reimbursement occurred is a red herring and does not address that reimbursement actually did occur.  Substantial record evidence — the invoice price from BlueScope's Australian producer to the related U.S. importer — demonstrates that the price was reduced by BlueScope for the exact amount of antidumping duties owed by the importer.  This is, by definition, reimbursement.  Commerce failed to grapple with this reality administratively, and the Government's novel litigation theory is not entitled to any deference because it is not found in any Commerce decision memorandum.

Plaintiffs demonstrated that Commerce committed legal error by including profit attributable to further manufacturing activities in the United States distinct from the profit attributable just to the imported hot-rolled steel coil in the net U.S. price for the subject merchandise.  That is, by statute Commerce must calculate an amount for further manufacturing profit that is specific to the value added in the United States.  To do otherwise would be to include profit attributable to non-subject merchandise in the net U.S. price for the subject merchandise.  This increases the U.S. price used in the dumping calculation and masks the extent

---

[4] "A rose is a rose is a rose is a rose."  Gertrude Stein, *Sacred Emily* (1913).

of BlueScope's dumping.  The Government responds by claiming that Commerce did not

commit an error because its CEP profit rate was calculated correctly.  But no party disputes the

CEP profit calculation.  In fact, Plaintiffs demonstrated that while Commerce also uses an

amount for further manufacturing in its CEP profit calculation of total profit, the statute's

directive to apportion the further manufacturing amount between subject and non-subject

merchandise would [                    ] the CEP profit ratio thereby avoiding double counting.

For the reasons discussed herein and in Plaintiffs' opening brief, Plaintiffs respectfully

request that the Court remand the matter to Commerce with instructions to revise its antidumping

calculations.

## ARGUMENT

### I.   BlueScope Reimbursed Its Affiliated Importer; *Post Hoc* Rationalizations Do Not Overcome Commerce's Failure to Remedy this Reimbursement

#### A.   The Government's Position that Commerce's Reimbursement Regulation Does Not Apply to Indirect Reimbursement Is a *Post Hoc* Rationalization that Is Not Entitled to Deference

The Government advocates a *post hoc* legal position that indirect reimbursement is

allowed because it is not explicitly named by Commerce's anti-reimbursement regulation.  The

Government claims that "neither Commerce's regulations nor the Preamble indicate that they

apply to indirect reimbursement."  USG Br. at 10.  It asserts that "Commerce's removal of the

reference to indirect reimbursement <u>demonstrates an intent that 19 C.F.R. § 351.402(f)(1)(i) not

apply to indirect reimbursement</u>."  *Id*. at 11 (emphasis added).  Commerce has never taken the

position that its regulation excludes indirect reimbursement.  *See* IDM at 8 (P.R. 116) ("The

plain language of Commerce's regulation is genuinely ambiguous with respect to direct or

indirect reimbursement {and the} *Preamble* additionally does not address whether or not

Commerce's regulation applies to indirect reimbursement."); *Porcelain-on-Steel Cookware from*

*Mexico: Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 30,068 (May 10, 2000) and accompanying Issues and Decision Memorandum at Cmt. 1 ("the language of the certification requirement does not exclude indirect reimbursements of the importer by the exporter or producer.").  This new policy advanced by the Government for the first time on appeal[5] is merely a convenient litigation strategy that is not owed deference.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *Abbott Labs. v. United States*, 573 F.3d 1327, 1332–33 (Fed. Cir. 2009) ("{W}e owe deference only to those considered agency judgments as to the issue directly involved in the litigation, not to the views of litigation counsel.").

Because the Government limits its response to a *post hoc* legal theory not found in Commerce's *Final Results*, it fails to address the entirety of Plaintiffs' argument in support of its regulatory interpretation — *i.e.*, the "example" of reimbursement Commerce provided in *Antifriction Bearings* ("*AFBs*") in accordance with the Court's holding that there must be a link between the lowered invoice price and the antidumping duties.  Opening Br. at 10 & 14;[6] *see* USG Br. at 6 ("Plaintiffs' challenge . . . is based entirely upon Commerce's long-since replaced 1980 regulations.").  As such, the Government has waived its defense to the majority of Plaintiffs' argument.  *See WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1073

---

[5] Underscoring the *post hoc* nature of the Government's argument is its failure to make the same argument in the appeal of the previous administrative review of the hot-rolled steel from Australia order concerning Commerce's reimbursement regulation.  If the Government's position were a true reflection of the agency's considered judgment, the Government would have made the argument consistently.

[6] Memorandum of Points of Law and Fact in Support of the Rule 56.2 Motion for Judgement on the Agency Record Filed by Plaintiff and Plaintiff-Intervenors, Ct. No. 21-528, ECF No. 37-38 (citations to the brief take the form "Opening Br. at __").

(Fed. Cir. 2019) (finding an argument not raised in briefing "was waived on this appeal");

*Pandrol USA, LP v. Airboss Ry. Prods.*, 320 F.3d 1354, 1366-67 (Fed. Cir. 2003) (holding that

defendant's argument "was waived when it was not raised in response to the motion…"); *see*

*also MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303, 1308 (Ct. Int'l Trade 2009)

("'{i}ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived. It is not enough merely to mention a possible argument in

the most skeletal way, leaving the court to do counsel's work…").  Stated differently, Plaintiffs

did not rely solely on Commerce's original regulations to demonstrate Commerce's intent to

apply its anti-reimbursement regulation to indirect reimbursement activities.  Regardless, the

Government's novel theory is found nowhere in Commerce's *Final Results*, and therefore cannot

be relied upon by the Court.

**B.**    **Despite the Government's Attempt to Write Indirect Reimbursement Out of the Law, Reimbursement Nevertheless Occurred**

1.    *Regardless of whether reimbursement is labeled as "indirect," Commerce's regulation requires an adjustment when a producer reimburses its importer for antidumping duties*

Contrary to the way the Government argues the case at bar, Commerce made a fact-

specific finding that "the facts on the record {do not} demonstrate indirect reimbursement."

IDM at 7 (P.R. 116).  But Commerce misapplied the law in making this finding, and the

Government's *post hoc* rationalization before this Court is an unreasonable construction of the

anti-reimbursement regulation.

Commerce's regulations direct it to "deduct the amount of any antidumping duty" that

the producer "{r}eimbursed to the importer."  19 C.F.R. § 351.402(f)(1).  The Government

contends that by "exclud{ing} reference to indirect reimbursement" when amending its rules in

1998, Commerce "demonstrate{d} an intent that 19 C.F.R. § 351.402(f)(1)(i) not apply to

indirect reimbursement."  USG Br. at 11.  *See id*. at 6 ("The fact that the 1980 regulation included more expansive language, language that Commerce did not include when it revised the regulation in 1998, underscores Commerce's intent not to include that language in its 1998 regulation.").  But the Government's logic is an unreasonable construction of the regulation.  By the Government's logic, the reimbursement regulation would not correct for *any* reimbursement at all.  In fact, if the Government were correct, Commerce's regulation would not even apply to "direct" reimbursement, because reference to direct reimbursement was also removed from the regulation as well.  Accordingly, if the anti-reimbursement regulation applies to neither direct nor indirect reimbursement, the Government's *post hoc* argument has rendered it a nullity.

In any event, the Government's rationale is belied by Commerce's own reasoning that it explained administratively.  As Commerce recognized in its *Final Results*, IDM at 8 (P.R. 116), the plain language of Commerce's anti-circumvention regulation does not limit its application to any specific kind of reimbursement.  By removing modifying adjectives such as "direct or indirect" from its 1998 regulation, the more logical and correct inference is that Commerce intended to adjust for *any* reimbursement of duties, regardless of how such reimbursement is accomplished.  This would comport with the spirit of the antidumping law insofar as it requires duties to be paid so that the price to the importer is higher.  *CTVs from Korea; Final Results of Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 4,408, 4,410-11 (Feb. 6, 1996) ("In effect, antidumping duties raise prices of subject merchandise to importers, thereby providing a level playing field upon which injured U.S. industries can compete.").  Therefore, Commerce's post-promulgation amendments to its anti-reimbursement regulation have not narrowed the application of the regulation — as advocated by the Government, USG Br. at 10 & 11 — but rather broadened its applicability to any scenario where the producer has reimbursed its importer.

2.   *Antidumping duties must always be paid; the anti-reimbursement regulation guards against the foreign producer paying the duties, which is exactly what occurred here*

The Government contends that reimbursement did not occur, as a factual matter, because antidumping duties were paid upon entry.  USG Br. at 6.  But evidence of reimbursement is found in the invoice price between the foreign producer and U.S. importer.  Reimbursement has nothing to do with whether duties were paid.  This is the same as if a direct payment were made from a foreign producer to its U.S. importer.  In both circumstances, antidumping duties are paid to the U.S. Treasury.  Yet, unlawful reimbursement has occurred.

No party disputes that a direct payment of funds by a foreign producer to a U.S. importer would constitute reimbursement.  Commerce also considers a producer lowering the amount invoiced to the importer for antidumping duties to be assessed "an example of what it considers to be reimbursement."  IDM at 8 (P.R. 116) (citing *AFBs from France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 54,043 (Oct. 17, 1997), IDM at Section 13, Comment 1.).  Indeed, lowering the invoice price by the amount of antidumping duties constitutes "a link" evidencing reimbursement, as contemplated by the Court in *Torrington*.  *Torrington Co. v. United States*, 881 F. Supp. 622, 632 (Ct. Int'l Trade 1995).

Once an importer is reimbursed through the invoice price (or any other means), that reimbursement cannot be remedied through the entered value or payment of antidumping duties as claimed by the Government.  An importer that pays the producer a duty-inclusive invoice price will not be assessed antidumping duties on the full invoice price.  Rather, antidumping duties are assessed on the entered value — *i.e.*, the value declared upon entry.  To calculate entered value, Customs regulations allow importers to deduct non-dutiable charges from the

7

NON-CONFIDENTIAL VERSION

invoice price — including antidumping duties included in the invoice price.  Headquarters

Ruling Letter (HQ) H301048, "Request for Internal Advice Regarding Deductions from Entered

Value of Softwood Lumber; Countervailing Duties; Anti-Dumping Duties," dated May 26, 2021

("the importer of record is still required to . . . identify the non-dutiable charges within the

invoice price, including duties in the case of a DDP transaction").  Stated differently, entered

value (the basis for duty payment) will never be duty inclusive, regardless of the payment terms.

Accordingly, looking to the amount of the entered value does nothing to remedy or address

reimbursement.

Consistent with Commerce's description of unlawful reimbursement,[7] the facts of the

underlying record support an affirmative finding that reimbursement occurred.  As the

Government concedes, the producer — BlueScope / AIS — lowered the amount invoiced to its

importer — BSA — for antidumping duties owed.  USG Br. at 2-3 ("the respondent's transfer

price to its United States importer did deduct duty amounts"); *id*. at 15 ("the fact that AIS

lowered its transfer price to BSA by the amount of estimated antidumping duties") (quoting IDM

at 9 (P.R. 116)); *id*. at 4 ("BlueScope calculates the transfer price from AIS to BSA by deducting

amounts for estimated antidumping duties").  There is no factual dispute that BlueScope lowered

the invoice price to its importer for antidumping duties.

The economic impact of invoice-based reimbursement vis-à-vis direct payment

reimbursement is one and the same.  Both activities ensure that the economic burden of the duty

---

[7] Commerce's rule is not premised on there being a supply agreement dictating a duty-inclusive price.  Rather, Commerce simply recognizes a producer lowering the price invoiced to its affiliated importer by an amount for antidumping duties to be reimbursement.  Therefore, BlueScope's arguments concerning whether the supply agreement applies to the price between the producer and importer should be disregarded.  *See* BlueScope Br. at 12-15.

remains with the foreign producer rather than the U.S. importer, even though the U.S. importer

actually pays the duties to U.S. Customs and Border Protection for the release of the goods.  For

example, if an importer is charged the full price (steel + duty) for the steel sold by the producer

and is paid the full price (steel + duty) by the purchaser, it is the importer that bears the expense

of the antidumping duties assessed by Customs.  Conversely, if the importer is charged the full

price less the antidumping duties and is paid the full duty-inclusive price by the purchaser, the

importer does not bear the expense of the antidumping duties assessed by Customs.  Here, the

importer (BSA) was charged the steel price less the antidumping duties and was paid the full

duty-inclusive price by the purchaser (Steelscape).  *Id*. at 2-4, 15; *id*. at 5 ("The supply

agreement also provided that shipments of subject merchandise be made on a Delivered Duty

Paid basis."); *id*. at 15 ("BSA paid the antidumping duties, and added those duties into its price

for Steelscape.").  BSA retains those profits on the transaction, and the economic burden of the

duty falls on the foreign producer.  Having the economic burden reside offshore is exactly the

opposite of what the statute intends and what Commerce's regulations safeguard against.

Rather than address the lowered invoice price, the Government relies on the importer's

payment of antidumping duties as evidence disproving reimbursement.  The Government asserts

that "Commerce's determination that AIS, an Australian exporter, did not reimburse BSA, its

affiliated United States importer, is supported by substantial record evidence showing that BSA

paid antidumping duties on its imports of hot-rolled steel from Australia."  *Id*. at 6; *see also id*. at

5 ("Commerce also found that record evidence showed that BSA paid antidumping duties."); *id*.

at 9 ("BSA, AIS's United States importer, provided record evidence in the form of a supply

agreement showing that BSA actually paid antidumping duties."); *id*. at 2-3 ("Record evidence

demonstrates that, although the respondent's transfer price to its United States importer did

deduct duty amounts, owed duties were ultimately paid by the United States importer and not reimbursed.").

The Government's reliance on the payment of antidumping duties is a red herring.  To be clear, the importer is always responsible for paying antidumping duties in exchange for goods being released into the commerce of the United States, regardless of whether it is reimbursed for those duties.  If the importer does not pay antidumping duties, the merchandise will not enter the United States.  Even if BSA received a check from BlueScope for the antidumping duties, BSA still would have had to pay those duties.  Therefore, the payment of duties does not establish that reimbursement did not occur.  By relying on the payment of antidumping duties instead of the lowered invoice price between BlueScope and its importer, Commerce failed to support its reimbursement finding in the *Final Results* with substantial evidence.

### C.   Commerce's Margin Calculation Will Not Otherwise Account For The Lowering Of An Invoice Price For Antidumping Duties Without An Adjustment For Reimbursement

The Government argues, "{a}s a matter of law. . . the price used by Commerce as a starting point for its constructed export price calculations will necessarily incorporate any deductions in the amount of estimated antidumping duties." USG Br. at 15.  This contention is belied by Commerce's long-standing practice — as repeatedly upheld by the courts — of not considering antidumping duties as a cost to be deducted from CEP.  *See Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007) (Upholding Commerce's finding, "cit{ing} to a series of cases in which the practice of not considering antidumping duties as 'United States import duties' has been repeatedly upheld."); *Apex Exps. v. United States*, Consol. No. 11-291, slip op. 13-158 at 17 (Ct. Int'l Trade 2013) ("Commerce has a longstanding practice not to deduct antidumping duties as costs, expenses or import duties because antidumping duties are

neither selling expenses nor normal customs duties. . . . Such practices have been sustained not only by this court but also by the Federal Circuit.") (internal citations omitted).  Commerce may wish to reconsider its approach, but that is not what it did administratively.

The Government goes on to argue that "{i}nsofar as AIS's transfer price did not factor into Commerce's constructed export price, that is only because BSA paid the antidumping duties, and added those duties into its price for Steelscape – meaning that neither entity is insulated from the disincentivizing effect of antidumping duties."  USG Br. at 15.  However, as discussed above, there is no dispute concerning whether BSA paid antidumping duties or whether Steelscape paid a duty-inclusive price.  Reimbursement is accomplished through the foreign producer's lowering the invoice price by the amount of antidumping duties.

Unlike the Government, BlueScope admits that the reimbursement of antidumping duties in the invoice price between producer and importer will not be reflected in Commerce's dumping calculation.  BlueScope Br. at 11.  That said, BlueScope mistakenly asserts that reimbursement will be accounted for by the entered value.  *See id*. at 11.  However, by deducting antidumping duties from the *invoice price* BlueScope reimburses its importer under Commerce's rules, whereas *entered value* is always lowered for antidumping duties included in the invoice price in accordance with Customs' rules.  Thus, entered value will never account for antidumping duties reimbursed through the invoice price.

## II.   Further Manufacturing Profit — As Distinct From Constructed Export Price Profit — Must be Accurately Calculated and Accounted For In Commerce's Constructed Export Price Calculation

In the United States, BlueScope imports hot-rolled steel and further manufactures it into coated steel.  "BlueScope Steel's Section A Questionnaire Response," dated March 3, 2020 at 39 (P.R. 33, C.R. 3).  To attain a "net" U.S. price for hot-rolled steel to compare to a "net" home

market price for hot-rolled steel, the antidumping statute instructs Commerce to make certain deductions to the invoice price to the first unaffiliated party in the transaction. *See* 19 U.S.C. § 1677a. Further manufacturing activities (*i.e.*, the further manufacturing costs) are one such element to be deducted from the invoice price. *See* 19 U.S.C. § 1677a(d)(2). This makes sense because coated steel is *not* the subject merchandise — hot-rolled steel is. In this case, the "net" hot-rolled steel price includes an embedded profit amount attributable to the further manufacturing activities because Commerce failed to follow the guidance of the statute and the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act ("URAA"). Such an increased U.S. sales price masks dumping. As discussed below, neither the Government nor BlueScope meaningfully address the gravamen of Plaintiffs' statutory argument.

### A.    The Government's Arguments Miss the Mark Because Plaintiffs Have Not Challenged the Constructed Export Price Profit Calculation

The Government argues that "Commerce's calculation of constructed export price profit is in accordance with law." USG Br. at 3. This response completely misses the mark because Plaintiffs did not challenge Commerce's CEP profit calculation.[8] Rather, Plaintiffs challenged Commerce's failure to calculate a further manufacturing profit specific to the value added in the United States pursuant to 19 U.S.C. § 1677a(d)(3), and to adjust CEP accordingly. To the extent CEP profit is implicated, it is only insofar as Commerce included an inflated amount of further manufacturing profit in its CEP profit calculation. IDM at 11 (P.R. 116) ("the variable CEPOTHER . . . includes the cost of further manufacturing.").

---

[8] From page 16 to 18 of its brief, BlueScope similarly argues, "Plaintiffs claim that Commerce is required to calculate different CEP profit amounts for different cost components of the CEP sales price." BlueScope's argument should be rejected for the same reasons discussed above.

The Government is unable to point to any language in Commerce's underlying decision that addresses the substance of Plaintiffs' challenge — the calculation of *further manufacturing profit*. Instead, the Government relies solely on two sentences out of the IDM discussing Commerce's *CEP profit* calculation and concludes that Commerce meaningfully addressed Plaintiffs' "concern." USG Br. at 17-18. Again, Plaintiffs' concern is about calculating an accurate "net" U.S. price by accounting for further manufacturing profit specific to the value added in the United States. Simply put, the profit associated with further manufacturing activities should not be included in the net U.S. price of hot-rolled steel (*i.e.*, the subject merchandise). Stated clearly — Plaintiffs do not challenge Commerce's CEP profit calculation and the CEP profit calculation has little to do with Plaintiffs' actual legal challenge.

**B.    The Government's Litigation Position Is Explicitly Contradicted By Commerce's *Final Results***

In mischaracterizing Plaintiffs' argument, the Government undermines Commerce's longstanding CEP profit calculation methodology. Specifically, the Government claims that Commerce's CEP profit calculation does not include an amount for further manufacturing profit. USG Br. at 7 ("Plaintiffs next claim that Commerce's calculation of constructed export price profit failed to account for 'further manufacturing profit,' but cannot establish any authority requiring, or even permitting, such an adjustment."). The Government's position is flawed as it is not responsive to Plaintiffs' challenge and contradicts Commerce's longstanding practice and explicit position in the *Final Results*.

Beyond missing the mark, the Government's position that Commerce's CEP profit calculation does not account for further manufacturing profit is at odds with Commerce's long-standing practice and its *Final Results*. As established in Policy Bulletin 97.1, Commerce's CEP profit calculation includes an amount for further manufacturing profit as a component of costs of

13

NON-CONFIDENTIAL VERSION

goods sold. *See* Policy Bulletin 97.1, "Calculation of Profit for Constructed Export Price

Transactions," dated Sept. 4, 1997 ("Policy Bulletin 97.1"). And in its *Final Results*, Commerce

confirmed that the "variable CEPOTHER, in the calculation of CEP Profit at line 9334, includes

the cost of further manufacturing." IDM at 11 (P.R. 116). Plaintiffs' position is that the amount

Commerce included for further manufacturing was inflated as it was not apportioned between

subject (hot rolled coil) and non-subject (value added in the United States) merchandise. *See*

Opening Br. at 34, 36-37.

     The Government claims the statute does not distinguish between CEP profit and further

manufacturing profit. USG Br. at 16-17. The Court need look no further than the plain language

of the statute to observe the flaw in the Government's assertion. Commerce's further

manufacturing profit and CEP profit adjustment are provided for under two distinct provisions of

the statute. *See* 19 U.S.C. § 1677a(d)(2) (directing Commerce to apportion profit to the "cost of

any further manufacture"); 19 U.S.C. § 1677a(f) ("special rule for determining profit").

Moreover, the Government's position is unreasonable insofar as Commerce has conclusively

established that further manufacturing profit is a distinct component of its CEP profit calculation.

*See* Policy Bulletin 97.1. A part cannot equal the whole, and Commerce lacks the authority to

read an entire subsection of the statute out of the law.

    **C.   The Statute Has Long Required Commerce to Reduce Constructed Export Price
by an Amount for Profit Allocable to the Further Manufacturing Expenses
Incurred in the United States**

     The Government attempts to discount Plaintiffs' statutory argument, claiming that "{t}he

law applied in *DRAMS from Korea* was thus replaced by the passage of the Uruguay Round

NON-CONFIDENTIAL VERSION

Agreements Act."[9]  USG Br. at 16.  Notably, the Government does not deny that in *DRAMS from Korea*, Commerce calculated an apportioned further manufacturing amount and adjusted the CEP accordingly.  Further, the Government conflates the URAA amendments with "replacing" a Commerce practice.  Rather, the practice Commerce adopted in *DRAMS from Korea* was codified in the URAA and reflected in the SAA.

In *DRAMS from Korea*, Commerce "deducted all value added in the United States {from the CEP}."  Commerce included in the value added in the United States a "proportional amount of profit or loss attributable to the value added."  *Dynamic Random Access Memory Semiconductors of One Megabit or Above from the Republic of Korea; Preliminary Results of Antidumping Duty Administrative Review*, 60 Fed. Reg. 47,149, 47,150 (Sept. 11, 1995) ("*DRAMs from Korea*").  Stated differently, Commerce did not include any profit in the net U.S. price attributable to further manufacturing activities.  This practice is consistent with the express direction provided by the SAA to calculate CEP "by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses (and profit) associated with economic activities occurring in the United States: . . . for profit allocable to the selling, distribution, and further manufacturing expenses incurred in the United States."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 823 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4165 ("SAA").  As the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and Act in any judicial proceeding in which a

---

[9] BlueScope similarly argues that the URAA eliminated the need for Commerce to make a further manufacturing profit adjustment.  BlueScope Br. at 18-22.  For the same reasons discussed here, BlueScope's arguments should be rejected.

NON-CONFIDENTIAL VERSION

question arises concerning such interpretation or application," 19 U.S.C. § 3512(d),[10] the SAA's directive for Commerce to allocate profit for further manufacturing activities must be construed to bind Commerce's actions here.  Deducting profit associated with further manufacturing expenses incurred in the United States from the CEP, as Commerce did in *DRAMS from Korea*, is consistent with the purpose of the provision, which is to calculate CEP "as closely as possible {to} a price corresponding to an export price between non-affiliated exporters and importers." SAA at 823.

The Government summarily dismisses Plaintiffs' position that CEP profit cannot satisfy the statute's further manufacturing profit adjustment "because {CEP profit} is [

].'' USG Br. at 17.  As an initial matter, the Government fails to explain how Plaintiffs' argument is "contrary to the statute," *id*., thus waiving any such defense.  *See WesternGeco*, 913 F.3d at 1073; *Pandrol USA*, 320 F.3d at 1366-67; *see also MTZ Polyfilms*, 659 F. Supp. 2d at 1308.  Moreover, as Plaintiffs demonstrated in their opening brief, Commerce's CEP profit adjustment accounts for total actual profit for all sales in both the home and U.S. markets.  *See* Opening Br. at 33-35.  Given that further manufacturing profit is intended to account for the "expenses incurred in the United States" — SAA at 823 — CEP profit cannot reasonably account for further manufacturing profit.

**D.   There Is No Double Counting**

BlueScope's argument that "Plaintiffs' calculation would result in impermissible double counting and non-sensical profit rates" is wrong.  BlueScope Br. at 22.

---

[10] Insofar as BlueScope attempts to dismiss the authoritative weight of the SAA as not Congressionally mandated, its argument is belied by the statute.  *See* BlueScope Br. at 18-19.

*First*, Commerce's dumping calculation in the *Final Results* was distorted by failing to apportion the further manufacturing profit amount already included under CEPOTHER and CEP Profit.  As Commerce recognized, "the variable CEPOTHER . . . includes the cost of further manufacturing."  IDM at 11 (P.R. 116).  "CEPOTHER {is} in the calculation of CEP Profit."  *Id*.  And the CEP profit is "to be deducted from the starting price in the U.S. market."  *Id*.  Plaintiffs do not advocate that Commerce adjust its methodology.  Plaintiffs simply aver that the amount Commerce included for further manufacturing should be specific to the value added in the United States and associated profit.  Apportioning the profit attributable to further manufacturing on one hand and the profit attributable to the hot-rolled steel coil on the other hand will result in an accurate net U.S. price because it will include only the profit attributable to the subject merchandise.  Because CEP profit considers the overall profitability of the respondent (BlueScope), the amount attributed to further manufacturing profit will impact the CEP profit ratio.

BlueScope claims, "Plaintiffs propose an additional deduction to price, which would be the total 'profit' on each individual U.S. sale, that then Plaintiff <u>also</u> includes as part of the CEP profit calculation."  BlueScope Br. at 23.  BlueScope ignores the fact that Commerce's methodology already provides for further manufacturing profit to be included under CEPOTHER and converted into a cost under CEP Profit.  Specifically, in its *Final Results*, Commerce included the full amount of profit attributable to the further manufactured merchandise under CEPOTHER (*i.e.*, $[          ]) and calculated a further manufacturing profit ratio of [          ] percent.  By isolating the amount of profit attributable to further manufacturing activities performed post-entry (*i.e.*, $[          ]) under CEPOTHER, Commerce would have calculated a further manufacturing profit ratio of [          ] percent.  Insofar as CEP is adjusted for the further

manufacturing profit included under CEPOTHER, by calculating CEP profit using further manufacturing profit as a cost — [          ] the CEP profit ratio — Commerce's dumping calculation avoids double counting.  *Id.* at Attachment I (resulting in [

]).

*Second*, calculating an apportioned further manufacturing profit amount does not result in "non-sensical" profit rates.  Specifically, BlueScope contends that Plaintiffs' proposed ratio to attribute the further manufacturing profit amount based on the "ratio of Steelscape's cost of purchasing hot rolled steel (the entered value of the hot rolled steel) to Steelscape's total cost of finished coated steel (entered value + cost of further processing)" is both incorrect and unnecessary because there is no "non-subject merchandise revenue."  *Id.* at 24-25.  BlueScope claims that unlike other cases in which there may be assemblies that can be easily segregated into subject and non-subject parts, the final product sold by Steelscape is hot rolled steel that has been cold rolled and coated with zinc and other materials, making the underlying steel an integral and inseparable part of the finished product.  *Id.* at 25.

BlueScope's contentions are wrong.  Commerce has no rule that such transformations should "easily segregate into subject and non-subject" streams of revenue as claimed by BlueScope.  In this instance, post-importation further manufacturing causes a physical change to the imported hot-rolled coil.  There is no question that the value added by this post-importation further manufacturing process requires the physical addition of raw materials and additional variable and fixed costs to transform the hot rolled coil — *i.e.*, "non-subject merchandise revenue."  What is at issue is that the profit realized on the sale of the final merchandise is attributable to the transformation of both the merchandise under consideration ("MUC") and non-MUC components.  Except for the CEP profit allocated to further processing, the profit

realized by the transformation is treated as value added to MUC — distorting the U.S. net price amount.  Thus, the profit generated from post-importation activities must accurately and reasonably be attributed to both MUC and non-MUC to avoid distortions in the margin calculations.  In this instance, the relationship between the entered value and the entered value plus the value added after importation is the most reasonable method of attributing profit to MUC and non-MUC.

Finally, BlueScope incorrectly claims the resulting profit amount is distortive. Specifically, BlueScope argues that a further manufacturing profit rate of [     ] on Steelscape's sales of MUC is distorted given that the company reports an actual profit rate of only [       ]. Id. at 23-24.  BlueScope is advocating an apples-to-oranges comparison.  Steelscape's company-wide profit cannot reasonably be compared to the specific profit realized on MUC that was further processed by Steelscape.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court hold Commerce's *Final Results* are not in accordance with law.  Plaintiffs further request that this Court remand the agency's determination with instructions to Commerce to correct its errors and provide such other relief as this Court deems appropriate.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>/s/ Roger B. Schagrin</td><td>/s/ Sarah E. Shulman</td></tr>
<tr><td>Roger B. Schagrin<br>Jeffrey D. Gerrish<br>Kelsey M. Rule</td><td>Thomas M. Beline<br>Yohai Baisburd<br>Sarah E. Shulman</td></tr>
<tr><td>SCHAGRIN ASSOCIATES<br>900 Seventh Street, N.W.<br>Suite 500<br>Washington, DC 20001<br>(202) 223-1700</td><td>CASSIDY LEVY KENT (USA) LLP<br>900 19th Street, N.W.<br>Suite 400<br>Washington, D.C. 20006<br> (202) 567-2300</td></tr>
<tr><td>*Counsel to Steel Dynamics, Inc. and SSAB Enterprises, LLC*</td><td>*Counsel to United States Steel Corporation*</td></tr>
</table>

Date:  July 7, 2022

NON-CONFIDENTIAL VERSION

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the forgoing submission of "Plaintiffs' and Plaintiff-Intervenors' Reply Brief in Support of the Rule 56.2 Motion for Judgment on the Agency Record" filed on July 7, 2022, contains 5,687 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 7,000 word count limitation set forth in rule 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade.

BY: <u>/s/ Sarah E. Shulman</u>
Sarah E. Shulman