Slip Op. 24-71

UNITED STATES COURT OF INTERNATIONAL TRADE

---

|  |  |
|---|---|
| UNITED STATES STEEL CORPORATION, | : |
| Plaintiff, | : |
| and | : |
| SSAB ENTERPRISES LLC, and STEEL DYNAMICS, INC., | : |
| Plaintiff-Intervenors, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| BLUESCOPE STEEL LTD. and BLUESCOPE STEEL AMERICAS, INC., | : |
| Defendant-Intervenors. | : |

Before: Richard K. Eaton, Judge

Court No. 21-00528

**PUBLIC VERSION**

---

## OPINION

[U.S. Department of Commerce's final results are sustained.]

Dated: June 13, 2024

*Sarah E. Shulman*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Plaintiff United States Steel Corporation. With her on the brief were *Thomas M. Beline* and *Yohai Baisburd*.

*Roger B. Schagrin*, *Jeffrey D. Gerrish*, and *Kelsey M. Rule*, Schagrin Associates, of Washington, D.C., for Plaintiff-Intervenors Steel Dynamics, Inc. and SSAB Enterprises LLC.

*Kelly A. Krystyniak*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Spencer*

*Neff*, Staff Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Daniel L. Porter*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for Defendant-Intervenors BlueScope Steel Ltd. and BlueScope Steel Americas, Inc. With him on the brief were *Christopher A. Dunn* and *James C. Beaty*.

Eaton, Judge: On May 16, 2023, proceedings in this case were stayed "pending resolution of the appeal in *U.S. Steel Corp. v. United States*, No. 22-2078." Order (May 16, 2023), ECF No. 67. That case involved the second administrative review of the antidumping duty order covering hot-rolled steel from Australia ("Order"). *See Certain Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962 (Dep't of Commerce Oct. 3, 2016) (Order). On April 4, 2024, the Federal Circuit, as discussed below, published its opinion in *U.S. Steel Corp. v. United States*,[1] affirming this Court's holding that the U.S. Department of Commerce's ("Commerce" or the "Department") non-reimbursement finding was supported by substantial evidence and otherwise in accordance with law. *See* 97 F.4th 1364, 1371 (Fed. Cir. 2024); *see also U.S. Steel Corp. v. United States*, 46 CIT __, 578 F. Supp. 3d 1323 (2022). Thereafter, the court lifted its stay of this case. *See* Order (May 1, 2024), ECF No. 71.

This case involves the final results of Commerce's third administrative review of the Order. *See Certain Hot-Rolled Steel Flat Products From Australia*, 86 Fed. Reg. 47,054 (Dep't of Commerce Aug. 23, 2021) ("Final Results") and accompanying Issues and Decision Mem. (Aug. 17, 2021), PR 116 ("Final IDM"); *see also* Order, 81 Fed. Reg. at 67,962. Domestic steel producers Plaintiff United States Steel Corporation ("U.S. Steel") and Plaintiff-Intervenors Steel Dynamics,

---

[1]        On May 28, 2024, the Federal Circuit issued its Mandate. *See* Mandate (May 28, 2024), Ct. No. 22-2078, ECF No. 78.

Inc. and SSAB Enterprises LLC (collectively, "Plaintiffs") challenge certain aspects of the Final Results.

Before the court is Plaintiffs' motion for judgment on the agency record. *See* Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 37 ("Pls.' Br."); Pls.' Reply, ECF No. 47. By their motion, Plaintiffs challenge as unsupported by substantial evidence and otherwise not in accordance with law, the dumping margin that Commerce determined for the sole mandatory respondent in the review—a collapsed entity of affiliated steel companies in Australia owned by Defendant-Intervenor BlueScope Steel Ltd. Specifically, Plaintiffs fault Commerce for not making two adjustments to U.S. price. First, Plaintiffs argue that the respondent exporter reimbursed its affiliated U.S. importer for the payment of antidumping duties, and, therefore, that Commerce was required to make a deduction from U.S. price for those duties. Second, Plaintiffs argue that Commerce must make a standalone deduction from U.S. price for profit resulting from the further manufacture of the steel in the United States.

The United States ("Defendant"), on behalf of Commerce, and Defendant-Intervenors BlueScope Steel Ltd. and BlueScope Steel Americas, Inc. ask the court to sustain Commerce's non-reimbursement finding and its finding that the profit deduction had been made, and thus to deny Plaintiffs' motion. *See* Def.'s Resp. Br., ECF No. 45 ("Def.'s Br."); Def.-Ints.' Resp. Br., ECF No. 43 ("Def.-Ints.' Br.").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018). For the following reasons, the court finds that Commerce's non-reimbursement finding and its decision not to make a standalone profit deduction for further manufacturing are supported by substantial evidence, and are otherwise in accordance with law. Plaintiffs' motion is therefore denied, and the Final Results are sustained.

## BACKGROUND

On January 17, 2020, Commerce initiated its third administrative review of the antidumping duty order on hot-rolled steel flat products from Australia. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 3,014 (Dep't of Commerce Jan. 17, 2020). The period of review ("POR") was October 1, 2018, to September 30, 2019. *See* Final IDM at 1.

Commerce reviewed one mandatory respondent[2]—a collapsed entity consisting of affiliated companies owned by Defendant-Intervenor BlueScope Steel Ltd. ("BlueScope").[3] *See* Final IDM at 1. BlueScope is the parent company of the Australian producer and exporter of the subject steel, BlueScope Steel (AIS) Pty Ltd. ("Exporter"), the U.S. importer of that steel Defendant-Intervenor BlueScope Steel Americas, Inc. ("Importer"), and the Importer's U.S.

---

[2]    As an exception to the general rule that "[Commerce] shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise," the statute permits Commerce to "determine the weighted average dumping margins for a *reasonable number* of exporters or producers." 19 U.S.C. § 1677f-1(c) (emphasis added); *see also Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1235-36 (2021) (labeling this exception the "Mandatory Respondent Exception"). Although the statute provides for a reasonable number, "Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be 'representative' of unexamined respondents for the purpose of calculating the all-others rate in a review, a devolution that this Court has regarded with some skepticism." *Jilin Forest Indus.*, 45 CIT at __, 519 F. Supp. 3d at 1236 (footnote omitted) (first citing *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); and then citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009)). As the Federal Circuit has stated, "a 'reasonable number' is generally more than one." *YC Rubber Co. (N. Am.) LLC v. United States*, No. 21-1489, 2022 WL 3711377, at *4 (Fed. Cir. Aug. 29, 2022).

[3]    The collapsed entity consisted of three companies: BlueScope, the parent company; BlueScope Steel (AIS) Pty Ltd. ("Exporter"); and BlueScope Steel Distribution ("Distributor"). *See* Final IDM at 1; BlueScope Steel Ltd.'s Resp. Sec. A Quest. (Mar. 3, 2020) at 8-9, PR 33, CR 3. Neither the Exporter nor the Distributor is a party to this action.

customer, Steelscape LLC ("Steelscape").[4] *See* BlueScope Steel Ltd.'s Resp. Sec. A Quest. (Mar. 3, 2020) at 8, 12, PR 33, CR 3 ("BlueScope's Resp. Sec. A Quest."). BlueScope and the Exporter, together with three other Australian entities, comprise Australian Steel Products ("ASP"), which is "an internal company designation for a segment" of the BlueScope business "responsible for both the manufacture and sale of the subject goods." BlueScope's Resp. Suppl. Sec. A Quest. (July 10, 2020) at 12-13, PR 59, CR 146; *see* BlueScope's Resp. Second Suppl. Sec. A Quest. (Dec. 17, 2020) at 5, PR 73, CR 159. In other words, it is not ASP itself that manufactures and sells the goods (as it is not its own legal entity), but rather the companies included in this designation.

Relevant to Commerce's determination of U.S. price are two back-to-back transactions between BlueScope's affiliated companies: (1) BlueScope, through its Exporter, sold the subject steel to the Importer, and (2) the Importer then resold the steel to Steelscape. *See* BlueScope's Resp. Sec. A Quest. at 2. After purchasing the subject steel from the Importer, "Steelscape further processed [in the United States] the subject merchandise into non-subject coated steel before its first sale to an unrelated customer." *Id.* This non-subject, further manufactured product was the only product Steelscape sold to unaffiliated U.S. customers. *See id.* at 2, 6-7, 22.

The back-to-back transactions among the three affiliates were governed by the terms of a supply agreement. *See* BlueScope's Resp. Suppl. Sec. A Quest. at Ex. SA-5 ("Supply Agreement"), PR 60, CR 152; *see also* Final IDM at 7.[5] This Supply Agreement set the transfer

---

[4]       Steelscape is BlueScope's half-owned subsidiary, in that BlueScope and another entity (Nippon Steel Sumitomo & Metal Corporation) each own a fifty percent interest in a holding company which itself wholly owns Steelscape. *See* BlueScope's Resp. Sec. A Quest. at 8.

[5]       The Supply Agreement is the same agreement that applied in the case involving the prior administrative review. *See U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1325-26. There have been no changes to the Supply Agreement since the prior administrative review. *See* BlueScope's Resp. Sec. A Quest. at 20.

price between the Importer and Steelscape through a pricing formula[6] and included a confidential

shipping term.[7] The effect of the pricing formula, read together with the shipping term, was that

the "reference prices [in the pricing formula] [were] delivered, duty-paid prices, that is, they

assume that the [Importer] [paid] freight, insurance, and any duties that might accrue on the

importation of the steel." Def.-Ints.' Br. at 5; *see also* BlueScope's Rebuttal Br. (Apr. 6, 2021)

at 4, PR 109, CR 265. In other words, in accordance with the pricing formula, the Importer paid

the antidumping duties (and freight) on the hot-rolled steel, and the price that Steelscape paid the

Importer for the subject steel included "the estimated duties and freight." Def.-Ints.' Br. at 6.

While the Supply Agreement detailed the pricing between the Importer and Steelscape, it

did not state how the invoice price between the Exporter and the Importer was determined. In its

questionnaire responses, however, BlueScope (the owner of all the affiliated companies) submitted

a transfer pricing worksheet to Commerce, which showed how BlueScope calculated the invoice

price from the Exporter to the Importer for the subject steel. *See* BlueScope's Resp. Suppl. Sec. A

Quest. at Ex. SA-6. First, BlueScope calculated the price of the hot-rolled steel to Steelscape using

the pricing formula in the Supply Agreement—this gave the base price of the steel, which

BlueScope adjusted for product characteristics. *See* Mem. from Allison Hollander to File, re: Final

Results Analysis Mem. for BlueScope Steel (AIS) Pty Ltd, BlueScope Steel Limited, and

---

[6]        The pricing formula in the Supply Agreement is: "[[

        ]]." Supply Agreement at 10.

[7]        The shipping term is "DDP [Delivered Duty Paid] Incoterms 2010", which is "the
Delivered Duty Paid section of the Incoterms 2010 produced by the International Chamber of
Commerce". Supply Agreement at 4, 10. This term means that "[t]he seller [Importer] bears all the
costs and risks involved in bringing the goods to the place of destination and has an obligation to
clear the goods not only for export but also for import, to pay any duty for both export and import
and to carry out all customs formalities." *U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1325 n.2
(quoting the 2010 Incoterms).

BlueScope Steel Distribution (Aug. 17, 2021) ("Final Analysis Mem.") at 3, PR 117, CR 266. From this price charged to Steelscape, BlueScope deducted commissions, ocean freight, and inland freight to reach a "mill duty paid" price. *See id.* Then, BlueScope deducted estimated duties (including antidumping duties) to reach the entered value.[8] BlueScope then added ocean freight to the entered value to reach the Importer's transfer price. Thus, the amount that the affiliated Importer paid the affiliated Exporter was a duty-free price. The Importer then paid the estimated antidumping duty cash deposits on the entered value, as demonstrated in its antidumping duty deposit account. *See id.*; BlueScope's Resp. Suppl. Sec. A Quest. at Ex. SA-15.

Of importance to this case, BlueScope calculated the transfer price from the Exporter to the Importer by first referencing the duty-inclusive price eventually charged to Steelscape. BlueScope then deducted estimated antidumping duties. *See* Final IDM at 9 ("[Exporter] calculates [Importer's] transfer price by, among other things, deducting an amount for estimated antidumping duties[9] from the price calculated for its ultimate affiliated purchaser, Steelscape."). In doing so, BlueScope accounted for the fact that the Importer made two payments: first, it paid to U.S. Customs and Border Protection ("Customs") the estimated antidumping duties on the entered value of the subject merchandise, and second, it paid to the Exporter the transfer price for the subject

---

[8]    Estimated duties are the duties calculated at the time of entry and include any antidumping duties. *See* 19 U.S.C. § 1505(a); *see also* 19 C.F.R. § 141.103 (2019).

[9]    Commerce also describes the deduction of estimated duties in its Final Analysis Memorandum, stating that "BlueScope deducts estimated duties (29.71 percent) from $[[          ]] to arrive at the $[[        ]] entered value, upon which [the Importer] paid its cash deposit antidumping duties." Final Analysis Mem. at 3. The estimated duties deducted here are nearly identical to the antidumping duty margin in place at the time of the purchase order between the Importer and Steelscape (December 20, 2018). *See* Order, 81 Fed. Reg. at 67,965; BlueScope's Resp. Sec. A Quest. at Ex. A-8, PR 34, CR 4.

steel itself. Steelscape then paid the Importer an amount that included the estimated duties (which had been paid by the Importer) and the price of the steel.

On February 23, 2021, Commerce issued its preliminary results. *See Certain Hot-Rolled Steel Flat Products From Australia*, 86 Fed. Reg. 10,923 (Dep't Commerce Feb. 23, 2021) ("Preliminary Results"), and accompanying Preliminary Decision Mem. (Feb. 16, 2021) ("PDM"), PR 94. In the Preliminary Results, Commerce found that BlueScope made sales of subject merchandise at less than fair value. *See* Preliminary Results, 86 Fed. Reg. at 10,924. As part of its dumping calculation, Commerce made certain adjustments to U.S. price, including an adjustment for the cost of further manufacturing the subject merchandise in the United States and for the profit allocable to further manufacture in the United States.[10] *See* PDM at 10. Commerce, however, declined to adjust U.S. price for reimbursement of antidumping duties, having found that "the record does not demonstrate that BlueScope reimbursed its U.S. affiliate [Importer]." *Id.*

On August 23, 2021, Commerce published its Final Results. *See* Final Results, 86 Fed. Reg. at 47,054. In the Final Results, Commerce continued to find that BlueScope, through its Exporter, did not reimburse the Importer for antidumping duties. *See* Final IDM at 7. Therefore, Commerce did not make a deduction from U.S. price for reimbursement of antidumping duties. Commerce did, however, deduct from U.S. price the profit allocated to U.S. selling expenses and the profit allocated to the further manufacture. *See id.* at 11-12; *see also* 19 U.S.C. § 1677a(d); Computer Programs from USDOC to File, Pertaining to BlueScope Margin Program Log (Feb.

---

[10]    Commerce made these deductions in accordance with the statute, which provides three different deductions ("Additional adjustments") specific to constructed export price: (1) a deduction for selling expenses, (2) a deduction for the cost of further manufacturing, and (3) a deduction for the profit allocated to the selling expenses and the cost of further manufacturing. *See* 19 U.S.C. § 1677a(d).

18, 2021), PR 97, CR 258. As a result, Commerce determined a dumping margin of 9.94% for

BlueScope. *See Final Results*, 86 Fed. Reg. at 47,054.


## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).


## LEGAL FRAMEWORK

To determine whether subject merchandise is being sold in the United States at less than

fair value, Commerce compares the U.S. price (export[11] or constructed export price ("CEP")[12]

with the price at which the foreign like product is sold in the exporting country (normal value).

*See* 19 U.S.C. §§ 1677a, 1677b. If Commerce determines that subject merchandise is being sold

at less than fair value, Commerce must impose an antidumping duty equal to "the amount by which

the normal value exceeds the export price (or the constructed export price) for the merchandise."

19 U.S.C. § 1673. This amount is known as the dumping margin. *See id.* § 1677(35)(A).

---

[11]    The "export price" is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under [19 U.S.C. § 1677a(c)]." 19 U.S.C. § 1677a(a).

[12]    The "constructed export price" is "the price at which the merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under [19 U.S.C. § 1677a(c) and (d)]." 19 U.S.C. § 1677a(b). Here, BlueScope reported that all sales to the United States were made on a constructed export price basis. *See* PDM at 9.

When determining U.S. price, Commerce must make certain adjustments, if applicable. *See id.* § 1677a(c)-(d); 19 C.F.R. § 351.402(a) (2019). These adjustments include a deduction for the reimbursement of antidumping duties, as stated in Commerce's regulation. *See* 19 C.F.R. § 351.402(f). The reimbursement regulation states: "[i]n calculating the export price (or the constructed export price) [the U.S. price], [Commerce] will deduct the amount of any antidumping duty or countervailing duty which the exporter or producer: (A) Paid directly on behalf of the importer; or (B) Reimbursed to the importer." *Id.* § 351.402(f)(1)(i).

The purpose of the reimbursement regulation is "to preserve the statute's remedial purpose by discouraging foreign exporters from assuming the cost of duties." *Hoogovens Staal BV v. United States*, 22 CIT 139, 141, 4 F. Supp. 2d 1213, 1217 (1998); *see also id.* at 141, 4 F. Supp. 2d at 1216 ("The antidumping statute provides a remedy to domestic producers injured by dumping." (first citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990); and then citing *Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States*, 9 CIT 213, 216-17, 608 F. Supp. 653, 656 (1985))). When "the exporter assumes the cost of antidumping duties, an importer could continue to import at the lower, dumped price," placing U.S. producers at a competitive disadvantage without a viable remedy for this injury. *Id.* at 141, 4 F. Supp. 2d at 1217.

When the transactions at issue are among affiliated companies, as they are here, evidence that intracorporate transfers occurred, without more, is not enough to find reimbursement. There must be "evidence showing a link between intracorporate transfers and the reimbursement of antidumping duties." *See Torrington Co. v. United States*, 19 CIT 403, 410, 881 F. Supp. 622, 632 (1995); *see, e.g.*, *U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1333 ("Commerce's finding that the Exporter's deduction of estimated antidumping duties from its invoice to the Importer, without

evidence that the price charged to the Importer was further lowered to reimburse the duties, fails

to demonstrate reimbursement . . . .").

Another adjustment to the U.S. starting price, stated in 19 U.S.C. § 1677a(d)(3), is a

deduction for "the profit allocated to" certain expenses, i.e., selling expenses and the cost of further

manufacturing the product. *See id.* § 1677a(d). The amount for profit is determined by reference

to a separate subsection, § 1677a(f), titled "[s]pecial rule for determining profit." *Id.* § 1677a(f)

("For purposes of subsection (d)(3), profit shall be an amount determined by multiplying the total

actual profit by the applicable percentage.").

When a product is further manufactured after it has entered the United States, Commerce

is directed to make certain adjustments to the U.S. starting price to take this further manufacturing

into account. *See id.* § 1677a(d)(2)-(3). The purpose of these adjustments (including the profit

allocated to further manufacturing) is to make sure the CEP (U.S. price) reflects the price of the

product as entered. *See Fla. Citrus Mut. v. United States*, 550 F.3d 1105, 1110 (Fed. Cir. 2008)

(indicating that Commerce makes adjustments when calculating CEP (U.S. price) in order "to

achieve 'a fair, "apples-to-apples" comparison' between U.S. price and foreign market value"

(quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995))).


**DISCUSSION**

**I.    Commerce's Finding of No Reimbursement Is Supported by Substantial Evidence
        and in Accordance with Law**

Commerce determined that the Exporter did not reimburse the Importer for antidumping

duties during the POR. *See* Final IDM at 9-10. In particular, Commerce found that the transfer

price from the Exporter to the Importer did not demonstrate reimbursement:

> [The Exporter]'s pricing methodology, in which [the Exporter] calculates [the Importer's] transfer price by, among other things, deducting an amount for estimated antidumping duties from the price calculated for its ultimate affiliated purchaser, Steelscape, is not evidence of reimbursement on the part of [the Exporter] as defined by Commerce's regulation against reimbursement. Therefore, consistent with *Torrington*,[13] for these final results, we continue to find that there is no basis to conclude that reimbursement of [antidumping] duties occurred in this segment of the proceeding.

*Id.* at 8. When making this finding, Commerce looked at the subsequent transaction between the Importer and Steelscape, the affiliated U.S. purchaser and further manufacturer: "The record is clear that [the Importer] paid [antidumping duty] deposits, and passed the price of those duties on to Steelscape. Thus, Steelscape's U.S. customers bore the impact of the antidumping duties." *Id.* at 9. In other words, the Importer paid duties on the steel and Steelscape paid an amount for the steel that included those duties, and Steelscape's customers paid a duty-inclusive price for the steel. Thus, the burden of the duties was felt in the U.S. market—the Exporter did not assume the burden of the duties.

Plaintiffs claim, however, as was argued in the *U.S. Steel* case resulting from the prior administrative review, that reimbursement occurred when the Exporter lowered the amount invoiced to the Importer to take account of antidumping duties.[14] *See* Pls.' Br. at 10; *see also U.S.*

---

13    The Court in *Torrington* sustained Commerce's decision not to make a deduction for reimbursement, citing Commerce's statement that "[e]vidence of below-cost transfer pricing between related parties is not in itself evidence of reimbursement of antidumping duties." *Torrington Co.*, 19 CIT at 409, 881 F. Supp. at 631. The Court held: "In light of Torrington's failure to produce any evidence showing a link between intracorporate transfers and the reimbursement of antidumping duties, this Court finds Commerce properly decided not to make a deduction to [U.S. price] for antidumping duty reimbursement or to conduct an investigation concerning transfer prices." *Id.* at 410, 881 F. Supp. at 632.

14    Plaintiff U.S. Steel was the plaintiff in *U.S. Steel*, a case sustaining Commerce's final results in the prior administrative review. *See U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1323; *U.S. Steel*, 97 F.4th at 1364. Plaintiff-Intervenors here, SSAB Enterprises LLC and Steel Dynamics, Inc., were not parties in that lawsuit.

*Steel*, 46 CIT at __, 578 F. Supp. 3d at 1326. Plaintiffs argue that "BlueScope indirectly reimbursed

its importer by lowering the [hot-rolled steel, i.e., subject merchandise] price by an amount for

antidumping duties," and, thus they further argue, "BlueScope ensured the burden of the

antidumping duty was carried by the Australian producer instead of the importer." Pls.' Br.

at 11, 26.

The court finds Plaintiffs' argument unconvincing and thus sustains Commerce's finding

of no reimbursement. Importantly, the facts here are nearly identical to those in *U.S. Steel*, the case

resulting from the prior administrative review:

> Shorn of references to transfer pricing, tri-partite agreements, and Commerce's
> regulations, the facts show: a single entity took the final price paid by its last-in-
> line affiliate, deducted from that price an amount equal to the duties paid at the time
> of entry, and used the result as the basis for the price charged to the Importer. Thus,
> the entered price, as is universally the case, did not contain duties which were paid
> at entry by the Importer. The Importer (as an affiliate) paid the duties and added
> them to the price charged to the last-in-line affiliate purchaser. Plaintiffs have
> presented no evidence that the Exporter adjusted the price charged to the Importer
> in two ways: first, to make the price free of the duties that the Importer would pay
> at entry, and second, in an amount sufficient to reimburse the duties paid by the
> Importer at entry. Thus, Plaintiffs have failed to demonstrate that the actual
> payments and prices charged were anything other than those in a garden variety
> transaction among an exporter, an importer, and an unaffiliated purchaser. That the
> price paid was arrived at by means of a formula found in the Supply Agreement
> simply does not matter so long as the price paid for the merchandise by the Importer
> was not discounted to account for the duties.

*U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1331; *id.* at 1325 (holding that "Commerce's non-

reimbursement finding is supported by substantial evidence and otherwise in accordance with

law"); *see also U.S. Steel*, 97 F.4th at 1370-71. In other words, in *U.S. Steel*, the price the importer

charged to Steelscape (the affiliated U.S. purchaser and further manufacturer) was a duty-inclusive

price. Thus, in *U.S. Steel*, the importer—the same entity as the Importer here—separately paid the

duties on the entered value of the steel. Thereafter, the price the importer charged Steelscape

included the value of the duties. That is, the *U.S. Steel* Court held that the price to the importer

was determined by subtracting the duties from the duty-inclusive price that Steelscape paid. This way, the importer did not pay duties twice. Regardless of BlueScope's pricing formula, the price the affiliated importer paid for the subject steel was not lowered by an amount to reimburse it for antidumping duties.

All this is true here too. First, BlueScope (the parent company) determined the price that would be charged to Steelscape (the affiliated U.S. purchaser and further manufacturer), which was a duty-inclusive price. *See* Final Analysis Mem. at 3; Final IDM at 9. Then, BlueScope deducted commissions, ocean freight, inland freight, *and estimated duties (including antidumping duties)* to reach the value of the entered steel. *See* Final Analysis Mem. at 3. On importation, the Importer paid the estimated antidumping duties on this amount. *See id.* Next, BlueScope added ocean freight to the value of the entered steel to reach the transfer price to the Importer. *See id*. As a result, the price the Importer paid for the subject merchandise was the entered value—"the price of the merchandise at the port of export" in Australia—plus ocean freight. BlueScope's Rebuttal Br. at 4; *see* Final Analysis Mem. at 3. This price to the Importer did not include estimated duties, and the Importer separately paid those duties at entry.

Consequently, there is no evidence that reimbursement occurred. The transfer price from the Exporter to the Importer was not lowered to reimburse the Importer for antidumping duties. So, there is no link between the intracorporate transfers and the reimbursement of antidumping duties. *Torrington*, 19 CIT at 410, 881 F. Supp. at 632. As in *U.S. Steel*:

> Plaintiffs have failed to demonstrate that the actual payments and prices charged were anything other than those in a garden variety transaction among an exporter, an importer, and an unaffiliated purchaser. That the price paid was arrived at by means of a formula found in the Supply Agreement simply does not matter so long as the price paid for the merchandise by the Importer was not discounted to account for the duties.

*U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1331.

Additionally, the purpose of the antidumping law is satisfied: the Importer paid antidumping duties and passed the burden to the affiliated U.S. further manufacturer, Steelscape—the Exporter did not bear the burden of the duties.

### A.  Alleged Factual Distinctions of This Case

Although the nature of the transactions is the same here as in *U.S. Steel*, Plaintiffs claim that two factual distinctions exist in this administrative review that require a finding of reimbursement. First, Plaintiffs claim that the terms of a purchase order between the Importer and Steelscape demonstrate that the Exporter, as part of an Australian steel segment, was responsible for the antidumping duties. *See* Pls.' Br. at 28; *see also* BlueScope's Resp. Sec. A Quest. at Ex. A-8, PR 34, CR 4. Also, to show that the Exporter, in fact, paid the duties, and thus reimbursed the Importer, Plaintiffs rely on a transfer pricing worksheet. Pls.' Br. at 8; *see also* BlueScope's Resp. Suppl. Sec. A Quest. at Ex. SA-6.

Second, Plaintiffs point to an additional factual distinction, a statement Commerce made in its Final IDM, addressing the lowered transfer price from the Exporter to the Importer. According to Plaintiffs, "Commerce mistakenly suggested that the 'lowered transfer price from [the Exporter] to [the Importer] by the amount of dumping duties offers no relief to [the Importer], because the lowered transfer price will be reflected in [the Exporter's] dumping margin.'" Pls.' Br. at 20.

### 1.  The Purchase Order Does Not Evidence Reimbursement of Duties

Plaintiffs claim that the terms of the purchase order between Steelscape (the affiliated U.S. purchaser and further manufacturer) and the Importer confirm that the Exporter was responsible

for the payment of antidumping duties.[15] *See* Pls.' Br. at 28 ("BlueScope confirmed ASP [Australian Steel Products]—its Australian steel producing segment—took all risk of the antidumping duty."). The confidential language of the purchase order, to which Plaintiffs point, states, "ASP[16] continues to take risk on all AD duties up to the existing c. 30%[17]."[18] BlueScope's Resp. Sec. A Quest. at Ex. A-8.

---

[15]        It should be noted that Plaintiffs attribute to BlueScope an assertion that the company did not, in fact, make. Plaintiffs claim that BlueScope admitted that "antidumping duties are for [sic] the responsibility of ASP [Australian Steel Products], not the responsibility of Steelscape." Pls.' Br. at 28 (citing BlueScope's Rebuttal of U.S. Steel's Pre-Prelim. Cmts. (Feb. 1, 2021) at 5, PR 87, CR 243 ("BlueScope's Pre-Prelim. Cmts.")). BlueScope never admitted this. Instead, BlueScope cited a statement in Plaintiff U.S. Steel's pre-preliminary comments to rebut it: "[U.S. Steel] notes specifically that Steelscape's purchase order for the steel explicitly states that antidumping duties are for [sic] the responsibility of ASP, not the responsibility of Steelscape." BlueScope's Pre-Prelim. Cmts. at 4-5. BlueScope offered its rebuttal by stating that "Steelscape's purchase order[,] in fact[,] says nothing about who actually pays the antidumping duties. Rather, it makes clear that the 'responsibility' for dumping duties belongs to someone else, not Steelscape." *Id.* at 5 n.1.

[16]        As previously noted, Australian Steel Products, or ASP, is not its own legal entity, but rather is "an internal company designation for a segment" of the BlueScope business "responsible for both the manufacture and sale of the subject goods." BlueScope's Resp. Suppl. Sec. A Quest. at 12-13. In other words, it is not ASP that itself manufactures and sells the goods, but rather the companies included in this designation that do so. ASP consists of five of BlueScope's Australian entities, including BlueScope, the Exporter, and the Distributor. *See* BlueScope's Resp. Second Suppl. Sec. A Quest. at 5; BlueScope's Resp. Sec. A Quest. at Ex. A-2.

[17]        In its Final Analysis Memorandum, Commerce states that "BlueScope deducts estimated duties (29.71 percent) from $[[          ]] to arrive at the $[[       ]] entered value, upon which [the Importer] paid its cash deposit antidumping duties." Final Analysis Mem. at 3. In other words, the estimated duties here are nearly identical to the antidumping duty margin in place at the time of the purchase order, varying by just over a tenth of a percentage point. *See* Order, 81 Fed. Reg. at 67,965.

[18]        In its entirety, the purchase order description states, "[]Risk of additional AD duties on POR3 is shared equally between parties; []ASP continues to take risk on all AD duties up to the existing c. 30%; and []this only relates to POR3 and has no bearing on other PORs or future pricing from ASP to SS [Steelscape]". BlueScope's Resp. Sec. A Quest. at Ex. A-8.

The purchase order is an agreement between two affiliates—Steelscape (the affiliated U.S. purchaser and further manufacturer) and the Importer—and appears to allocate which affiliated entity takes the risk with respect to both antidumping duties and those duties in excess of duties represented by the cash deposit rate.[19] This language, however, is of no use to Plaintiffs. As with the back-to-back transactions discussed, *supra*, the affiliated entity contractually obligated to take the risk with respect to the duties simply does not matter. What matters is what actually occurred, not which entity contractually assumes what responsibility. Here, the affiliated importer made two payments: (1) one for the steel, and (2) one for the duties, so that ultimately the unaffiliated purchaser paid a price that was duty-inclusive. The regulation against reimbursement is aimed at the unaffiliated U.S. purchaser—if it pays the duty-inclusive price, and is itself not reimbursed, there is no evidence of unlawful reimbursement because the burden of the duties is in the United States. *See* 19 C.F.R. § 351.402(f)(1)(i); *see also Hoogovens Staal BV*, 22 CIT at 141, 4 F. Supp. 2d at 1216-1217.

An examination of the purchase order, and a review of the actual transactions themselves, reveals that the Exporter did not agree to pay antidumping duties or, in fact, that it paid them. Rather, the key phrase—"take risk"—merely indicates that, if the steel is not sold to an unaffiliated

---

[19]          In this context, "additional" duties means duties in excess of estimated duties. *See United States v. Am. Home Assurance Co.*, 47 CIT __, __, 653 F. Supp. 3d 1277, 1280, 1292 n.22 (2023) (indicating that "additional duties" are "amounts in excess of the cash deposit" of estimated duties). The estimated duties upon which the Importer paid cash deposits are apparently the "c. 30%" referenced in the purchase order because this was the antidumping margin at the time the purchase order was created in 2018, before Commerce had done its first administrative review on the antidumping Order. *See* Order, 81 Fed. Reg. at 67,965 (stating that BlueScope's weighted average dumping margin is 29.58%). Because the purchase order says "ASP continues to take risk on all AD duties up to the existing c. 30%," that means that it would not take risk on anything more than 30%. Yet to take risk on duties in excess of estimated duties, ASP would have to take risk on an amount *more than* 30%, such as 31%. Thus, under this term of the purchase order, it does not appear that ASP takes risk on excess duties.

purchaser, the affiliated entities responsible for the duties are those entities (such as the Exporter) included in the Australian steel segment, Australian Steel Products (ASP), which manufactured and sold the steel. Thus, the provision to which Plaintiffs point refers to which affiliated entity assumed the risk in the event that Steelscape did not sell the steel. It means that, if Steelscape did not sell the further manufactured product (non-subject coated steel), the entities that comprise ASP would pay the antidumping duties. BlueScope's Resp. Second Suppl. Sec. A Quest. at 5. That is, the risk assumed by ASP was that it would become responsible for the duties only if Steelscape did not sell the non-subject coated steel. The risk of having to pay the duties would then solely be an internal matter.[20] Steelscape, however, did sell the coated steel, and so the risk provisions of the purchase order were never put into effect because the precondition for ASP being on the hook for the duties, never took place. Thus, this part of the various agreements was never invoked.

What matters here, for purposes of the reimbursement regulation, is the sale that did take place to the unaffiliated U.S. purchaser. That is, the unaffiliated U.S. purchaser obtained the further manufactured steel at the duty-inclusive price. Thus, the burden of the duties was felt by an unaffiliated purchaser in the U.S. market—not by the Exporter in Australia. Accordingly, the term in the Steelscape purchase order does not show that ASP, which includes the Exporter, actually reimbursed the Importer for antidumping duties. And the reimbursement regulation, 19 C.F.R. § 351.402(f), was not violated.

---

[20]     If Steelscape did not sell the steel—not the facts here—then the product would not reach the customers in the U.S. market. In this scenario, there would, of course, be no impact on the U.S. market. Indeed, for antidumping purposes there would be no way to determine CEP (U.S. price) absent a sale to an unaffiliated purchaser. Thus, the transfer of the responsibility for the duties to ASP would merely be an internal transfer, and therefore would not affect the U.S. market.

Plaintiffs next argue that BlueScope's transfer pricing formula confirms the reimbursement allegedly promised in the purchase order. *See* Pls.' Br. at 8, 26-27 ("BlueScope's transfer pricing worksheet . . . confirms that BlueScope indirectly reimbursed its importer by lowering the [hot-rolled steel] price by an amount for antidumping duties."). The transfer pricing formula is nothing new to these proceedings, as it has been considered by both this Court and the Federal Circuit. *See* *U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1331; *U.S. Steel*, 97 F.4th at 1370-71 ("Even after weighing this evidence, the agency found that the transfer pricing methodology did not constitute reimbursement. . . . The record indicates that the evidence before the agency was adequate to support the agency's finding of nonreimbursement.").

The transfer pricing formula found in this case is the same one considered by the courts in *U.S. Steel*. *See U.S. Steel*, 46 CIT at __, 578 F. Supp. 3d at 1325 n.3; *U.S. Steel*, 97 F.4th at 1367-68, 1370-71. All this formula shows is a transfer between affiliated companies whereby the estimated duties included in the price to the affiliated further manufacturer, are deducted in setting the price to the affiliated importer. BlueScope's Resp. Suppl. Sec. A Quest. at Ex. SA-6. As noted, in accordance with the transfer pricing formula, the affiliated Importer separately paid antidumping duties and passed them on by including them in the price charged to Steelscape, which then passed them on to the unaffiliated purchaser. Nothing in the formula or the facts demonstrates that the price to the Importer was lowered in an amount sufficient to reimburse it for antidumping duties, only that the price charged to the Importer was duty free. *See* BlueScope Rebuttal Br. at 4 ("[The Importer] has paid an amount exactly equivalent to the price set forth in the pricing formula: the FOB [free on board] Australia price, plus the estimated duties that it pays separately."); *see also* BlueScope's Resp. Suppl. Sec. A Quest. at Ex. SA-6. Plaintiffs' attempt to show reimbursement through the combination of the purchase order and BlueScope's transfer pricing formula fails

because neither provides evidence that unlawful reimbursement was anticipated by the formula or the agreement, or that such reimbursement was actually made.

### 2. Commerce's Statement on Transfer Pricing Does Not Evidence Reimbursement of Duties

Plaintiffs next argue that Commerce was mistaken in its Final IDM when it stated that "[a]s a practical matter, the fact that [the Exporter] lowered its transfer price[21] to [the Importer] by the amount of estimated antidumping duties offers no relief to [the Importer] because the lowered transfer price will be accurately reflected in [the Exporter's] dumping margin." Final IDM at 9. For Plaintiffs, Commerce is incorrect because, "[b]y statute, Commerce disregards the transfer price in its dumping calculation." Pls.' Br. at 20. Plaintiffs go on to claim that "[t]he lowered transfer price will not be reflected in BlueScope's margin without a reimbursement adjustment." *Id.* at 23.

Plaintiffs may well be right that what they call the "lowered transfer price" would "not be reflected in BlueScope's [dumping] margin" because the transfer price plays no role in the dumping margin's calculation. *See generally* 19 U.S.C. §§ 1677a, 1677b. Nonetheless, this focus on Commerce's statement does not help Plaintiffs' case.

As previously discussed, under the transfer pricing formula, the transfer price that the Importer pays to the Exporter is calculated by subtracting an amount equal to the estimated duties from the price paid by Steelscape, the affiliated U.S. purchaser and further manufacturer. The Importer both pays the Exporter for the steel and pays the antidumping duties (duties determined

---

21      Although Commerce and Plaintiffs use the phrase "lowered transfer price," its use does not accurately describe what has happened here. The Importer's transfer price was never "lowered"—it was merely determined by making deductions from the duty-inclusive price that Steelscape paid. In other words, the deductions were made to *reach* the Importer's transfer price, but the Importer's transfer price was never itself lowered.

by the dumping margin) to Customs. The price paid by Steelscape (the affiliated U.S. purchaser and further manufacturer) and by the unaffiliated purchasers, thus represents (1) an amount for the steel and (2) an amount for the antidumping duties. Thus, the burden of the duties was assumed by U.S. purchasers just as the statute intends. Whatever Commerce meant by its statement is thus immaterial to the decision of this case because no reimbursement took place.

Therefore, Plaintiffs' two alleged factual distinctions do not support a finding of reimbursement. As in *U.S. Steel*, here Plaintiffs have not shown a link between the affiliates' transfer pricing and the reimbursement of antidumping duties. Thus, Commerce's determination that there was no reimbursement is sustained.

## II.    Commerce's Calculation and Deduction of Profit from U.S. Price Is Supported by Substantial Evidence and in Accordance with Law

When calculating constructed export price, i.e., CEP (U.S. price), the statute directs Commerce to make certain adjustments to "the first sale price to an unaffiliated purchaser ('starting price')." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1304 (Fed. Cir. 2001). The purpose of these adjustments is "to achieve 'a fair, "apples-to-apples" comparison' between U.S. price and foreign market value [normal value]." *Fla. Citrus Mut.*, 550 F.3d at 1110 (quoting *Torrington Co.*, 68 F.3d at 1352). Among these adjustments is a deduction for *profit allocated to* (1) selling expenses incurred in the United States and (2) *the further manufacturing that takes place in the United States*. *See* 19 U.S.C. § 1677a(d)(3). In addition, an adjustment is made for the cost of any further manufacturing itself. *See id.* §1677a(d)(2).

In its Final Results, Commerce made one deduction from the starting price in the United States for profit, and this deduction included an amount for profit allocated to selling expenses incurred in the United States and an amount for profit allocated to the cost of further manufacturing

in the United States. *See* Final IDM at 11-12.

Plaintiffs insist that Commerce acted contrary to law by only making one profit deduction, for "CEP profit": "Commerce erred as a matter of law by concluding that 'the appropriate amount of profit attributable to further manufacturing activities has already been deducted from CEP [U.S. price] {by [including profit allocable to further manufacture in the total] CEP profit [amount]}' thus declining to reduce the U.S. starting price by an apportioned further manufacturing profit amount." Pls.' Br. at 35. For Plaintiffs, the statute requires two profit deductions for activities taking place in the United States when CEP (U.S. price) is being calculated: one for "further manufacturing profit" and one for CEP profit. *See id.* at 33; Pls.' Reply at 14. As to the deduction for "further manufacturing profit" (i.e., profit allocated to further manufacture), the Plaintiffs argue that "by both failing to [1] calculate a further manufacturing profit amount apportioned to the value added in the United States after import and [2] reducing CEP [U.S. price] by that amount, Commerce calculated a dumping margin based on an inflated U.S. price inconsistent with the dumping statute." Pls.' Br. at 2.

The essence of Plaintiffs' argument appears to be that, in fact, Commerce did not deduct an amount for the profit allocated to the further manufacturing that took place in the United States and that "the profit associated with further manufacturing activities should not be included in the net U.S. price of hot-rolled steel (*i.e.*, the subject merchandise)." Pls.' Reply at 13; *see* Pls.' Br. at 37. Plaintiffs elaborated on their argument:

> [F]urther manufacturing expenses reported based on the sale of the downstream merchandise will necessarily include a proportion of profit attributable to the subject merchandise as distinct from the value added in the United States by further manufacturing. Therefore, *to adjust CEP*[22] *[U.S. price] by an amount specific to*

---

[22]    To the extent Plaintiffs believe that CEP (U.S. price) is or should be adjusted by subsection (d), they are in error. The statute states that CEP (U.S. price) is the price "as adjusted,"

*further manufacturing profit*, Commerce must apportion the reported profit as between the subject merchandise and the value added in the United States.

Pls.' Br. at 30 (emphasis added).

For Plaintiffs, accomplishing the calculation and deduction of the profit allocated to further manufacture requires two steps: (1) Commerce must apportion profit between subject merchandise and the value added from further manufacturing (i.e., the creation of the non-subject coated steel) so that Commerce can identify an amount for "further manufacturing profit," and (2) Commerce must deduct this further manufacturing profit from U.S. price. *See id.*

In the Final Results, Commerce declined to adopt Plaintiffs' two-step process. Rather, the Department stated that "the appropriate amount of profit attributable to further manufacturing activities *has already been deducted*." Final IDM at 12 (emphasis added). By this, Commerce meant that the single deduction it made included a deduction for further manufacturing profit.

The court finds that Commerce's calculation and deduction of profit from the U.S. starting price is supported by substantial evidence and in accordance with law.

As an initial matter, the statute provides for only certain deductions from the U.S. starting price when calculating CEP (U.S. price). It does not, however, direct that these individual deductions either be treated separately or as a sum. The statute provides that one of these deductions shall be "the profit allocated to the expenses described in paragraphs (1) and (2)." 19

---

meaning, that CEP (U.S. price) is the price that is determined *after* the relevant adjustments—such as the profit deduction—are made to the price to the unaffiliated purchaser (i.e., the starting price). *See* 19 U.S.C. § 1677a(b); *see also* 19 C.F.R. § 351.402(a) ("In order to establish export price, constructed export price, and normal value, [Commerce] must make certain adjustments to the price to the unaffiliated purchaser (often called the 'starting price') . . . .").

U.S.C. § 1677a(d)(3).[23] The expenses described in paragraphs (1) and (2) are incurred in the

United States and include, respectively, selling expenses and "the cost of any further manufacture

or assembly (including additional material and labor)."[24] *Id.* § 1677a(d)(1)-(2). Thus, in addition

---

[23]        19 U.S.C. § 1677a(d) provides: "the price used to establish constructed export price [U.S. price] shall also be reduced by—":

> (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—
>
>> (A) commissions for selling the subject merchandise in the United States;
>>
>> (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
>>
>> (C) any selling expenses that the seller pays on behalf of the purchaser; and
>>
>> (D) any selling expenses not deducted under subparagraph (A), (B), or (C);
>
> (2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and
>
> (3) the profit allocated to the expenses described in paragraphs (1) and (2).

19 U.S.C. § 1677a(d).

[24]        While the statute explicitly states that the expenses in paragraph (1) are "incurred . . . in the United States," it does not do so for the expenses in paragraph (2). The statute, however, clarifies that the expenses in both paragraphs (1) and (2) are incurred in the United States when it defines "total United States expenses" as "the total expenses described in subsection (d)(1) and (2) [i.e., selling expenses and the cost of further manufacture]." 19 U.S.C. § 1677a(f)(2)(B). The Statement of Administrative Action confirms this by indicating that the profit deducted from the U.S. starting price is the profit "allocable to the selling, distribution, and further manufacturing expenses *in the United States.*" Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 at 823 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163 (emphasis added).

to other adjustments, Commerce must deduct from the U.S. starting price an amount that includes both the profit allocated to selling expenses and *the profit allocated to the cost of further manufacturing in the United States*. 19 U.S.C. § 1677a(d)(3).

The statute provides a method for determining this profit amount in a separate subsection, which provides that "[f]or purposes of subsection (d)(3), [allocated] profit [for selling expenses and further manufacture] shall be an amount determined by multiplying the total actual profit[25] [from the sale of the subject steel] by the applicable percentage." *Id.* § 1677a(f)(1). The "applicable percentage" is defined as "the percentage determined by dividing the total United States expenses by the total expenses."[26] *Id.* § 1677a(f)(2)(A). The "total United States expenses" (the numerator of this percentage calculation) are "the total expenses described in subsection (d)(1) and (2)," i.e.,

---

Additionally, Commerce's regulation clarifies that the adjustments stated in 19 U.S.C. § 1677a(d)—which include "the cost of any further manufacture or assembly"—are incurred in the United States. *See* 19 C.F.R. § 351.402(b) (emphasis added) ("In establishing constructed export price under section 772(d) of the Act [19 U.S.C. § 1677a(d)], [Commerce] will make adjustments for expenses associated with *commercial activities in the United States* that relate to the sale to an unaffiliated purchaser, no matter where or when paid.").

25      "Total actual profit" is "the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph." 19 U.S.C. § 1677a(f)(2)(D). In other words, the total actual profit is the profit earned by the foreign producer, exporter, and U.S. seller affiliated with the producer and exporter from selling *subject merchandise* in the United States (here, the product sold was subject merchandise that was further manufactured into non-subject coated steel), and it is based on all revenues and expenses (including both U.S. and home market revenues and expenses). *See U.S. Steel Grp. v. United States*, 225 F.3d 1284, 1291 (Fed. Cir. 2000); *Floral Trade Council v. United States*, 23 CIT 20, 43, 41 F. Supp. 2d 319, 339-40 (1999) ("Both 'total actual profit' and 'total expenses' include data for both U.S. and home market sales."). Commerce describes how it calculates total actual profit in a policy bulletin. *See* Import Admin., U.S. Dep't of Commerce, Calculation of Profit for Constructed Export Price Transactions, Policy Bulletin 97.1 (1997), https://enforcement.trade.gov/policy/bull97-1.htm (last visited May 30, 2024) ("Policy Bulletin 97.1").

26      The Federal Circuit has stated that the "ratio [of total U.S. expenses to total expenses] acts to identify a narrower set of U.S. profit from a base pool of total actual profit." *U.S. Steel Grp.*, 225 F.3d at 1291.

selling expenses and the cost of further manufacturing the product. *Id.* § 1677a(f)(2)(B). The "total

expenses" (the denominator) are "all expenses . . . which are incurred by or on behalf of the foreign

producer and foreign exporter of the subject merchandise and by or on behalf of the United States

seller affiliated with the producer or exporter with respect to the production and sale of such

merchandise."[27] *Id.* § 1677a(f)(2)(C).

This calculation for the profit deducted from U.S. price ("CEP profit") can be expressed as

a formula:

CEP profit = total actual profit x $\frac{\textit{total U.S. expenses, i.e., U.S. selling expenses + cost of further manufacture}}{\textit{total expenses}}$

Thus, the statute provides for one profit deduction from U.S. starting price for profit

associated with selling expenses and further manufacturing, and provides the method for

determining the amount of this deduction. So, the single profit deduction resulting from application

of the method includes profit attributable to the cost of further manufacturing of the steel in the

United States.

It is, therefore, apparent that Plaintiffs are wrong in their contention that Commerce did

not "apportion the reported profit as between the subject merchandise and the value added in the

United States." Pls.' Br. at 30. Commerce did apportion the profit resulting from further

manufacture just as the statute directs. The statute provides for only one profit deduction and this

deduction includes an amount for further manufacturing profit. Plaintiffs are therefore mistaken in

arguing that the law directs an additional, "separate deduction" for further manufacturing profit,

---

[27]      "Total expenses" cover all expenses in the first of three categories which applies.
*See* 19 U.S.C. § 1677a(f)(C). The first category is for "expenses incurred with respect to the subject
merchandise sold in the United States and the foreign like product sold in the exporting country if
such expenses were requested by the administering authority for the purpose of establishing normal
value and constructed export price." *Id.* § 1677a(f)(2)(C)(i). The parties did not raise an issue about
which category applies, nor did Commerce discuss this in its Final IDM. *See* Final IDM at 11-12.

and that Commerce failed to apportion profit between subject and non-subject merchandise to reach the amount for further manufacturing profit. *See* Pls.' Br. at 2, 30, 33. Were Commerce to follow Plaintiffs' lead, further manufacturing profit would be deducted twice from the U.S. starting price.

Plaintiffs next argue (while not making their point quite clear) that somehow it matters that the deduction for "further manufacturing profit" is found in 19 U.S.C. § 1677a(d)(3),[28] while the CEP profit deduction is found in 19 U.S.C. § 1677a(f). Pls.' Br. at 33; *see also* Pls.' Reply at 14 ("Commerce's further manufacturing profit and CEP profit adjustment are provided for under two distinct provisions of the statute."). This is a peculiar reading of the subsections. While § 1677a(d)(3) provides for the deduction of profit associated with further manufacturing (profit is "allocated to" the cost of further manufacture), § 1677a(f) provides for how the amount of profit is determined. *See* 19 U.S.C. § 1677a(d)(2)-(3); *Micron Tech.*, 243 F.3d at 1309 ("[T]he [Statement of Administrative Action] instructs that this profit deduction applies only to profits 'allocable to selling, distribution and further manufacturing activities in the United States.'"); *see also NTN Bearing Corp. of Am. v. United States*, 295 F.3d 1263, 1268 (Fed. Cir. 2002).

Plaintiffs' claim that § 1677a(f) provides for an additional deduction is a misreading of the subsection. Subsection 1677a(f) does not provide for its own standalone deduction, but rather provides the method for calculating the amount of the deduction in (d)(3).

Consistent with the statute, Commerce allocated profit to U.S. selling expenses and the cost of further manufacture, combined it with certain expenses incurred with manufacturing and selling the coated steel, and deducted the combined amount from the U.S. starting price. To

---

[28]    Plaintiffs later claim that this deduction is found in subsection (d)(2) (a deduction for "the cost of further manufacture or assembly"). *See* Pls.' Reply at 14; *see also* 19 U.S.C. § 1677a(d)(2). Costs, however, are not profit.

determine the amount of profit allocated to further manufacture, Commerce multiplied an amount

including the total actual profit (including profit resulting from the further manufactured product)[29]

by an amount including the cost of further manufacture in the United States.[30] *See* Final IDM at 11.

Commerce, therefore, deducted from the U.S. starting price a profit amount that included profit

allocated to the further manufactured product. Accordingly, the CEP (U.S. price) *does not include*

profit attributable to the further manufactured product (i.e., the non-subject merchandise), or for

that matter, any profit associated with U.S. sales.[31] *See id.* at 11-12.

---

[29]     The amount being referenced here is represented by the variable TOTPROFT (i.e., total profit—this is the label Commerce has given to the "total actual profit" stated in the statute). *See* Final IDM at 11. Total actual profit equals total revenue (for both the U.S. and home markets) reduced by total expenses (including the cost of manufacture for both the U.S. and home markets). *See* Policy Bulletin 97.1.

[30]     Commerce calculated the profit to be deducted from the U.S. starting price in its margin program log. *See* Final IDM at 11. The margin program demonstrates that, to determine the profit amount, Commerce used the following formula: CEPROFIT = (USCREDIT + CEPICC + CEPISELL + CEPOTHER) * CEPRATIO. *See* Computer Programs from USDOC to File, Pertaining to BlueScope Margin Program Log (Feb. 18, 2021), PR 97, CR 258. Commerce stated that "[t]he variable CEPOTHER, in the calculation of CEP Profit . . . includes the cost of further manufacturing" Final IDM at 11. Commerce also indicated that "[t]he variable CEPRATIO is equal to TOTPROFT (total profit) over TOTEXP (total expenses)." *Id.* Therefore, by multiplying the sum of variables, including CEPOTHER, by CEPRATIO, Commerce allocated profit to the cost of further manufacture in the United States. Commerce then stated, "this calculated CEP profit is then deducted from the starting price in the U.S. market." *Id.* at 11-12. In other words, in accordance with the statute, Commerce deducted from the U.S starting price profit that was attributable to the cost of further manufacture in the United States. *See* 19 U.S.C. § 1677a(d)(3).

[31]     Commerce's regulation states that "[t]he Secretary will not double-count adjustments." 19 C.F.R. § 351.401(b)(2). Here, this means that Commerce will not make two deductions from U.S. price for profit attributable to the cost of further manufacture in the United States. Defendant and Defendant-Intervenors are correct in arguing that making a separate deduction for "further manufacturing profit" would double-count a profit deduction because profit allocated to the cost of further manufacture was *already* deducted from U.S. price. *See* Def.'s Br. at 17 (arguing that interpreting "further manufacturing profit" as distinct from CEP profit "would unreasonably lead to the double counting of a profit deduction, because Commerce's practice is to deduct an amount of the respondent's total actual profit apportioned to its United States sales"); Def.-Ints.' Br. at 23 ("Plaintiffs' calculation both deducts its presumed 'profit' from U.S. price on

     Plaintiffs seem to argue that Commerce must break out the amount for further manufacturing profit and deduct it separately when calculating CEP (U.S. price). At no point do Plaintiffs contend that separately deducting profit attributable to the further manufactured product would materially alter the CEP (U.S. price) calculation. Indeed, since the profit allocable to further manufacture was, in fact, deducted from the U.S. starting price to arrive at CEP (U.S. price), it is difficult to see how Plaintiffs could demonstrate with substantial evidence, or indeed any evidence at all, how the CEP (U.S. price) calculation would be different had Commerce made two separate profit calculations.

**CONCLUSION**

     Based on the foregoing, the court denies Plaintiffs' motion and sustains the Final Results. Judgment will be entered accordingly.

                                                 /s/ Richard K. Eaton
                                                      Judge

Dated:       June 13, 2024
             New York, New York

---

a line-item basis, and then includes that same 'profit' amount once more in the calculation of the actual CEP profit deduction.").